Steven Gerber, Esq. (SG 5881)
ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, NY 10004
(212) 809-5700
*Our File No. 300503.0001*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| EMPRESA GENERADORA DE ELECTRICIDAD ITABO, S.A. ("ITABO"), | Civil Action No. 05-cv-5004 (RMB) |
| Plaintiff, | |
| vs. | |
| CORPORACION DOMINICANA DE EMPRESAS ELECTRICAS ESTATALES ("CDEEE"), | |
| Defendant. | Document Electronically Filed |

_____

---

## DEFENDANT CDEEE'S MEMORANDUM OF LAW IN OPPOSITION TO ITABO'S MOTION FOR INTERIM RELIEF IN AID OF ARBITRATION

---

ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, New York 10022

On the Memorandum:
Steven Gerber, Esq.
Of Counsel:
Hugo Chaviano, Esq.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

STATEMENT OF FACTS ..............................................................................................1

ARGUMENT ..................................................................................................................4

I.      THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE FSIA
        BECAUSE THE ARBITRATION EXCEPTION TO FOREIGN STATE IMMUNITY
        DOES NOT APPLY ...........................................................................................4

        The "Basic Contracts"...........................................................................................6

        ITABO's Bylaws .....................................................................................................9

II.     ITABO'S CLAIMS FAIL FOR LACK OF PERSONAL JURISDICTION......................11

III.    ITABO HAS FAILED TO ESTABLISH THE REQUISITES FOR INJUNCTIVE
        RELIEF. ..........................................................................................................13

A.      ITABO Cannot Prevail On The Merits Of Its Claim ...........................................13

B.      ITABO Cannot Establish Irreparable Harm .......................................................14

C.      CDEEE's Filing Of The Dominican Lawsuits Is Not A Refusal To Arbitrate. ..................14

D.      ITABO Is Not Entitled To The Extraordinary Remedy Of An Anti-Suit Injunction ..........16

CONCLUSION ...............................................................................................................19

# TABLE OF AUTHORITIES

<u>Cases</u>

Argentine Republic v. Amerada Hess Shipping Corp.,
488 U.S. 428 (1989)....................................................................................................4

Cargill Int'l A.A. v. M/T Pavel Dybenko,
991 F.2d 1012 (2d Cir. 1993)......................................................................................5

China Trade and Dev. Corp. v. M.V. Choong Yong,
837 F.2d 33 (2d Cir. 1987)....................................................................................16, 17

Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for Galadari,
12 F.3d 317 (2d Cir. 1993), cert. denied, 511 U.S. 1069 (1994) .................................5

International Shoe Co. v. State of Washington,
326 U.S. 310 (1945)..................................................................................................12

Jacobs v. USA Track & Field,
374 F.3d 85 (2d Cir 2004)..........................................................................................15

Laif X Sprl v. Axtel S.A. DE C.V.,
390 F.3d 194 (2d Cir. 2004).........................................................................14, 15, 16, 18

Milliken v. Meyer,
311 U.S. 457 (1940)..................................................................................................12

Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,
369 F.3d 645 (2d Cir. 2004).........................................................................16, 17, 18

Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992) ...................................................................................................4

Texas Trading & Milling Corp. v. Federal Republic of Nigeria,
647 F.2d 300 (2d Cir. 1981).......................................................................................12

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,
241 F.3d 135 (2d Cir. 2001).........................................................................11, 12, 13

<u>Statutes</u>

28 U.S.C. §1330(a) ..................................................................................4

28 U.S.C. §1330(b) ................................................................................12

28 U.S.C. §1602 ....................................................................................4

28 U.S.C. §1603(a) ..................................................................................5

28 U.S.C. §1603(b) ..................................................................................5

28 U.S.C. §1604 ....................................................................................4

28 U.S.C. §1605(a)(6) ..............................................................................6

## STATEMENT OF FACTS

At the turn of the 20th Century, Compania Electrica de Santo Domingo ("CEDSD") was formed. CEDSD was originally owned by U.S. based investors. In 1953 CEDSD was bought by Rafael Trujillo Molina, the former dictator of the Dominican Republic. In 1955, by Law 1405 (Ley Organica de la Corporacion Dominicana de Electricidad) enacted by the Dominican Legislature Corporacion Dominicana de Electricidad ("CDE") was created. CDE operated as a monopoly on matters of power and energy generation until 1999. Over that period of time CDE handled all aspects of electrical distribution, generation, transmission and hydroelectric plants. See accompanying Declaration of Henry Meran dated June 10, 2005 (hereinafter "Meran Dec."), ¶ 4.

CDE was not an efficient operating entity. As its infrastructure aged and deteriorated major gaps in its service developed. Blackouts throughout the country became common. Because of the need for significant capital infusion to upgrade system, in 1997 Law 141 (Ley de Reforma de la Empresa Publica) was enacted by the Dominican Congress to allow foreign investors to purchase an interest in CDE. As a result of this new government-led initiative five new privately funded energy companies were created. Plaintiff Empressa Generadora de Electricidad Itabo, S.A. ("ITABO") was one of those companies. Meran Dec., ¶ 5.

ITABO was created with the infusion of fixed assets of CDE such as real estate and power plants, and cash from foreign investors. In return for an investment of approximately $US178 million the foreign investors were given a 50.1% interest in ITABO and four seats on its Board of Directors. CDE obtained a 49.9% interest in the

company and one seat in the Board of Directors. The original foreign investors in ITABO were GENER, SA a Chilean company, and Coastal, a U.S. company. AES, a U.S. Company later acquired GENER, SA and hence, GENER's stake in ITABO. Coastal's interest, which was held by Coastal ITABO, LTD (on information and belief a Cayman Islands company), was later acquired by EL PASO. AES is now the operating partner in ITABO on behalf of its foreign investors. Meran Dec., ¶ 6. The capital infusion of the foreign investors in ITABO was for the purpose of creating and growing the infrastructure of the company, *i.e.* the hard assets which had been contributed to the venture by the Dominican government's company, CDE. Meran Dec., ¶ 7.

In 2001, Law 125, known as "Ley General de Electricidad", was passed by the Dominican Congress. This new law regulates all business dealing with national electricity, abolished CDE and created defendant Corporacion Dominicana de Empresas Electricas Estatales ("CDEEE"). As such, CDEEE is owned by the state of the Dominican Republic. Supplemental Declaration of Henry Meran, dated June 13, 2005 ("Supp. Meran Dec."), ¶ 4. Under Article 138 of the Dominican "Ley General de Electricidad", CDEEE is the entity charged with leading and coordinating electrical companies, and is in charge of the execution of government run programs related to providing electricity in rural and suburban communities, as well as the administration and application of provider contracts with independent producers of electricity. On the other hand, Fondo Patrimonial de las Empresas Reformadas ("FONPER"), which was created by Ley 124, is an entity created to receive the monies generated by government owned companies operating under Ley 125, and capitalized by private investment. Meran Dec., ¶ 8.

In 2001, ITABO contracted with third parties for the rehabilitation of two thermo-electric plants, hereinafter referenced as ITABO 1 and ITABO 2. Of the original $US178 million cash investment in ITABO, $US112.5 million went towards funding the rehabilitation project. The rehabilitation project had an original estimate of approximately $US54.15 million. As a result of the cost overruns in the rehabilitation project and due to the public nature of part of ITABO'S assets, CDEEE as minority shareholder and FONPER, the recipient and administrator of the right to the government's dividends in ITABO, retained independent accounting firms to conduct audits. The accounting firm Stone & Webster was retained on behalf of CDEEE and the accounting firm Grant Thornton was retained on behalf of FONPER. These accounting firms, independently of each other, separately concluded approximately $US15 million purportedly spent on the ITABO 1 and 2 rehabilitation projects was not accounted for.

The result of these independent audits led CDEEE, in its capacity of minority shareholder of ITABO, to request an accounting from its partners, the private majority shareholders. After various attempts at negotiation between CDEEE and ITABO, ITABO still failed to provide an accounting of these funds with supporting financial data and documentation. As a result, in 2004, CDEEE brought the two actions referred to in plaintiff's brief in the Dominican courts for an accounting. If, and only if, ITABO fails to comply with a court order for an accounting could CDEEE seek sanctions. Thus, if an order is entered requiring ITABO to provide an accounting and ITABO complies with the court order, ITABO will not be deprived of its assets. Meran Dec., ¶¶ 9 and 22.

CDEEE does not own, lease or possess any real property or other assets in the United States of America. CDEEE does not maintain any bank or financial institution

accounts in the United States of America.  CDEEE does not maintain or have any office for the conduct of business in the United States of America.  See accompanying Supplemental Declaration of Henry Meran dated June 13, 2005 ("Supp. Meran. Dec."), ¶¶ 5-7.

## ARGUMENT

**I.    THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE FSIA BECAUSE THE ARBITRATION EXCEPTION TO FOREIGN STATE IMMUNITY DOES NOT APPLY.**

The Foreign Services Immunities Act (the "FSIA"), 28 U.S.C. §1602 *et seq.*, provides the exclusive source of subject matter jurisdiction over suits brought against a foreign state brought in the United States courts.  *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610-11 (1992); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  FSIA confers original jurisdiction on federal courts "without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."  28 U.S.C. § 1330(a).  The FSIA provides that " a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Thus, the general rule is that a foreign state is presumptively immune from jurisdiction unless a court finds that one of the specific exceptions to immunity provided in sections 1605 to 1607 of the FSIA applies.  28 U.S.C. §1604.

FSIA defines a "foreign state" as including a political subdivision of a foreign state or and agency or instrumentality of a foreign state. 28 U.S.C. §1603(a). An agency or instrumentality of a foreign state means any entity "which is a separate legal person, corporate or otherwise", and which is an "organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. §1603(b). Thus, it is undisputed that CDEEE is a "foreign state" within the meaning of section 1603(a) of the FSIA because it is a state-owned corporation created under Article 138 of the Dominican "Ley General de Electricidad" and charged, in relevant part, with the execution of government-run programs related to providing electricity in rural and suburban communities. Meran Dec., ¶ 8; Supp. Meran Dec. ¶ 4; Moving Declaration of Giselle Marie Leger ("Leger Dec."), ¶2. Therefore, ITABO has the burden of going forward with evidence demonstrating that its claims fall within one of the statutory exceptions to sovereign immunity, although the ultimate burden of persuasion remains with CDEEE. *See Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993) (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)), *cert. denied*, 511 U.S. 1069 (1994)). Absent a showing by ITABO that an exception to foreign immunity exists, the Court is without subject matter jurisdiction.

The only exception that could support subject matter jurisdiction here is set forth in section 1605(a)(6) of the FSIA. That section provides for an exception to foreign sovereign immunity where an action is brought against a foreign state:

> either to enforce an agreement made by a foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject

> matter capable of settlement by arbitration under the laws of the United
> States, or to confirm an award made pursuant to such an agreement to
> arbitrate, if (A) the arbitration takes place or is intended to take place in
> the United States, (B) the agreement or award is or may be governed by a
> treaty or other international agreement in force for the United States
> calling for the recognition and enforcement of arbitral awards, (C) the
> underlying claim, save for the agreement to arbitrate, could have been
> brought in a United States court under this section or section 1607, or (D)
> paragraph (1) of this subsection is otherwise applicable;

28 U.S.C. §1605(a)(6).

ITABO claims that arbitration clauses in what it has termed the "Basic Contracts" and ITABO's Bylaws provide for arbitration of all disputes between the parties under New York Law before the International Chamber of Commerce (ICC). See Plaintiff's Brief ("Pb"), p. 4. However, contrary to ITABO's contention that the arbitration clauses found in the Basic Contracts and ITABO Bylaws uniformly provide for arbitration of all disputes between the ITABO shareholders, a complete and careful reading of the applicable provisions of the ITABO Bylaws and each of the Agreements annexed to the moving Declaration of Javier Navarro-Velasco (counsel for ITABO) ("Navarro-Velasco Dec."), makes clear that (1) not all disputes between ITABO shareholders are subject to arbitration, and (2) none of the documents ITABO has put before this Court establish an agreement by CDEEE to proceed by arbitration in its request for an accounting of the millions of dollars the majority ITABO shareholders have expended.

**The "Basic Contracts"**

ITABO's argument that the "Basic Contracts" require arbitration of CDEEE's demand for an accounting under the laws of the Dominican Republic is also flawed, as the clauses referring to arbitration under the Basic Contracts at most only address arbitration of disputes resulting from or arising out of those specific Agreements. As

alleged, the "Basic Contracts" refer to a series of contracts dated 1999 pursuant to which ITABO was to generate and supply electrical power to CDE and other electrical distribution companies that were created at the same time and by the same process as ITABO.  Plaintiff's Complaint, ¶12.  The "Basic Contracts" submitted by ITABO are:

a.   Stock Subscription Agreement (Contrato de Suscripcion de Acciones), dated August 13, 1999 and the attached Bylaws (Estatutos Sociales) of ITABO, dated August 17, 1999;

b.   Administration Contract (Contrato de Administracion) dated September 8, 1999;

c.   Contract Granting Rights for the Exploitation of Electrical Works in Connection with the Service of Electrical Generation in the Dominican Republic [Agreement on the Assignment of Generation Rights] (Contrato de Otorgamiento de Derechos para la Explotacion de Obras Electricas Relativas al Servicio de Generacion de Electricidad en la Republica Dominicana, dated September 8, 1999;

d.   Power Sale Agreement (Contracto de Venta de Energia) dated August 13, 1999 between Empresa Distribuidora de Electricidad del Norte, S.A. and CDE; and

e.   Assignment of Power Sale Agreement.

Navarro-Velasco Dec., ¶5.

Other than the Bylaws which are discussed below, only two of the foregoing "Basic Contracts" has any application to CDEEE – the Stock Subscription and the Agreement on the Assignment of Generation Rights (Contract Granting Rights for the Exploitation of Electrical Works).[1]  As ITABO correctly notes, each of the applicable

---

[1] The Administration Contract (Ex. B to the Navarro-Velasco Dec.) is between ITABO and New Caribbean Investment, which was the consortium created between ITABO's current private party majority shareholders' predecessors-in-interest.   CDEEE is not a party to the Contract of Administration.  Meran Dec., ¶18; Navarro-Velasco Dec., Ex. B. Likewise, the "Power Sale Agreement" (Ex. D to the Navarro-Velasco Dec.) is a contract between CDE and a commercial distributor of electricity in the Dominican Republic (Empresa Distribuidora de Electricidad del Norte, S.A.)  ITABO is not a party to this Contract.  Meran Dec., ¶20; Navarro-Velasco Dec., Ex. D.  The Assignment of Power Sale Agreement (Ex. E. to the Navarro-Velasco Dec.) is an assignment agreement between the predecessors-in-interest of the two private shareholders who now own a

contracts contains an arbitration clause.  However, neither the Stock Subscription nor the Contract Granting Rights for the Exploitation of Electrical Works bar CDEEE's actions for an accounting filed in the courts of the Dominican Republic.

Section 12.3(a) of the Stock Subscription Agreement provides that "[a]ny dispute resulting from or in connection *with this Agreement* that may not be solved by mutual agreement between the parties in dispute, shall be solved when the Parties require it, through arbitration executed in accordance with the Arbitration Law and the Rules of Arbitration."  Navarro-Velasco Dec., ¶ 7 and Ex. A, §12.3(a), p.34 (*emphasis* added). The Stock Subscription Agreement involves the shareholders' acquisition of their original stock, the classes of stock and other issues, but not the right of a shareholder to an accounting.  The object of the Stock Subscription Agreement is to establish the means, mechanism and consideration for the purchase of ITABO stock by the various parties to that Agreement.  Navarro-Velasco Dec., Ex. A.; Declaration of Lee Penya ("Penya Dec."), ¶ 4. Therefore, the proceedings for an accounting in the Dominican Republic do not result from or arise in connection with the Stock Subscription Agreement.

The Agreement on the Assignment of Generation Rights (Contract Granting Rights for the Exploitation of Electrical Work) also does not compel arbitration of the accounting CDEEE seeks.  Under this Contract, the then existing nationally owned electrical monopoly in the Dominican Republic, CDE, granted to ITABO a portion of CDE's monopoly rights to electricity development, generation and distribution in the Dominican Republic.  Nothing in this Contract dictates or mandates to ITABO how ITABO should engage in that venture, including how or if ITABO chose to engage in any

majority of ITABO.  CDEEE is not a party to this agreement.  Meran Dec., ¶21; Navarro-Velasco Dec., Ex. E.

8

rehabilitation of generating capacity.  Meran Dec., ¶19; Navarro-Velasco Dec., Ex. C, Article 9, p. 9.  As was the case with the Stock Subscription Agreement, the arbitration provision in this Contract limits the remedy ITABO seeks, arbitration, to claims or disputes resulting from the Contract granting a portion of monopoly rights.[2]  Meran Dec., ¶19; Navarro-Velasco Dec., Ex. C, Article 9, p. 9.  Therefore, the proceedings for an accounting in the Dominican Republic do not result from or arise in connection with the Contract Granting Rights for the Exploitation of Electrical Work.

**ITABO's Bylaws**

The only arbitration provision that arguably may apply is Article 58 of the ITABO Bylaws and that provision is limited to disputes on which the ITABO Board of Directors are deadlocked or those requiring an interpretation of the Bylaws.  CDEEE's actions for an accounting do not involve either of these circumstances and hence arbitration was never the agreed upon dispute resolution forum.

The first paragraph of Article 58 provides as follows:

In the event that the deliberations of the Ordinary or Extraordinary Shareholders' Meeting result in a tie that cannot be resolved by mutual agreement, the shareholders must resort to arbitration as subsequently provided in this Article. They must also resort to arbitration if, in the event of a disagreement or dispute among the shareholders or between one or more of them and the Corporation or within the Board of Directors concerning the interpretation and application of these Bylaws, it proves impossible to resolve the same by mutual agreement among them.

See p. 23; Penya Dec., ¶¶ 2-3.  Navarro-Velasco Dec., Ex. A, Article 58 of the Bylaws.

---

[2] The first sentence of Section 12.3(a) of the Stock Subscription Agreement and Article 9, subparagraph (a) of the Contract Granting Rights for the Exploitation of Electrical Work are identical.  Compare Navarro-Velasco Dec., ¶ 7 and Ex. A, §12.3(a), p.34 with Ex. C, Article 9, p. 9.

Thus, Article 58 of the ITABO Bylaws provides, in substance, that only when the Board of Directors (the Administration Board) of ITABO is deadlocked or where there is a dispute as to the interpretation of the Bylaws are the parties to the dispute required to submit that matter to arbitration. The first sentence of Article 58 states that in the event of a deadlock of the "Ordinary and Extraordinary General Board", *i.e.*, the shareholders, arbitration is the selected means of redress. That is not the case here. Therefore, only the second sentence of Article 58 of the Bylaws could conceivably support ITABO's claim that the Bylaws contains an agreement to arbitrate CDEEE's request for an accounting. As shown below, the second sentence does not support ITABO's position either.

The English translation of the second sentence of Article 58 of the Bylaws contained in paragraph 9 of the Navarro-Velasco Declaration is misleading and inaccurate. Counsel for ITABO, Mr. Navarro-Velasco, has inserted in his purported English translation of this critical sentence commas not contained in the original Spanish Bylaws, to make it appear that any dispute between the shareholders must be arbitrated when that is not the case. See original Spanish portion of Article 58, Penya Aff., ¶ 2; Navarro-Velasco Dec., Ex. A, "Articulo 58" at p. 23 (note absence of commas in second sentence of first paragraph). The entire translation of Article 58 of the Bylaws urged by Mr. Navarro-Velasco in his Declaration, ¶ 9, is reprinted below, with the bolded brackets surrounding the commas ITABO inaccurately has in its translation:

> ARTICLE 58.- In the event the deliberations of the Ordinary and Extraordinary General Board ended in a draw and may not be resolved by mutual agreement, the shareholders have the obligation to file and arbitral proceedings according to the provisions hereto set forth. Furthermore, they have the obligation of appealing to arbitration, providing that in the event of differences or disputes between the shareholders **[,]** or one or more of them and the corporation **[,]** or between the Administration Board in connection with the construction and application of these

Bylaws, such differences become impossible to be resolved by mutual agreement between them.

Specifically, by inserting commas in its counsel's English translation that do not appear in the original Bylaws, ITABO suggests that all disputes between shareholders, not just those concerning the interpretation of the Bylaws, must be arbitrated. However, when translated correctly, *i.e.*, without inserting the commas (see Penya Dec., ¶ 3), it is clear that the arbitration provision in the Bylaws applies only to disputes involving the Bylaws themselves.

Under Dominican law, a shareholder, here CDEEE, has the right to an accounting upon a sufficient showing of need. That right to an accounting derives from the Dominican Code of Civil Procedure, and not, as the foregoing discussion demonstrates, from ITABO's Bylaws or from any of what have been denominated as the "Basic Contracts". Meran Dec., ¶14. CDEEE and ITABO have not agreed to arbitrate any and all issues arising between the parties. Rather, the parties only agreed to arbitrate disputes regarding the interpretation of the Bylaws and disputes arising under the very specific terms of the Stock Subscription Agreement and the Agreement on the Assignment of Generation Rights (Contract Granting Rights for the Exploitation of Electrical Work). The parties did not agree to, and ITABO is not entitled to, arbitrate in New York under New York law the issues raised in the Dominican actions, specifically, CDEEE's right to an accounting. Accordingly, because there is no valid agreement or obligation to arbitrate, there is no subject matter jurisdiction under the FSIA.

## II.    ITABO'S CLAIMS FAIL FOR LACK OF PERSONAL JURISDICTION.

"In general, 'subject matter jurisdiction plus service of process equals personal jurisdiction under the FSIA.'" *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,

241 F.3d 135, 151 (2d Cir. 2001)(quoting *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981)).  *See also* 28 U.S.C. § 1330(b).  In the instant matter, for the reasons discussed in Point I, *supra*, there is no subject matter jurisdiction and therefore, there can be no personal jurisdiction over CDEEE.

Furthermore, the exercise of personal jurisdiction under the FSIA must comport with the Due Process Clause.  *Id.* at 152.  Whether a defendant's contacts with the forum are so numerous that the reach the "minimum contacts" required by *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945), depends on whether "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Id.* at 316 (citing *Milliken v. Meyer*, 311 U.S. 457 (1940)).  Whether it is reasonable to exercise jurisdiction under the circumstances of a particular case involves four separate inquiries: "the extent to which the defendant availed itself of the privileges of American law, the extent to which litigation in the United States would be foreseeable to it, the inconvenience to defendants of litigating in the United States and the countervailing interest of the United States in hearing the suit."  *Texas Trading & Milling Corp.*, 647 F.2d at 314.  *See also U.S. Titan Inc.*, 241 F.3d at 152.

Here, the cause of action does not arise from CDEEE's contacts with the forum state.  CDEEE does not own, lease or possess any real property or other assets in the United States of America.  CDEEE does not maintain any bank or financial institution accounts in the United States of America.  CDEEE does not maintain or have any office for the conduct of business in the United States of America..  Supp. Meran Dec., ¶¶ 5-7.

Clearly, this is not a case where CDEEE "'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court'" here.

*U.S. Titan Inc.*, 241 F.3d at 152.  Rather, the matter involves two Dominican corporations and an issue requiring the application of Dominican law, specifically, CDEEE's entitlement to an accounting.  CDEEE's sole contact with the forum state are certain agreements containing clauses requiring the parties to arbitrate certain disputes in New York under New York law.  However, as previously discussed, the parties did not agree to, and ITABO is not entitled to, arbitrate in New York under New York law the issues raised in the Dominican actions.  Accordingly, because there is no valid agreement or obligation to arbitrate CDEEE's application for an accounting, the requisite minimum contacts are lacking and any exercise of personal jurisdiction would be in violation of the Due Process clause.

## III.    ITABO HAS FAILED TO ESTABLISH THE REQUISITES FOR INJUNCTIVE RELIEF.

ITABO seeks an order (i) compelling CDEEE to arbitrate all of its disputes with ITABO in the New York Arbitration and (ii) enjoining CDEEE from continuing with its litigation in the Dominican courts pending a determination by the arbitrators in the New York Arbitration of the disputes, including the issue of arbitrability, between the parties. As discussed more fully below, ITABO fails to establish the requisites for the injunctive relief that it seeks.

### A.    ITABO Cannot Prevail On The Merits Of Its Claim

For the reasons discussed in Point I, *supra*, ITABO cannot prevail on the merits of its claim.  Contrary to ITABO's argument, neither ITABO's Bylaws nor the Basic Contracts require the parties to settle "any and all" of their disputes pursuant to the Rules of Arbitration of the International Chamber of Commerce.  Pb11.  Rather, the parties only agreed to arbitrate disputes regarding the interpretation of the Bylaws and disputes

arising under the very specific terms of the Stock Subscription Agreement and the Contract Granting Rights for the Exploitation of Electrical Work. The parties did not agree to, and ITABO is not entitled to, arbitrate in New York under New York law the issues raised in the Dominican actions, specifically, CDEEE's right to an accounting. Accordingly, in the absence of a valid agreement or obligation to arbitrate, there is no subject matter jurisdiction under the FSIA. Meran Dec., ¶ 22.

**B.    ITABO Cannot Establish Irreparable Harm**

In support of its claim for an injunction, ITABO claims that it will suffer irreparable damages if CDEEE is allowed to proceed with the actions in the Dominican Republic. It is ITABO's contention that if CDEEE prevails, it will seize ITABO's assets. Pb10-11. This is simply not the case. First and foremost, the two actions in the Dominican Republic are actions for an accounting. If, and only if, ITABO fails to comply with a court order for an accounting could CDEEE seek sanctions. Thus, if an order is entered requiring ITABO to provide an accounting and ITABO complies with the court order, ITABO will not be deprived of its assets and no irreparable harm will result.

**C.    CDEEE's Filing Of The Dominican Lawsuits Is Not A Refusal To Arbitrate.**

The instant matter is analogous to *Laif X Sprl v. Axtel S.A. DE C.V.*, 390 F.3d 194, 200 (2d Cir. 2004). In *Axtel*, under the bylaws of Axtel S.A. de CV ("Axtel"), a Mexican corporation, disputes between and among the company and its shareholders arising under or in connection with any of their respective rights under Axtel's bylaws or their interpretation, were subject to arbitration. The bylaws further provided that arbitrations were to be held in New York City and were subject to the New York Convention on Recognition and Enforcement of Foreign Arbitral Awards. *Id.* at 197.

A dispute arose between Axtel's controlling shareholder, Telinor, and a Belgian investor, LAIF X. LAIF X filed a demand for arbitration. Before filing an answer to the arbitration demand, Telinor commenced suit in Mexico challenging LAIF X's status as a shareholder. Thereafter, Telinor answered the demand for arbitration and in its answer requested that the arbitration be dismissed for lack of an arbitral dispute and, alternatively, for a stay of proceedings pending the outcome of the Mexican lawsuit. *Id.* at 197-198. LAIF X petitioned the district court for an order compelling Telinor to arbitrate the issues raised in the Mexican lawsuit and an anti-suit injunction enjoining Telinor from further pursuit of any related lawsuits. The district court declined to grant the relief sought. *Id.* at 198.

On appeal, LAIF X contended that the district court erred in refusing to compel Telinor to arbitrate its entire dispute with LAIF X and in declining to issue an anti-suit injunction that would bar Telinor from pursuing its litigation in Mexico. As is the case here, LAIF X contended that Telinor's filing of a suit in Mexico amounted to a "refusal" by Telinor to arbitrate. Addressing the question of Telinor's alleged refusal to arbitrate, the appeals court noted that Telinor had answered the arbitral demand. Thus, Telinor's challenge to the arbitrability of LAIF X's claims did not constitute a refusal to arbitrate. *Id.* at 199 (citing *Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004)("The fact that respondents raised before the AAA an objection to petitioner's Demand for Arbitration . . . does not constitute a 'refusal to arbitrate' on the part of respondents.")). The court also concluded that Telinor's commencement of suit in Mexico did not constitute a refusal to arbitrate noting that as an investor in a Mexican company,

governed by Mexican law, LAIF X could not claim to be disadvantaged by a Mexican court's decision regarding LAIF X's shareholder status under Mexican law. *Id.* at 199.

As was the case in *Axtel*, CDEEE has not refused to arbitrate. It filed an answer on April 23, 2005 in which it objects to the arbitration. Navarro-Velasco Dec., ¶¶ 19, 24-26. While CDEEE has objected to the arbitration, it has done so in the arbitral forum. CDEEE has submitted to the arbitral forum, and exercised its right in that forum to assert a claim of non-arbitrability. Thus, CDEEE's challenge to the arbitration is not a refusal to arbitrate and an order to compel CDEEE to submit to arbitration will not change CDEEE's course of conduct. If the arbitrators conclude that the issues raised in CDEEE's Dominican lawsuits are not arbitrable and need to be decided before arbitration continues, the arbitrators will issue a stay, in which event CDEEE's conduct will be in accord with the arbitral process.

**D.    ITABO Is Not Entitled To The Extraordinary Remedy Of An Anti-Suit Injunction.**

A federal court has the power to enjoin parties before it from pursuing a foreign action; "[b]ut principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with great care and restraint.'" *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004)(quoting *China Trade and Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987)).

"An anti-suit injunction against parallel litigation may be imposed only if:  (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics Electromedicina*, 369 F.3d at 652. When these threshold requirements are met, five factors are suggested

in determining whether the action should be enjoined: "(1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment." *China Trade and Dev. Corp.*, 837 F.2d at 35. *See also Paramedics Electromedicina*, 369 F.3d at 655.

In the instant matter, the parties are not the same – FONPER, a corporate entity distinct from CDEEE, is a named respondent in the arbitration and not a party to this action or the Dominican lawsuits. Also, resolution of the case before the enjoining court would not be dispositive of the action to be enjoined. CDEEE has objected to the arbitration in the arbitral forum on the grounds that the issues raised in the Dominican lawsuits are not subject to any agreement to arbitrate. If the arbitrators conclude that the issues raised in CDEEE's Dominican lawsuits are not arbitrable and need to be decided before arbitration continues, the arbitrators will issue a stay of the arbitration, in which event the Dominican actions will continue.

Since "[p]rinciples of comity weigh heavily in the decision to impose a foreign anti-suit injunction," *Paramedics Electromedicina*, 369 F.3d at 654-55, "[t]he fact that an injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity, because such an order effectively restricts the jurisdiction of the court of a foreign sovereign." *China Trade and Dev. Corp.*, 837 F.2d at 35 (internal citation omitted).

As was the case in *Axtel*, comity militates strongly against an injunction here. *Axtel*, 390 F.39 at 200.  ITABO and CDEEE are Dominican corporations governed by Dominican law.  A question has arisen under Dominican law regarding CDEEE's entitlement to an accounting from ITABO and that question has been properly presented to the Dominican courts.  The Dominican Republic's judiciary has a strong interest in determining whether under the Dominican Code of Civil Procedure, CDEEE is entitled to an accounting.

Furthermore, whether or not CDEEE is entitled to an accounting from ITABO in no way implicates ""the strong public policies of the enjoining forum'".  *Axtel*, 390 F.3d 200 (quoting *Paramedics Electromedicina*, 369 F.3d at 652).  Contrary to ITABO's claims, the Dominican litigation does not threaten the federal policy favoring liberal enforcement of arbitration clauses.  Pb14.  As previously discussed, under Dominican law, a shareholder, here CDEEE, has the right to an accounting upon a sufficient showing of need.  CDEEE's right to an accounting derives from the Dominican Code of Civil Procedure, and not, as ITABO contends, from ITABO's Bylaws or from any of what have been denominated as the "Basic Contracts".  CDEEE and ITABO have not agreed to arbitrate any and all issues arising between the parties.  Rather, the parties only agreed to arbitrate disputes regarding the interpretation of the Bylaws and disputes arising under the very specific terms of the Stock Subscription Agreement and the Contract Granting Rights for the Exploitation of Electrical Work, neither of which is applicable in the instant matter.  The parties did not agree to, and ITABO is not entitled to, arbitrate in New York under New York law the issues raised in the Dominican actions, specifically, CDEEE's right to an accounting.  Accordingly, in the absence of a valid agreement or

obligation to arbitrate, there can be no violation of the federal policy favoring the enforcement of arbitration clauses.

## CONCLUSION

Based on the foregoing, defendant Corporacion Dominicana de Empresas Electricas Estatales respectfully requests that the Court deny plaintiff Empresa Generadora de Electricidad ITABO, S.A.'s application for an order restraining Corporacion Dominicana de Empresas Electricas Estatales from pursuing litigation against Empresa Generadora de Electricidad ITABO, S.A. in the Dominican Republic and dismiss plaintiff's Complaint with prejudice for lack of subject matter jurisdiction.

ADORNO & YOSS LLP

Attorneys for Defendant CDEEE


By____*s/Steven Gerber*_____
        Steven Gerber (SG 5881)

Dated: June 14, 2005

Steven Gerber, Esq. (SG5881)
ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, NY 10004
(212) 809-5700
Attorneys for Corporacion Dominicana de
Empresas Electricas Estatales
*Our File No. 300503.0001*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

EMPRESA GENERADORA DE
ELECTRICIDAD ITABO, S.A. ("ITABO"),

     Plaintiff,

     vs.

CORPORACION DOMINICANA DE
EMPRESAS ELECTRICAS ESTATALES
("CDEEE"),

     Defendant.

_____

Civil Action No. 05-cv-5004 (RMB)


DECLARATION OF HENRY M. MERAN
IN OPPOSITION TO PLAINTIFF'S
APPLICATION FOR INTERIM
RESTRAINTS

DOCUMENT ELECTRONICALLY FILED


     I, Henry M. Meran, declare as follows:

1.     I am General Counsel for defendant Corporacion Dominicana De Empresas Electricas Estatales (hereinafter referred to as "CDEEE").

2.     In 1997, I was admitted to practice law in the Dominican Republic and have served as General Counsel for CDEEE since August 19, 2004.

3.     I respectfully submit this declaration in opposition to the application of ITABO for an order seeking to compel CDEEE to arbitrate its request for an accounting and for certain other relief.

## BACKGROUND

4.     At the turn of the 20th Century, COMPANIA ELECTRICA DE SANTO DOMINGO ("CEDSD") was formed.  CEDSD was originally owned by U.S. based investors.  In 1953 CEDSD was bought by Rafael Trujillo Molina, the former dictator of the Dominican Republic. In 1955, by Law 1405 (Ley Organica de la Corporacion Dominicana de Electricidad) enacted by the Dominican Legislature Corporacion Dominicana de Electricidad ("CDE") was created.  CDE operated as a monopoly on matters of power and energy generation until 1999.  Over that period of time CDE handled all aspects of electrical distribution, generation, transmission and hydroelectric plants.

5.     CDE was not an efficient operating entity.  As its infrastructure aged and deteriorated major gaps in its service developed.  Blackouts throughout the country became common. Because of the need for significant capital infusion to upgrade system, in 1997 Law 141 (Ley de Reforma de la Empresa Publica) was enacted by the Dominican Congress to allow foreign investors to purchase an interest in CDE.  As a result of this new government led initiative five new privately funded energy companies were created.  ITABO was one of those companies.

6.     ITABO was created with the infusion of fixed assets of CDE such as real estate and power plants, and cash from foreign investors. In return for an investment of approximately $US178 million the foreign investors were given a 50.1% interest in ITABO and four seats on its Board of Directors.  CDE obtained a 49.9% interest in the company and one seat in the Board of Directors.  The original foreign investors in ITABO were GENER, SA a Chilean company, and Coastal, a U.S. company.  AES, a U.S. Company later acquired GENER and hence, GENER's stake in ITABO.  COASTAL'S interest which was held by COASTAL ITABO, LTD (on

2

information and belief a Cayman Islands company), was later acquired by EL PASO. AES is now the operating partner in ITABO on behalf of its foreign investors.

7.    The capital infusion of the foreign investors in ITABO was for the purpose of creating and growing the infrastructure of the company, i.e. the hard assets which had been contributed to the venture by the Dominican government's company, CDE.

8.    In 2001, Law 125, known as "Ley General de Electricidad", was passed by the Dominican Congress.  This new law regulates all business dealing with national electricity, abolished CDE and created CDEEE.  Under Article 138 of the Dominican "Ley General de Electricidad", CDEEE is the entity charged with leading and coordinating electrical companies, and is in charge of the execution of government run programs related to providing electricity in rural and suburban communities, as well as the administration and application of provider contracts with independent producers of electricity.  FONPER, on the other hand, (Fondo Patrimonial de las Empresas Reformadas) which was created by Ley 124, is an entity created to receive the monies generated by government owned companies operating under Ley 125, and capitalized by private investment.

9.    In 2001, ITABO contracted with third parties for the rehabilitation of two thermo-electric plants, hereinafter referenced as ITABO 1 and ITABO 2.  Of the original $US178 million cash investment in ITABO, $US112.5 million went towards funding the rehabilitation project.  The rehabilitation project had an original estimate of approximately $US54.15 million.  As a result of the cost overruns in the rehabilitation project and due to the public nature of part of ITABO'S assets, CDEEE as minority shareholder and FONPER, the recipient and administrator of the right to the government's dividends in ITABO, retained independent accounting firms to conduct an audit.  The accounting firm Stone & Webster was retained on behalf of CDEEE and Grant

Thornton on behalf of FONPER. These accounting firms, independently of each other, separately concluded approximately $US15 million purportedly spent on the ITABO 1 and 2 rehabilitation projects was not accounted for. The result of these independent audits led CDEEE, in its capacity of minority shareholder of ITABO, to request an accounting from its partners, the private majority shareholders. After various attempts at negotiation between CDEEE and ITABO, ITABO still failed to provide an accounting of these funds with supporting financial data and documentation. As a result, CDEEE brought actions in 2004 in the Dominican courts for relief.

## ITABO'S BY-LAWS AND THE "BASIC CONTRACTS"

10.    Contrary to the allegations in the Complaint, paragraph 15, that the arbitration clause in the Basic Contracts and ITABO by-laws uniformly provide for arbitration of all disputes between the ITABO shareholders, a complete and careful reading of the applicable provisions of the ITABO By-Laws and each of the Agreements annexed to the moving Declaration of Javier Navarro-Velasco (counsel for ITABO) ("Navarro-Velasco Dec.") makes clear that (1) not all disputes between ITABO shareholders are subject to arbitration, and (2) none of the documents ITABO has put before this Court establish an agreement by CDEEE to proceed by arbitration in its request for an accounting of the millions of dollars the majority ITABO shareholders have expended.

11.    The only arbitration provision that arguably may apply is the one found in the ITABO bylaws and that provision is limited to disputes on which the ITABO Board of Directors are deadlocked or those requiring an interpretation of the By-laws. CDEEE's actions for an accounting do not involve either of these circumstances and hence arbitration was never the agreed upon dispute resolution forum.

12.    The Navarro-Velasco declaration collectively attaches as Exhibit A the Stock Subscription Agreement and the ITABO By-laws.  The By-laws start with the page entitled "ESTATUTOS SOCIALES" and have a number on the bottom as page 1.  I understand that a full translation of the pertinent portion of the Bylaws is being provided by a certified translator.

13.    The only portion of the ITABO By-laws pertaining to arbitration is Article 58.  Article 58 provides, in substance, that only when the Board of Directors (the Administration Board) of ITABO is deadlocked or where there is a dispute as to the interpretation of the Bylaws are the parties to the dispute required to submit that matter to arbitration.  The first sentence of Article 58 states that in the event of a deadlock of the "Ordinary and Extraordinary General Board", i.e. the shareholders, arbitration is the selected means of redress.  That is not the case here. Therefore, only the second sentence of Article 58 of the By-laws could conceivably support ITABO's claim that the By-laws contains an agreement to arbitrate CDEEE's request for an accounting.  As shown below, the second sentence support ITABO's position either.

14.    The English translation of the second sentence of Article 58 of the Bylaws contained in paragraph 9 of the Navarro-Velasco Declaration is misleading and inaccurate.  Counsel for ITABO, Mr. Navarro-Velasco, has inserted in his purported English translation of this critical sentence commas not contained in the original Spanish By-laws, to make it appear that any dispute between the shareholders must be arbitrated when that is not the case.  Specifically, by inserting commas in its counsel's English translation that do not appear in the original By-laws, ITABO suggests that all disputes between shareholders, not just those concerning the interpretation of the By-laws, must be arbitrated.  The commas in bolded brackets [,] below do not appear in the original Spanish provision of the Bylaws.  For the Court's convenience, the entire translation urged by Mr. Navarro-Velasco in his Declaration, para. 9 at p. 5 of Article 58

of the Bylaws is reprinted below, with the bolded brackets surrounding the commas ITABO inaccurately has in its translation:

> ARTICLE 58.- In the event the deliberations of the Ordinary and Extraordinary General Board ended in a draw and may not be resolved by mutual agreement, the shareholders have the obligation to file and arbitral proceedings according to the provisions hereto set forth. Furthermore, they have the obligation of appealing to arbitration, providing that in the event of differences or disputes between the shareholders **[,]** or one or more of them and the corporation **[,]** or between the Administration Board in connection with the construction and application of these by-laws, such differences become impossible to be resolved by mutual agreement between them.

When read in this correct fashion, it is clear that the arbitration provision in the By-laws applies only to disputes involving the By-Laws themselves. As General Counsel for CDEEE, I am familiar with all the proceedings in the Dominican Republic. In fact, under Dominican law, a shareholder, here CDEEE, has the right to an accounting upon a sufficient showing of need. That right to an accounting derives from the Dominican Code of Civil Procedure, not from ITABO's By-laws or from any of what Mr. Navarro-Velasco refers to in his Declaration as the "Basic Contracts".

15.    ITABO's argument that the "Basic Contracts" require arbitration of CDEEE's demand for an accounting under the laws of the Dominican Republic is also flawed, as the clauses referring to arbitration under the Basic Contracts at most only address arbitration of dispute resulting from or arising out of those specific Agreements.

16.    For example, the Navarro-Velasco Declaration purports to translate and quote at length from the Stock Subscription Agreement (within Ex. A). The Stock Subscription Agreement involves the shareholders' acquisition of their original stock, the classes of stock and other issues, but not the right of a shareholder to an accounting. The object of the Stock Subscription Agreement is to establish the means, mechanism and consideration for the purchase of ITABO

6

stock by the various parties to that Agreement. Therefore, the proceedings for an accounting in the Dominican Republic do not result from or arise in connection with the Stock Subscription Agreement.

17.    None of the other "Basic Contracts" annexed to ITABO's moving papers support the proposition that ITABO's request for an accounting is subject to arbitration. Each of the arbitration clauses in question is limited to arbitration of matters arising out of the specific agreements in question.

18.    For example, Ex. B to the Navarro-Velasco Dec. is the Contract of Administration between ITABO and New Caribbean Investment, which was the consortium created between ITABO's current private party majority shareholders' predecessors-in-interest. CDEEE is not a party to the Contract of Administration. In any event, the arbitration provision in that Contract of Administration, at page 6, provides in substance that any dispute, controversy or claim that arises from this Contract (the Contract of Administration) shall be resolved as set forth in the ITABO By-laws (the "Estatutos", as is defined in the Contract of Administration).

19.    Ex. C to the Navarro-Velasco Declaration, named in para. 5.c. as the "Contract Granting Rights for the Exploitation of Electrical Work. . . ," also does not compel arbitration of the accounting CDEEE seeks. Under this Contract, the then existing nationally owned electrical monopoly in the Dominican Republic, CDE, granted to ITABO a portion of CDE's monopoly rights to electricity development, generation and distribution in the Dominican Republic. Nothing in this Contract dictates or mandates to ITABO how ITABO should engage in that venture, including how or if ITABO chose to engage in any rehabilitation of generating capacity. The arbitration provision in this Contract limits the remedy ITABO seeks, arbitration, to claims or disputes resulting from the Contract granting a portion of monopoly rights.

20.    Likewise, Ex. D to the Navarro-Velasco Dec., denominated as the "Power Sale Agreement" (Navarro-Velasco Dec., para. 5.d)  is a contract between CDE and a commercial distributor of electricity in the Dominican Republic (Empresa Distribudora de Electricidad del Norte, S.A.)  ITABO is not a party to this Contract.

21.    Ex. E. to the Navarro-Velasco Dec. is an assignment agreement between the predecessors-in-interest of the two private shareholders who now own a majority of ITABO (and have brought this action in this Court).  CDEEE also is not a party to this agreement.

## NO IRREPARABLE DAMAGE WILL RESULT TO ITABO

22.    In support of its claim for an injunction, ITABO claims that it will suffer irreparable damages if CDEEE is allowed to proceed with the actions in the Dominican Republic.  It is ITABO's contention that if CDEEE prevails, it will seize ITABO's assets.  This is simply not the case.  First and foremost, the two actions in the Dominican Republic are actions for an accounting.  If, and only if, ITABO fails to comply with a court order for an accounting could CDEEE seek sanctions.  Thus, if an order is entered requiring ITABO to provide an accounting and ITABO complies with the court order, ITABO will not be deprived of its assets.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 10, 2005.

HENRY M. MERAN

8

Steven Gerber, Esq. (SG5881)
ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, NY 10004
(212) 809-5700
Attorneys for Corporacion Dominicana de
Empresas Electricas Estatales
*Our File No. 300503.0001*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMPRESA GENERADORA DE
ELECTRICIDAD ITABO, S.A. ("ITABO"),

      Plaintiff,

      vs.

CORPORACION DOMINICANA DE
EMPRESAS ELECTRICAS ESTATALES
("CDEEE"),

      Defendant.

---

Civil Action No. 05-cv-5004 (RMB)

SUPPLEMENTAL DECLARATION OF
HENRY M. MERAN IN OPPOSITION TO
PLAINTIFF'S APPLICATION FOR
INTERIM RESTRAINTS

DOCUMENT ELECTRONICALLY FILED

    I, Henry M. Meran, declare as follows:

1.    I am General Counsel for defendant Corporacion Dominicana De Empresas Electricas Estatales (hereinafter referred to as "CDEEE").

2.    In 1997, I was admitted to practice law in the Dominican Republic and have served as General Counsel for CDEEE since August 19, 2004.

3.    I respectfully submit this supplemental declaration in further opposition to the application of ITABO for an order seeking to compel CDEEE to arbitrate its request for an accounting and for certain other relief.

4.      As detailed in my original Declaration dated June 10, 2005, at paragraph 8, CDEEE was created in 2001 by Law 125 passed by the Dominican Congress, for the purposes set forth in that paragraph of my original Declaration.  As such, CDEEE is owned by the state of the Dominican Republic.

5.      CDEEE does not own, lease or possess any real property or other assets in the United States of America.

6.      CDEEE does not maintain any bank or financial institution accounts in the United States of America.

7.      CDEEE does not maintain or have any office for the conduct of business in the United States of America.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 13, 2005.

HENRY M. MERAN

2

Steven Gerber, Esq. (SG5881)
ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, NY 10004
(212) 809-5700
Attorneys for Corporación Dominicana de
Empresas Eléctricas Estatales
*Our File No. 300503.0001*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMPRESA GENERADORA DE
ELECTRICIDAD ITABO, S.A. ("ITABO"),

      Plaintiff,

      vs.

CORPORACIÓN DOMINICANA DE
EMPRESAS ELÉCTRICAS ESTATALES
("CDEEE"),

      Defendant.

---

Civil Action No. 05-cv-5004 (RMB)

DECLARATION OF LEE PENYA

DOCUMENT ELECTRONICALLY FILED

I, Lee Penya, declare as follows:

1.     I am affiliated with Geotext Translations, Inc., a translation service with offices at 259 W. 30th Street, New York, New York, as a translator of Spanish to English. I am fluent in both Spanish and English. I have translated many legal documents from Spanish into English in connection with numerous litigation matters in the United States.

## TRANSLATION OF BY-LAWS

2.     I have translated from Spanish into English a portion of the By-laws of ITABO, specifically the first full paragraph of Article 58 on page 23. The Spanish words I translated are as follows:

CAPITULO VIII

ARBITRAJE

ARTÍCULO 58- En caso de que en las deliberaciones de la Junta General Ordinaria o Extraordinaria se suscitare un empate que no pueda ser resuelto por mutuo acuerdo, los accionistas estarán obligados a recurrir al arbitraje realizado de conformidad con lo que posteriormente se dispone en este artículo. Será igualmente obligatorio recurrir al arbitraje siempre que, al surgir diferencias o disputas entre los accionistas o entre uno o más de estos y la sociedad o dentro del Consejo de Administración relacionadas con la interpretación y aplicación de los presentes estatutos, sea imposible resolverlo de común acuerdo entre ellos.

3.      The true translation into English of the above-quoted portion of Article 58 of

ITABO's by-laws is as follows:

CHAPTER VIII

ARBITRATION

ARTICLE 58. In the event that the deliberations of the Ordinary or Extraordinary Shareholders' Meeting result in a tie that cannot be resolved by mutual agreement, the shareholders must resort to arbitration as subsequently provided in this Article. They must also resort to arbitration if, in the event of a disagreement or dispute among the shareholders or between one or more of them and the Corporation or within the Board of Directors concerning the interpretation and application of these Bylaws, it proves impossible to resolve the same by mutual agreement among them.

**TRANSLATION OF STOCK SUBSCRIPTION AGREEMENT**

4.      I have also translated from Spanish into English certain headings and portions of

the Stock Subscription Agreement, the full title of which is below. The Spanish words I

translated, followed by the true translations into English of the quoted portions of the original

Spanish, follow.  The [bracketed] references are to the page number(s) of the Agreement in

question:

(a)      [Title Page]:

Contrato de Suscripción de Acciones

CONTRATO DE SUSCRIPCIÓN DE ACCIONES
CON RELACIÓN A LA CAPITALIZACIÓN DE

2

**EMPRESA GENERADORA DE ELECTRICIDAD DE ITABO, S.A.**
Suscrito en Santo Domingo, el trece (13) de agosto de 1999.

**ENTRE**

**CORPORACIÓN DOMINICANA DE ELECTRICIDAD**
**Y**
**GENER, S.A. Y COSTAL ITABO, LTD.**
Santo Domingo, República Dominicana

Stock Subscription Agreement

**STOCK SUBSCRIPTION AGREEMENT**

CONCERNING THE CAPITALIZATION OF

**EMPRESA GENERADORA DE ELECTRICIDAD DE ITABO, S.A.**
Executed in Santo Domingo, Dominican Republic, on the 13th (thirteenth) of August, 1999

**BETWEEN**

**CORPORACIÓN DOMINICANA DE ELECTRICIDAD**
**AND**
**GENER, S.A. AND COASTAL ITABO, LTD.**
Santo Domingo, Dominican Republic

(b)      [Pages 5-6]:

**CONSIDERANDO:**

A.      Que el Gobierno de la República Dominicana, a través de la entidad denominada Comisión de Reforma de la Empresa Pública (el "Gobierno"), como asunto de política, tiene la intención de involucrar al sector privado en la reestructuración y operación de la infraestructura de generación y distribución de energía eléctrica, de la cual hasta ahora CDE ha sido propietaria y administradora, permitiendo que capitals nuevos del sector privado rehabiliten y extiendan el sistema de generación y distribución, a medida que se crea un Mercado competitivo de electricidad que premie la eficiencia y la buena administración.

B.      Que la Ley General de Reforma de la Empresa Pública (la "Ley de Reforma"), dispuso la creación de la Comisión para la Reforma de la Empresa Pública (la "Comisión") como institución del Gobierno, la cual, adscrita al Poder Ejecutivo, tiene jurisdicción sobre la CDE.

3

C.    Que, entre otras razones, a fin de facilitar este proceso de reestructuración del sub-sector electrico, el Gobierno promulgó la Ley de Reforma, dictó el Decreto No. 118 del 16 de marzo de 1998, mediante el cual creó la Superintendencia de Electricidad de la Secretaria de Estado de Industria y Comercio (la "Superintendencia") y dicha Secretaria, el 29 de octubre, dicto a su vez, la Resolución 235-98 que reglamenta lo referente a la producción, transmisión, distribución y comercialización de electricidad en la República Dominicana (la "Resolución"). Igualmente, el Gobierno nombró mediante decretos Nos. 206-98 de fecha 3 de junio de 1998 y 311-99 de fecha 14 de Julio de 1999, a los miembros de la antes mencionada Superintendencia.

D.    Que la EMPRESA GENERADORA DE ELECTRICIDAD ITABO, S.A. (la "Generadora") es una de las cinco Sociedades Dominicanas creadas por la CDE expresamente a fin de capitalizar la generación y distribución de electricidad de conformidad con la Ley de Reforma y de conformidad con los derechos y deberes de la CDE bajo su Ley Orgánica No. 4115 del 21 de abril de 1955 (la "Ley Organica de la CDE").

E.    Que la CDE transferirá a la Generadora ciertos activos, incluyendo licencias de operación, y ciertos pasivos, y como retribución la Generadora emitirá a la CDE sus acciones comunes de Clase A. Luego la CDE deberá colocar dichas acciones en un fondo de desarrollo del Estado Dominicano (el "Fondo Patrimonial") según lo dispone la Ley de Reforma.

F.    Que la Generadora le emitirá Acciones adicionales a cambio de efectivo, a una compañia que califique, después de un proceso de licitación competitiva internacional (la "Licitación Pública Abierta Internacional"). Que Gener y Costal, constituidos en consorcio, se constituyeron en oferente gandor, obligándose a suscribir este Contrato, conforme al cual cada una de ellas, directamente o a través de sociedades por ellas controladas, adquirirán de manera individual las acciones comunes Clase B de la Generadora y de conformidad con la Ley de Reforma y se firmará un Contrato de Administración que le otorgue el control operacional y directivo de la Generadora, según lo dispone dicha ley.

G.    Que la Comisión llamó a una Licitación Pública Abierta Internacional y como consecuencia de la misma le adjudicó al consorcio formado por las empresas Gener y Coastal, el derecho de adquirir directamente (o a través de la empresa por ellos constituida) las Acciones Clase B de la Generadora, sujeto al cumplimiento de ciertas condiciones, de conformidad con las Leyes de la República Dominicana y con los Contratos Básicos.

POR TANTO, en consideración de los acuerdos contenidos en el presente, las partes convienen en lo siguiente:

## WHEREAS:

A. The Government of the Dominican Republic, through the entity called the Commission for the Reform of Public Enterprise (the "Government"), as a matter of policy, intends to involve the private sector in the restructuring and operation of the infrastructure for the generation and distribution of electrical energy, of which the CDE has thus far been the owner

and administrator, thereby allowing new private-sector capital to improve and expand the generation and distribution system while a competitive electricity market that rewards efficiency and sound administration is created.

B. The General Act on the Reform of Public Enterprise (the "Reform Act") provided for the creation of the Commission for the Reform of Public Enterprise (the "Commission") as a Government institution that is attached to the Executive Branch and has jurisdiction over the CDE.

C. Among other reasons, for purposes of facilitating this process of restructuring the electrical subsector, the Government enacted the Reform Act and issued Decree No. 118 of March 16, 1998, whereby it created the Electricity Supervisory Authority of the State Department of Industry and Commerce (the "Authority"). On October 29, said Department in turn adopted Resolution 235-98, which regulates the production, transmission, distribution, and marketing of electricity in the Dominican Republic (the "Resolution"). Likewise, by means of Decree 206-98 of June 3, 1998 and Decree 311-99 of July 14, 1999, the Government appointed the members of the aforementioned Authority.

D. EMPRESA GENERADORA DE ELECTRICIDAD ITABO, S.A. (the "Generator") is one of the five Dominican Corporations created by the CDE expressly for purposes of capitalizing the generation and distribution of electricity in accordance with the Reform Act and in accordance with the rights and duties of the CDE under its Implementing Act No. 4115 of April 21, 1955 (the "Implementing Act of the CDE").

E. The CDE will transfer to the Generator certain assets, including operating licenses, and certain liabilities, and in exchange, the Generator will issue to the CDE its Class A common shares of stock. Thereupon, the CDE must deposit said shares in a development fund of the Dominican Government (the "Development Fund") as provided by the Reform Act.

F. In exchange for cash, the Generator will issue additional shares to a company designated by it following an international competitive bidding process (the "International Open and Public Bidding Process"). Furthermore, Gener and Coastal, acting as a consortium, became the successful bidder, thereby being obligated to execute this Agreement, whereby each of them, directly or through companies controlled by them, will individually acquire the Class A shares of common stock of the Generator, and, in accordance with the Reform Act, a Management Agreement will be signed, which will grant the successful bidder the operational and managerial control of the Generator as provided by said Act.

G. The Commission called for an International Open and Public Bidding Process, and as a result of the same, it awarded to the consortium formed by the companies Gener and Coastal the right to acquire directly (or through the company formed by them) the Class B Shares of the Generator, subject to the fulfillment of certain conditions, in accordance with the laws of the Dominican Republic and the Basic Agreements.

THEREFORE, in view of the covenants contained herein, the parties hereby agree as follows:

(c)    [Page 6]:

## ARTÍCULO 1

### DEFINICIONES; REGLAS DE INTERPRETACIÓN

## ARTICLE 1

### DEFINITIONS; RULES OF INTERPRETATION

(d)    [Page 12]:

## ARTÍCULO 2

### ESTABLECIMIENTO DE LA GENERADORA; COMPRA Y EMISIÓN DE ACCIONES. COMPROMISOS DE LAS PARTES

## ARTICLE 2

### ESTABLISHMENT OF THE GENERATOR; PURCHASE AND ISSUE OF SHARES. OBLIGATIONS OF THE PARTIES

(e)    [Page 14]:

## ARTÍCULO 3

### EL CIERRE Y LA TRANSFERENCIA DE ACCIONES

## ARTICLE 3

### THE CLOSING; TRANSFER OF SHARES

(f)    [Page 16]:

## ARTÍCULO 4

### DECLARACIONES Y GARANTÍAS DE CADA UNO DE LOS MIEMBROS DE LA SOCIEDAD SUSCRIPTORA Y/O EL ACCIONISTA INVERSIONISTA ESTRATÉGICO

# ARTICLE 4

# WARRANTIES AND REPRESENTATIONS OF EACH OF THE MEMBERS OF THE EXECUTING CORPORATION AND/OR THE STRATEGIC INVESTOR/SHAREHOLDER

(g)    [Page 19]:

# ARTÍCULO 5

## DECLARACIONES Y GARANTÍAS DE LA CDE

# ARTICLE 5

## WARRANTIES AND REPRESENTATIONS OF THE CDE

(h)    [Page 22]:

# ARTÍCULO 6

## CONVENIOS DE LA SOCIEDAD SUSCRIPTORA Y/O EL ACCIONISTA INVERSIONISTA ESTRATÉGICO

# ARTICLE 6

## COVENANTS OF THE EXECUTING CORPORATION AND/OR THE STRATEGIC INVESTOR/SHAREHOLDER

(i)    [Page 23]:

# ARTÍCULO 7

## CONVENIOS DE LA CDE

# ARTICLE 7

## COVENANTS OF THE CDE

(j)    [Page 24]:

## ARTÍCULO 8

### CONDICIONES SUSPENSIVAS AL CIERRE

## ARTICLE 8

### CONDITIONS PRECEDENT TO THE CLOSING

(k)    [Page 26]:

## ARTÍCULO 9

### SUPERVIVENCIA E INDEMNIZACIÓN

## ARTICLE 9

### SURVIVAL OF TERMS AND CONDITIONS; INDEMNIFICATION

(l)    [Page 30]:

## ARTÍCULO 10

### EVENTOS DE INCUMPLIMIENTO

## ARTICLE 10

### EVENTS OF BREACH

(m)    [Page 33]:

## ARTÍCULO 11

### TÉRMINO

8

## ARTICLE 11

## TERM OF AGREEMENT

(n)    [Page 34]:

## ARTÍCULO 12

## RESOLUCIÓN DE DISPUTAS

12.3    Arbitraje.

(a)    Cualquier disputa que surja de o con relación a este Contrato y que no sea resuelta por mutuo acuerdo entre las partes en conflicto, deberá ser resuelta a solicitud de cualquiera de las Partes, mediante arbitraje celebrado de conformidad con la Ley de Arbitraje y bajo los Reglamentos de Arbitraje. Las partes renuncian desde ahora y para siempre a someter cualquier litigio a cualquier tribunal del orden judicial o internacional, salvo lo expresado más abajo en literal (k).

## ARTICLE 12

## DISPUTE RESOLUTION

12.3 Arbitration.

(a) Any dispute that arises under or in connection with this Agreement and cannot be resolved by mutual agreement among the parties to the dispute must be resolved, at the request of any of the Parties, by arbitration conducted in accordance with the Arbitration Act and under the Rules of Arbitration. The Parties hereby waive, now and forever, the right to submit any dispute to any judicial or international tribunal, except as indicated below in section (k).

(o)    [Page 36]:

## ARTÍCULO 13

## DISPOSICIONES VARIAS

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

**TRANSLATION OF AGREEMENT [ON THE] ASSIGNMENT OF GENERATION RIGHTS**

     5.     I also have translated from Spanish into English certain headings and portions of the Agreement [on the] Assignment of Generation Rights, the full title of which is below. The Spanish words I translated, followed by the true translations into English of the quoted portions of the original Spanish, follow. The [bracketed] references are to the page number(s) of the Agreement in question:

     (a)     [Title Page]:

versión 8 sept. 99           Contrato Cesión de Derechos de Generación

**CONTRATO DE OTORGAMIENTO DE DERECHOS
PARA LA EXPLOTACIÓN DE OBRAS ELÉCTRICAS
RELATIVAS AL SERVICIO DE GENERACIÓN DE ELECTRICIDAD EN LA
REPÚBLICA DOMINICANA.**

**SUSCRITO ENTRE**

**LA CORPORACIÓN DOMINICANA DE ELECTRICIDAD**

**Y**

**LA EMPRESA GENERADORA DE ELECTRICIDAD ITABO, S.A.**

**EN FECHA: 08 DE SEPTIMBRE DE 1999**

**SANTO DOMINGO, REPÚBLICA DOMINICANA**

Version Sept. 8, 1999           Agreement [on the] Assignment of Generation Rights

**AGREEMENT ON THE GRANTING OF RIGHTS
FOR THE MANAGEMENT OF ELECTRICAL FACILITIES
RELATED TO THE SERVICE OF ELECTRICITY GENERATION
IN THE DOMINICAN REPUBLIC.**

**EXECUTED BY AND BETWEEN**

## THE CORPORACIÓN DOMINICANA DE ELECTRICIDAD [DOMINICAN ELECTRICITY CORPORATION]

### AND

### THE COMPANY GENERADORA DE ELECTRICIDAD ITABO, S.A. ON SEPTEMBER 8, 1999 IN SANTO DOMINGO, DOMINICAN REPUBLIC

(b)    [Page 5]:

### ARTÍCULO 2 – OBJETO DEL CONTRATO

La CDE, por medio del presente Contrato y de acuerdo con la Licitación Pública Internacional iniciada en marzo de 1998 por la Comisión de Reforma de la Empresa Pública, delega en favor de La Generadora, quien acepta, el derecho a construir, operar y explotar por cuenta y beneficio propios y a su solo riesgo, obras eléctricas relativas a la generación de electricidad, percibiendo los ingresos que generen sus actividades, bajo las condiciones que se describen en lo adelante.

### ARTICLE 2. PURPOSE OF THE AGREEMENT

The CDE, by means of the present Agreement and in accordance with the International Public Bidding Process initiated in March 1998 by the Commission for the Reform of Public Enterprise, delegates to the Generator, and the Generator accepts, the right to construct, operate, and manage, for its own account and benefit and at its sole risk, electrical facilities related to the generation of electricity, thereby receiving the income produced by its activities, under the conditions described below.

(c)    [Page 9]:

### ARTÍCULO 9 – RESOLUCIÓN DE DISPUTAS

(a) Cualquier Disputa que surja de o con relación a este contrato y que no sea resuelta por mutuo acuerdo entre las partes en conflicto, deberá ser resuelta a solicitud de cualquiera de las Partes, mediante arbitraje celebrado de conformidad con la Ley de Arbitraje y bajo los Reglamentos de Arbitraje. Las partes renuncian desde ahora y para siempre a someter cualquier litigio a cualquier tribunal de orden judicial o internacional, salvo lo expresado más abajo en literal h.

### ARTICLE 9. DISPUTE RESOLUTION

11

(a) Any dispute that arises under or in connection with this Agreement and cannot be resolved by mutual agreement among the parties to the dispute must be resolved, at the request of any of the Parties, by arbitration conducted in accordance with the Arbitration Act and under the Rules of Arbitration. The Parties hereby waive, now and forever, the right to submit any dispute to any judicial or international tribunal, except as indicated below in section h.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 10, 2005.

Lee Penya

Steven Gerber, Esq. (SG 5881)
ADORNO & YOSS LLP
80 Broad Street, 32nd Floor
New York, NY 10004
(212) 809-5700
Our File No. 300503.0001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

EMPRESA GENERADORA DE
ELECTRICIDAD ITABO, S.A. ("ITABO"),                Civil Action No. 05-cv-5004 (RMB)

               Plaintiff,

    vs.                                                                    ***PROOF OF SERVICE***

CORPORACION DOMINICANA DE
EMPRESAS ELECTRICAS ESTATALES
("CDEEE"),

               Defendant.

_____

      STEVEN GERBER, a member in good standing admitted to practice before the United

States District Court for the Southern District of New York, in accordance with L. Civ. R. 5.2 of

the Local Civil Rules of the United States District Court for the Southern District of New York,

declares as follows:

      1.     I am an attorney at law admitted to practice, inter alia, before the United States

District Court for the Southern District of New York and am a member of the law firm, Adorno

& Yoss, LLP, counsel for the defendant named herein.

      2.     On June 14, 2005, I caused to be filed electronically with the Clerk of Court,

United States District Court, Southern District of New York, the following documents:

Declaration of Henry Meran, dated June 10, 2005; Supplemental Declaration of Henry Meran,

dated June 13, 2005; Declaration of Lee Penya, dated June 10, 2005; Defendant CDEEE's Memorandum Of Law In Opposition To ITABO's Motion For Interim Relief In Aid Of Arbitration; and this Proof of Service.

3.      Also on June 14, 2005, I caused to be served, via ECF, the documents referenced in Paragraph 2 hereof, on plaintiff's attorney:  Grant Hanessian, Esq. Baker & McKenzie LLP, 805 Third Avenue, New York, NY 10022.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 14, 2005.


ADORNO & YOSS, LLP
Attorneys for Defendant,
Corporacion Dominicana de Empresas
Electricas Estatales


s/ Steven Gerber
Steven Gerber (SG-5881)