Grant Hanessian (GH-6582)
Susan R. Knox (SK-4110)
BAKER & McKENZIE LLP
805 Third Avenue
New York, New York 10022
Tel. (212) 751-5700
Fax (212) 759-9133

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
EMPRESA GENERADORA DE ELECTRICIDAD  :
ITABO, S.A.  ("ITABO"),
                                                    :
    Plaintiff,                                Case No. 05 Civ. 5004 (RMB)
                                                    :
    - against -                               ECF CASE
                                                    :

CORPORACIÓN DOMINICANA DE EMPRESAS  :
ELÉCTRICAS ESTATALES ("CDEEE"),
                                                    :
    Defendant.
-------------------------------------------------------------- X

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# ITABO'S MOTION FOR INTERIM RELIEF
# IN AID OF ARBITRATION

                                           Grant Hanessian (GH-6582)
                                           Susan R. Knox (SK-4110)
                                           BAKER & McKENZIE LLP
                                           805 Third Avenue
                                           New York, New York 1002
                                           Tel. (212) 751-5700
                                           Fax (212) 751-9133

ARGUMENT

POINT I

    ITABO IS ENTITLED TO THE REQUESTED RELIEF .................................... 3

    A.    ITABO Is Likely To Succeed On The Merits Of Its Claim........................ 3

        1.    CDEEE Does Not Dispute that New York Law Requires Arbitrators to Decide Questions Regarding the Scope of Arbitration Clauses ........................................................................ 3

        2.    ITABO is Entitled to Arbitrate CDEEE's Claims ......................... 3

    B.    ITABO will Suffer Irreparable Harm If the Requested Relief is Not Granted................................................................................................... 5

    C.    ITABO is Entitled to An Anti-Suit Injunction.......................................... 6

        1.    ITABO Has Demonstrated the Threshold Factors......................... 6

        2.    The Dominican Actions Frustrate Public Policy Forum Favoring Liberal Enforcement of Arbitration Agreements……….8

    D.    The Balance Of Hardships Decisively Favors ITABO............................. 9

POINT II

    THE COURT HAS JURISDICTION UNDER THE FSIA ............................... 10

CONCLUSION................................................................................................ 11

Plaintiff Empresa Generadora de Electricidad ITABO, S.A. ("ITABO") submits this reply memorandum in response to the memorandum of Corporación Dominicana de Empresas Eléctricas Estatales dated June 14, 2005 ("CDEEE Mem.") and in further support of ITABO's application for an order in aid of international arbitration.

The material facts are not in dispute. ITABO was created in 1999 as part of an effort to recapitalize and rehabilitate the electricity infrastructure in the Dominican Republic. The Dominican government continues to hold, through CDEEE, a substantial minority interest in ITABO. Majority shareholders in ITABO ultimately controlled by two U.S. companies, AES Corporation and El Paso Corporation,[1] invested some $178 million in ITABO in reliance on contractual assurances that disputes between ITABO's majority foreign shareholders and CDEEE – including disputes regarding the scope of the arbitration agreements -- would be resolved by international arbitration under New York law, and not by the courts of the Dominican Republic.

Notwithstanding its arguments to this Court, *CDEEE's claims before the Dominican courts clearly are within the scope of the parties' arbitration agreements.* CDEEE has flagrantly disregarded its obligations to arbitrate its disputes with ITABO, and the Dominican courts have failed to respond to ITABO's repeated arguments that the Dominican Actions should be stayed in favor of ICC arbitration in New York under New York law. CDEEE does not dispute that a decision on the merits of one of the Dominican cases may be rendered as early as July 18, 2005.[2]

Thus it has fallen to this Court – in New York, the situs of a pending arbitration -- to enforce both the parties' arbitration agreement and the United Nations Convention on the Recognition and Enforcement of International Arbitration Awards, to which both the United States and the Dominican Republic are parties. If this Court does not grant ITABO the relief it has requested and

---

[1] *See* Third Declaration of Giselle Marie Leger dated June 27, 2005, ¶¶ 2-4, which accompanies this memorandum.

[2] Second Cornielle Decl. dated June 2, 2005, provided to the Court by letter from Grant Hanessian dated June 3, 2005 as Exh. A, ¶¶ 7, 11.

1

if, as expected, CDEEE obtains the relief it has requested from the Dominican courts, ITABO and its majority shareholders will have to choose between complying with a Dominican court order – and thus abandoning the contractual and international arbitration rights upon which the majority shareholders relied in making their investment -- or declining to comply with the Dominican order and losing their entire investment in ITABO.

There is no dispute about this "choice." CDEEE's General Counsel has told this Court that if "ITABO complies with the court order, ITABO will not be deprived of its assets." Meran Decl. dated June 10, 2005, ¶ 22. Although CDEEE states that it is participating in the ICC arbitration, the arbitration will be a meaningless exercise unless CDEEE is enjoined from continuing to pursue the Dominican litigation.[3] Whether or not ITABO complies with the Dominican court order, CDEEE will have obtained the ultimate relief it seeks in its Dominican actions.

CDEEE has not suggested that there is the slightest urgency in its claims in the Dominican courts, or that it will be prejudiced in any way if this Court provides the relief ITABO has requested. By contrast, if this Court does not grant the requested relief, the Dominican government's promise of international arbitration will have been rendered unenforceable – a right without a remedy.

\* \* \*

With this reply memorandum, ITABO submits the Third Declaration of Giselle Marie Leger dated June 27, 2005, the Second Declaration of Javier Navarro-Velasco dated June 27, 2005, and the Declaration of Dr. Wellington Ramos Messina dated June 21, 2005. For the convenience of the Court and the parties, a table summarizing the exhibits provided to the Court by ITABO to date is annexed at the end of this memorandum.

---

[3] ITABO's efforts to expedite the arbitration are described in the Second Declaration of Javier Navarro-Velasco dated June 27, 2005.

2

Argument

POINT I

<u>ITABO IS ENTITLED TO THE REQUESTED RELIEF</u>

 A. **ITABO Is Likely To Succeed On The Merits Of Its Claim**

  1. **CDEEE Does Not Dispute that New York Law Requires Arbitrators to Decide Questions Regarding the Scope of Arbitration Clauses**

In its submissions to this Court, CDEEE has ignored the precise relief requested by ITABO. ITABO has not asked this Court to determine whether CDEEE's claims are arbitrable. Instead, in accordance with the parties' arbitration agreements and New York law, ITABO asks this Court to enjoin CDEEE from continuing to participate in the Dominican actions "*pending a determination by the arbitrators* . . . of the disputes between the parties properly subject" to the ICC arbitration in New York. *See* Order to Show Cause dated May 26, 2005 (emphasis added).

CDEEE does not address, much less contest, ITABO's arguments that resolution of the scope of an arbitration clause under New York law is for *the arbitrators* – not for this Court, and certainly not for CDEEE or the Dominican courts. *See* ITABO Mem., pp. 11-12 *, citing Contec Corp. v. Remote Solution Co*., 398 F.3d 205, 209 (2d Cir. 2005) and ICC Rules, Art. 6(2). CDEEE concedes that it is a party to "certain agreements containing clauses requiring the parties to arbitrate certain disputes in New York under New York law[,]" CDEEE Mem., p. 13, and argues only that its claims against ITABO are not within the scope of the arbitration agreements. *See* CDEEE Mem., pp. 6-11. However, because the parties agreed that *the arbitrators would decide the issue of arbitrability,* CDEEE's arguments regarding the scope of the arbitration agreement are irrelevant to the relief sought by ITABO.

  2. **ITABO is Entitled to Arbitrate CDEEE's Claims**

Although this Court need not consider the scope of the arbitration agreements, there is no question that CDEEE's claims are squarely within the scope of these agreements.

3

CDEEE's assertion that its alleged "right to an accounting derives from the Dominican Code of Civil Procedure and not . . . from ITABO's Bylaws or . . . the 'Basic Contracts[,]'" CDEEE Mem., at 11, is simply false. This is demonstrated by the most cursory examination of CDEEE's Dominican claims.[4] As discussed in detail in the accompanying Third Leger Declaration, ¶¶ 6-33, the First Chamber demand and complaint specifically reference, and assert claims concerning, both the Bylaws and the Stock Subscription Agreement, and the Fifth Chamber compliant specifically references, and asserts claims concerning, the Bylaws, the Exploitation Contract, and the Administration Contract.[5] Indeed, *CDEEE's Dominican pleadings refer to the ITABO Bylaws or certain of the Basic Contracts more than thirty times. Nearly half the text of the Fifth Chamber complaint (pages 10-24 of the English translation) concerns CDEEE's claims alleging violation of Article 38 of the Bylaws.*

The disputes between CDEEE, as minority shareholder, and ITABO and/or its majority shareholders concerning the administration of ITABO *are* within the first paragraph of Article 58 of the Bylaws, since such disputes "concern the interpretation and application of" the Bylaws. CDEEE's claims for an accounting directly arise out of – and require interpretation and application of – CDEEE's rights under the Bylaws. *See* Third Leger Decl., ¶¶ 9-12, 16-21.

Moreover, CDEEE simply ignores the fact that the last paragraph of the dispute resolution provisions of the Stock Subscription Agreement and the Bylaws specifically provide that in the event that the Dominican Republic ratifies the New York Convention, as it did in 2001, the parties

---

[4] CDEEE's demand in the First Chamber Action, preceded by a certified translation, is annexed to the Third Leger Decl. as Exhibit A. The complaint in the First Chamber Action is annexed to the First Cornielle Declaration dated May 25, 2005 as Exhibit A. The complaint in the Fifth Chamber Action is annexed to the First Cornielle Declaration as Exhibit B. Certified English translations of the First and Fifth Chamber Action complaints were provided to the Court on June 14, 2005, under cover of letter from Grant Hanessian, as Exhibits 3A and 4A, respectively.

[5] *See* Third Leger Decl., ¶¶ 6-33 and the Declaration of Dr. Wellington Ramos Messina dated June 21, 2005, which accompanies this memorandum. Dr. Ramos, as legal advisor to the Dominican government, drafted the arbitration clauses at issue in this matter.

4

"agree to settle their disputes through international arbitration" pursuant to ICC Rules. This provision – which provides no limitation or qualification to the word "disputes" -- clearly encompasses all disputes between CDEEE, ITABO and its shareholders.

Finally, the Share Subscription Agreement, which specifically incorporates the Bylaws at Articles 6.2 and 7.4, provides, at Article 12.3, that "any dispute resulting from or in connection with this Agreement" is subject to arbitration. There are similarly broad clauses in the Exploitation Contract and the Administration Contract.[6]

Clearly, the parties' disputes are within the arbitration clauses of the Basic Contracts and Bylaws, and the parties agreed that these disputes would be resolved in the ICC arbitration in New York and not by the Dominican courts.

### B. ITABO will Suffer Irreparable Harm If the Requested Relief is Not Granted

CDEEE states that "if an order is entered requiring ITABO to provide an accounting and ITABO complies with the court order, ITABO will not be deprived of its assets and no irreparable harm will result." CDEEE Mem., p. 14. Since ITABO is now precluded from submissions on the merits in the First Chamber Action, if this Court does not grant the requested relief, it is very likely that ITABO will soon have to choose between loss of its assets and loss of its arbitration. Such loss of arbitration rights is itself irreparable injury.[7]

---

[6] See Third Leger Declaration, ¶¶ 25-26, 31-32; Ramos Messina Decl., ¶¶ 14B-C.

[7] *See Olde Discount Corp. v. Tupman*, 805 F. Supp. 1130, 1141 (D. Del. 1992), *aff'd*, 1 F.3d 202 (3d Cir. 1993), *cert. denied*, 510 U.S. 1065 (1994) ("the loss of its federal substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic loss"); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 482 F. Supp. 788, 792 (D. Fla. 1980), *rev'd on other grounds*, 637 F.2d 391 (5th Cir. 1981) (loss of arbitration rights is irreparable since "the advantages of arbitration, pursuant to an agreement of the parties are forever dissipated when it is peremptorily supplanted by litigation"); *Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Servs.*, 962 F. Supp. 385, 391 (S.D.N.Y. 1997) ("Reliance will suffer irreparable harm if it is if it is deprived of its federal and state contractual right to arbitrate its disputes with Seismic."). *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631,

CDEEE does not dispute that it has requested an embargo (seizure) of ITABO's assets, and that this embargo might be ordered at any time on one day's notice. Moreover, CDEEE does not merely seek an accounting in the Dominican Actions, but challenges ITABO's granting of contracts to affiliates of the U.S. investors, and has requested imposition of sanctions on certain officers of ITABO and the payment of money damages including punitive damages. *See* Declaration of Carlos Radhamés Cornielle dated May 25, 2005, ¶¶ 7, 13. CDEEE's demands must be taken seriously, in light of the abject failure of the Dominican courts to enforce the international arbitration rights of El Paso, one of the ITABO investors, with respect to another Dominican power project. *See* Third Leger Decl., ¶¶ 35-41.

By contrast, CDEEE has made no argument to this Court that there is the slightest urgency in its claims before the Dominican courts, or that CDEEE will be prejudiced in any way if the requested relief is granted.

### C. ITABO Is Entitled To An Anti-Suit Injunction

#### 1. ITABO Has Demonstrated the Threshold Factors

CDEEE contends that ITABO has failed to establish the threshold requirements for an anti-suit injunction because (i) the parties are not identical in the arbitration and the Dominican actions, and (ii) the requested injunction would not be dispositive of the CDEEE's Dominican actions. Neither argument is valid.

As to the first point, CDEEE ignores the authorities cited in ITABO's brief, which are directly on point. *See* ITABO Mem., p. 13. Courts in this circuit have repeatedly issued injunctions in such circumstances.[8] Moreover, the parties in this action and in the Dominican actions are

---

105 S.Ct. 3346, 3356, 87 L.Ed.2d 444, 458 (1985) (the "emphatic federal policy in favor of arbitral dispute resolution . . . . applies with special force in the field of international commerce").

[8] *Paramedics Electromendicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) ("substantial similarity and affiliation" between GEMS-IT, and GE Brasil, and

6

exactly the same -- ITABO and CDEEE.  Although FONPER[9] is a named respondent in the arbitration and it is not a party to this action or the Dominican actions, ITABO's substantive claims against CDEEE and FONPER are identical.

On the second point, as well, CDEEE's argument directly contradicts established law.  *See Paramedics Electromedicina*, 369 F.3d at 653 (a finding that issues were reserved to arbitration was dispositive of the foreign litigation).  The rules of virtually all the world's arbitration institutions provide that arbitrators determine their own jurisdiction.[10]  CDEEE argues, in effect, that a U.S. court may never enjoin a party raising an issue as to the scope of an arbitration clause from participating in foreign litigation since a court may never know in advance how the arbitrators will decide the arbitrability issue.  Such a result is directly contrary both to binding precedent in *Paramedics Electromedicina* and strong U.S. policy favoring liberal enforcement of international arbitration agreements.

---

claims against GE Brasil arose "out of the same facts, circumstances and relationships as alleged in the dispute" that was the subject of the arbitration and the foreign litigation); *Motorola Credit Corp. v. Uzan*, 2003 U.S. Dist. LEXIS 111 (S.D.N.Y. Jan. 7, 2003);  s*ee also Newbridge Acquisition I, L.L.C. v. Grupo Corvi, S.A*., 2003 U.S. Dist. LEXIS 55 (S.D.N.Y. Jan. 6, 2003) (parties in two actions and arbitration were sufficiently identical even though an additional nominal defendant was named in Mexican action); *Mastercard Int'l Inc. v. Argencard Sociedad Anonima*, 2002 U.S. Dist. LEXIS 4625 (S.D.N.Y. Mar. 4, 2002) (parties sufficiently identical even though one of the Argentine defendant's controlling shareholders had intervened in Argentine action) .

[9] ITABO named FONPER as a respondent in the arbitration because, under Dominican law, FONPER, and not CDEEE, has the legal right to representation on ITABO's board of directors and to ownership of a 49.9% interest in ITABO, notwithstanding the fact that CDEEE has acted as the holder of those rights and interests.  *See* Declaration of Javier L. Navarro-Velasco dated May 25, 2005, ¶ 6; ITABO Memo., p.13 n.1.

[10]  *See, e.g*., International Centre for Dispute Resolution of the American Arbitration Association International Arbitration Rules Art. 15.1; LCIA Arbitration Rules Art. 23.1; WIPO Arbitration Rules Art. 36(a); Inter-American Commercial Arbitration Commission Arbitration Rules Art. 21(1)); UNCITRAL Arbitration Rules, Art. 21.1.

7

### 2. The Dominican Actions Frustrate Public Policy Favoring Liberal Enforcement Of Arbitration Agreements

Although strong public policies of this forum support the granting of an injunction, principles of comity are of obvious relevance in determining whether an anti-suit injunction should issue. The Second Circuit has identified certain other factors to consider when the two threshold requirements have been met. *See* CDEEE Mem., pp. 17-18; *Paramedics Electromedicina*, 369 F.3d at 654-55; *China Trade and Dev. Corp.*, 837 F.2d at 35.[11] CDEEE focuses on just one of those factors -- whether permitting the Dominican litigation to proceed would frustrate a policy of the enjoining forum. *See* CDEEE Mem., p. 17-19. CDEEE's argument on this point is based entirely on *Laif X Sprl v. Axtel, S.A. de C.V.*, 390 F.3d 194 (2d Cir. 2004). However, there are critical differences between this case and *Laif X Sprl*.

**No imminent loss of economic interest in *Laif X*.** As discussed above, absent an injunction, ITABO's U.S. shareholders will be required to choose in the few days between loss of their arbitration and other contractual rights and the loss of their $178 million investment. By contrast, the alleged loss of economic interest *had already taken* place in *Laif X* by the time the New York court was asked to issue an anti-suit injunction.

In the *Laif X* case, Telinor, the controlling shareholder of the Mexican company Axtel, entered into a subscription agreement in March 2003 that allegedly deprived LAIF X, a Belgian entity, of LAIF X's controlling interest in Axtel's Series C shares. In October 2003, Telinor caused the election of a slate of Series C directors depriving LAIF X of governance rights in Axtel. In December 2003, LAIF X initiated arbitration proceedings against Telinor under the arbitration

---

[11] The other factors that CDEEE cites, but does not discuss, are: (i) the foreign action would be vexatious; (ii) a threat to the issuing court's jurisdiction; (iii) the proceedings in the other forum prejudice equitable considerations and (iv) adjudication of the same issues in separate actions would result in delay, inconvenience, or a race to judgment. *See* CDEEE Memo., p. 18; *China Trade and Dev. Corp.*, 837 F.2d at 35. An injunction in this case is appropriate under these factors. Adjudication of the same issues in the Dominican courts and ICC arbitration may result in inconsistent results, and would clearly engender unnecessary expense. CDEEE's resort to its home forum, in direct contravention of the arbitration agreement, is clearly inequitable and vexatious.

8

provision in the Axtel bylaws. In January 2004, Telinor commenced an action in a Mexican court seeking a declaration that LAIF X did not have a valid interest in Axtel's Series C shares under Mexican law, and therefore LAIX F was not a party to an arbitration agreement. LAIF X brought its action in New York seeking to enjoin the Mexican action in February, 2004 – eleven months after Telinor's subscription agreement and *five months after the event that deprived LAIF X of its economic interest in Axtel*. There was no imminent irreparable injury at issue in *Laif X*, unlike the case here.

**The dispute in *Laif X* involved non-U.S. investors and foreign law determined standing to arbitrate**. In *Laif X*, the Second Circuit noted that Mexican law would determine whether there was an arbitration agreement -- i.e., whether LAIF X possessed rights to Axtel stock under Mexican law, and therefore whether LAIF X could invoke the arbitration provision in the bylaws-- and noted that the dispute involved a Belgian investor and a Mexican company. The Second Circuit stated that "where foreign law governs an issue that bears on standing to arbitrate, the submission of that issue to the competent foreign court, without more, does not constitute a refusal to arbitrate." 390 F.3d at 199.

Here, by contrast, there is no dispute that CDEEE and ITABO are parties to an arbitration agreement governed by New York law, or that U.S. entities relied on this agreement in investing $178 million to acquire a majority interest in ITABO. CDEEE makes no argument that Dominican law bears on "standing to arbitrate" – or any other question relating to arbitrability. There is no question that New York law controls issues of arbitrability. CDEEE's prosecution of the Dominican actions to judgment, prior to a decision by the arbitrators concerning arbitrability of the dispute, would clearly frustrate an important public policy of this forum.

**D.   The Balance Of Hardships Decisively Favors ITABO**

CDEEE does not contest that the balance of hardships decisively favors ITABO. If the requested relief is not granted, ITABO's majority U.S. shareholders will be deprived of either their

9

arbitration rights or their interest in ITABO. By contrast, CDEEE claims no urgency of any kind in the resolution of the Dominican actions.

## POINT II

## THE COURT HAS JURISDICTION UNDER THE FSIA

CDEEE specifically agreed in the Stock Subscription Agreement that it would not claim "any right immunity . . . in any jurisdiction" in an action concerning the Basic Agreements."[12] CDEEE does not mention this waiver in its submission to this Court, and concedes, in any event, that section 1605(a)(6) of the Foreign Sovereign Immunity Act provides for personal and subject matter jurisdiction (as well as waiver of sovereign immunity), where an action is brought against a foreign state to enforce an agreement to arbitrate

> if (A) the arbitration takes place or is intended to take place in the United States [or] (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . .

CDEEE concedes that it is a party to "certain agreements containing clauses requiring the parties to arbitrate certain disputes in New York under New York law[,]" CDEEE Mem., p. 13, and that the arbitration agreement and award will be governed by the New York Convention. CDEEE's jurisdictional and sovereign immunity arguments are thus premised entirely on its argument that the

---

[12] Article 13.3 of the Stock Subscription Agreement, titled "Commercial Acts; Immunity" specifically provides:

> CDE agrees that the signing, execution and completion by it of this contract constitutes a private and commercial act. Also, CDE agrees, unconditionally and irrevocably, that i) if an action (including an arbitral action) is initiated against it or its assets, in relation to this contract or any other transaction contemplated in this contract, CDE will not claim immunity from the actions, in whole or in part; ii) CDE renounces any right to immunity that it now possesses or may acquire in the future in any jurisdiction with respect to any of said actions; and iii) CDE agrees in general, to the execution of any judgment against it in any action (including any arbitral action) in any jurisdiction, the granting of any award or the issuance of any measure in connection with said claims.

Third Leger Decl., ¶7.

claims it has asserted in the Dominican litigation are not within the scope of the arbitration agreements between the parties. For the reasons stated previously, this analysis is both irrelevant and incorrect.

As to CDEEE's due process arguments, there is no question that an agreement to arbitrate in a particular forum constitutes consent to personal jurisdiction in the courts of that forum. *Maritime Ventures International, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp.1340, 1351-1352 (S.D.N.Y. 1988) (finding personal jurisdiction over foreign sovereign by consent to arbitration in New York); *see also Merrill Lynch v. Shaddock,* 822 F.Supp. 125, 128-131 (S.D.N.Y. 1993); *Venconsul N.V. v. TIM International,* 2003 U.S. Dist. LEXIS 13594, * 8 (S.D.N.Y. 2003).

## CONCLUSION

Plaintiff Empresa Generadora de Electricidad ITABO, S.A. respectfully requests that the Court grant its application for an order restraining Corporación Dominicana de Empresas Eléctricas Estatales and all other and further relief as the Court deems just and appropriate.

Dated: New York, New York  
      June 27, 2005                                          BAKER & McKENZIE LLP

By: _____s/_____  
    Grant Hanessian (GH-6582)  
    Susan R. Knox (SK-4110)  
    805 Third Avenue  
    New York, New York 10022  
    Tel. (212) 751-5700  
    Fax (212) 751-9133

# ITABO'S EXHIBITS

| | Document | Location in ITABO's Submissions | Certified Translation Submitted to the Court |
|---|---|---|---|
| **1. Documents from the ICC Arbitration** | | | |
| a. | Request for Arbitration (without Exhibits) | Navarro-Velasco Decl. (May 25, 2005) Exh. 1 | 6/14/2005 |
| b. | May 18, 2005 fax from ICC | Second Leger Decl. (June 1, 2005) Exh. 5 | 6/14/2005 |
| c. | June 3, 2005 letter from ICC | Second Navarro-Velasco Decl. (June 27, 2005) Exh. 1 | 6/27/2005 |
| d. | June 8, 2005 letter from ICC to the parties | Second Navarro-Velasco Decl. Exh. 2 | 6/27/2005 |
| e. | June 10, 2005 letter from ICC to the parties and arbitrators | Second Navarro-Velasco Decl. Exh. 3 | 6/27/2005 |
| f. | June 13, 2005 letter from the arbitrators to ICC | Second Navarro-Velasco Decl. Exh. 4 | 6/27/2005 |
| g. | June 15, 2005 ITABO motion requesting interim relief | Second Navarro-Velasco Decl. Exh. 5 | 6/27/2005 |
| h. | June 16, 2005 letter from ICC to the parties with copy to the arbitrators | Second Navarro-Velasco Decl. Exh. 6 | 6/27/2005 |
| i. | June 17, 2005 letter from ITABO to ICC | Second Navarro-Velasco Decl. Exh. 7 | 6/27/2005 |
| **2. Basic Contracts**[1] | | | |
| a. | Stock Subscription Agreement | Navarro-Velasco Decl. Exh. 1A | 6/14/2005 (Section 12.3) |
| b. | ITABO Bylaws | Navarro-Velasco Decl. Exh. 1A | 6/14/2005 (Article 58) |
| c. | Administration Contract | Navarro-Velasco Decl. Exh. 1B | |
| d. | Exploitation Contract | Navarro-Velasco Decl. Exh. 1C | |
| e. | Energy Sales Contract | Navarro-Velasco Decl. Exh. 1D | |
| f. | Shareholder Agreement | Navarro-Velasco Decl. Exh. 1E | |
| **3. Documents from the First Chamber Action** | | | |
| a | Bailiff's Act No. 1781/2004 (Demand) | Third Leger Decl. (June 27, 2005) Exh. A | 6/27/2005 |
| b. | Bailiff's Act No. 1798/2004 (Complaint) | Cornielle Decl. (May 25, 2005) Exh. 1 | 6/14/2005 |

---

[1] Itabo will provide certified translations of Articles 6.2, 7.4 and 13.3 of the Stock Subscription Agreement; Articles 12, 37(b), 38, 39, 47, 48, and 49 of the Bylaws; Articles 5(a), 5(i), 9(a) and 9(k); Definition of "Dispute", Articles 3.6, 3.7, and 6 of the Administration Contract; and Article 58 of the Dominican Commercial Code.

|    | **Document** | **Location in ITABO's Submissions** | **Certified Translation Submitted to the Court** |
|----|---|---|---|
| c. | ITABO's written arguments to the Court of Appeal | Cornielle Decl. Exh. 2 | 6/14/2005 |
| d. | May 27, 2005 Order | Second Cornielle Decl. (June 2, 2005) Exh. 1 | 6/14/2005 |
| **4. Documents from the Fifth Chamber Action** | | | |
| a. | Bailiff's Act No. 422/2004 (Complaint) | Cornielle Decl. Exh. 3 | 6/14/2005 |
| b. | ITABO's written arguments to the Fifth Chamber | Cornielle Decl. Exh. 4 | 6/14/2005 |
| **5. Documents Concerning Service on CDEEE** | | | |
| a. | Act No. 147/2005 | Second Leger Decl. Exh. 2 | 6/14/2005 |
| b. | Act No. 149/2005 | Second Leger Decl. Exh. 4 | 6/14/2005 |
| **6. Other Documents** | | | |
| a. | Motion for Permanent Injunction | Third Leger Decl. Exh. B | 6/27/2005 |
| b. | *Hoy* Article re: Ambassador Hans Hertell | Third Leger Decl. Exh. C | 6/27/2005 |
| c. | OPIC letter to Dominican Republic President Mejia | Third Leger Decl. Exh. D | 6/27/2005 |