Translated by **Donna L. Hicks de Pérez-Mera**
*Santo Domingo Speakers Bureau, S.A.*
Tel.: (809) 566-3085; Fax.: (809) 289-0080; Celular: 919-0428
E-mail: donna.hicks@verizon.net.do

Grant Hanessian (GH-6582)
Susan R. Knox (SK-4110)
BAKER & McKENZIE LLP
805 Third Avenue
New York, New York 10022
Tel. (212) 751-5700
Fax (212) 759-9133

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

EMPRESA GENERADORA DE ELECTRICIDAD :    05 Civ. 5004 (RMB)
ITABO, S.A.  ("ITABO"),

                                      :    ECF CASE

        Plaintiff,

                                 :         **DECLARATION OF DR.**
             - against -                      **WELLINGTON RAMOS**
                                 :              **MESSINA**

CORPORACIÓN DOMINICANA DE EMPRESAS :
ELÉCTRICAS ESTATALES ("CDEEE"),

                                       :

        Defendant.

------------------------------------------------------------- X

I.  Dr. Wellington Ramos Messina declares as follows:

1.  I am a lawyer with a Doctorate Degree in Law  and I am a Notary Public; I have been licensed to practice law in the Courts of the Dominican Republic since 1950, and I am a member and founding partner of the law firm of "Ramos Messina & Asociados," established in Santo Domingo, Dominican Republic in the year 1951.  I am a member of the corps of arbitrators of the Chamber of Commerce and Production of Santo Domingo, tenured professor of the Santo Domingo Autonomous University (1960-65) and the Pedro Henríquez Ureña National University (1966-) in the subjects of criminal law and criminology, a member of the board of directors of the Bar Association of the Dominican Republic (1961-64), past president of the Institutionality and Justice Foundation (FINJUS), author of the Treatise on Banking Law of the Dominican Republic.  The lawfirm of Ramos & Messina specializes in the areas of corporate, commercial, banking,

1

business, civil, international, contractual, concession, distribution and any other brand of law of general practice.

2. On May 20, 1997, our firm signed a legal advisory contract to participate as national consultants to the Commission for Reform of State-Owned Enterprises ("CREP"), created by Law 141-97 dated June 24, 1997, on the occasion of the capitalization of the Dominican Electrical Corporation ("CDE"). I am writing to the Court to communicate to it my opinion concerning the arbitration clauses contained in the By-Laws and Contracts signed between the CDE and the Empresa Generadora de Electricidad ITABO, S.A. ("ITABO"), which were drafted by this office as part of the legal advisory services which we were pleased to provide within the framework of the said capitalization process.

3. On June 24, 1997, the Executive Power in the Dominican Republic promulgated the General Law on Reform of State-Owned Enterprises No. 141-97. Said law (hereinafter Law 141-97) created the legal framework to permit the capitalization of the CDE. The CDE was initially the state-owned enterprise through which the Dominican Republic would maintain its participation and contracts with the private sector in the area of electrical energy.

4. In the years 1998 and 1999 the Dominican Republic carried out a capitalization program of the electrical industry owned by the Dominican state or the activities which the CDE held with a monopoly of exploitation. Said capitalization was carried out by the CREP, which with international advisers issued the terms of reference and the various legal instruments, including the contracts which are described below, which were amended successively insofar as during the consultation phase the various pre-qualified bidders participated, until the final version of these contracts was approved.

5. As a result of this program, several enterprises were created which, by means of the capitalization by private investors, obtained the financial resources and technical assistance necessary to improve and expand the generation of electrical energy in the country, and invest in the electrical sector.

6. In accordance with Law 141-97, five business enterprises were created: two of them, ITABO and Empresa Generadora de Electricidad Haina, S.A., would be dedicated to the **generation** of electricity, while main activity of the remaining three, Empresa Distribuidora de Electricidad del Norte, S.A., Empresa Distribuidora de Electricidad del Sur, S.A., and Empresa Distribuidora de Electricidad del Este, S.A., would be the **distribution** of electricity. That is to say that, of the commercial electrical generator enterprises created, ITABO was one, for which the corresponding incorporation documents were signed (Assemblies, By-Laws, Payrolls, Commissar's Reports of Contributions, and other formalities of the Commercial Code).

7. In accordance with Law 141-97, ITABO would be capitalized through (i) the contribution that CDE would make to these enterprises of certain equipment and infrastructure for the generation of electrical energy, for which contribution CDE would

2

receive Series A common shares; and (ii) for the contribution in cash by the private enterprises to whom the bid was adjudicated in a procedure of international public bidding handled by CREP. The private companies that capitalized the companies of electrical generation would for their contribution receive the equivalent of 50% of the shares representing the capital stock of the capitalized enterprises in Series B shares.

8. As a result of the corresponding procedure of international public bidding, in the case of ITABO, the following contracts were celebrated:

i) ITABO´s Corporate By-Laws;
ii) Contract for Signing of Shares;
iii) Administration Contract;
iv) Contract Granting Rights for Exploitation of Electrical Works relating to the Generation of Electricity;
v) Energy Sale Contract;
vi) Agreement for Transfer of Energy Sale Contract.

9. Those contracts have been called the "Basic Contracts" of the Capitalization Process. Said contracts govern the relations between ITABO and ITABO´s shareholders, including the Patrimonial Fund for Reformed Enterprises (FONPER) created by arts. 20 of law 141-97 and 2 and following of Law 124-01 dated July 24, of the year 2001, and any other interests of the Dominican State in the capitalized enterprises, in succession of the CDE´s rights. I understand that a copy of those contracts has been deposited by ITABO before this honorable court.

10. Both the By-Laws and the rest of the Basic Contracts stipulate that the shareholders would have to attempt to resolve their differences in an amicable manner, but in the event that said efforts were fruitless, the disputes between the parties would have to be resolved by means of international comemrcial arbitration. In their relevant part, the By-Laws and the rest of the Basic Contracts provide the following:

> "If the Dominican Republic ratifies the New York Convention on recognition and execution of foreign arbitration rulings adopted by the United Nations Conference on International Commercial Arbitration dated June 10, 1958, and/or the Panama Convention on Commercial Arbitration, the parties agree to resolve their disputes by means of an international arbitration, in conformance with the Rules of Arbitration of the International Chamber of Commerce (ICC Rules of Conciliation) dated January 1, 1988, and under the laws of New York. No arbitrator named according to the present article shall be a citizen of any of the jurisdictions of the parties or of the jurisdiction of any of the initial shareholders, neither may said arbitrator be an employee or agent/representative nor former employee or agent/representative of any of said persons."

11. The Dominican Republic ratified the New York Convention by means of resolution 178-01 of the National Congress, duly promulgated by the Executive Power on

November 8, 2001. The Dominican Republic adhered to same on April 11, of the year 2002, and it took effect as of July 10th of the year 2002.

12. It is necessary to inform this Honorable Court that the New York Convention, as it is known internationally, is duly upheld by the Constitution of the Dominican Republic of July 25, 2002, according to its articles 3, 37, and 55, by establishing that the Domincan Republic "**recognizes and applies the norms of general international and American law insofar as its public powers have adapted it.**"

13. This Convention on the Recognition and Execution of Foreign Arbitration Rulings, which is already in effect in the Dominican Republic, is a legal statute that can be imposed on the parties intervening in the process of capitalization of the former CDE, or on any successor with an interest in said process, which is a true continuation of the rights of CDE.

14. ITABO's Corporate By-Laws and the rest of the Basic Contracts establish that the parties must resolve their differences by mutual agreement, but in the event that said efforts were futile, the shareholders in conflict must resolve their disputes by means of international commercial arbitration. This mechanism for resolution of disputes is provided expressly in the Corporate By-Laws and the rest of the Basic Contracts, each one of them containing in their relevant part a clause or stipulation in which is established the obligatory nature of the international commercial arbitration in case of disputes not resolved between shareholders. In that regard, the By-Laws and other Basic Contracts have separtely stipulated as follows:

### A. ITABO's Corporate By-Laws

"*ARBITRATION*
*Art. 58. In the event that the deliberation of the Ordinary or Extraordinary Assembly should result in a tie which cannot be resolved by mutual agreement, the shareholders shall be obligated to resort to arbitration performed in conformance with what is subsequently provided in the present article. It shall be equally obligatory to resort to arbitration whenever differences or disputes arise among the shareholders or between one or more shareholders, and the partnership, or within the Board of Administration related to the interpretation and application of the present by-laws, and it is impossible to resolve it by common agreement among them.*

*Any dispute, which as previously established is not resolved by mutual agreement between the parties in conflict, <u>must be resolved by means of arbitration held in conformance with the provisions of Law No. 50-87 dated June 4, 1987, of the Dominican Republic, and under the rules and procedures of arbitration established by the Rules of the Arbitration Court of the Chamber of Commerce and Production of the National District, Inc.</u>*

*("Cámara de Comercio y Producción del Distrito Nacional, Inc.") of November 1988 (the "Arbitration Rules").*

*Said arbitration shall take place in Santo Domingo, Dominican Republic, and, excepting if the Parties should decide otherwise, the number of arbitrators shall be three, who shall be  named by means of agreement between the Parties, and in the event that the Parties  should not reach an agreement, the arbitrators shall be named in accordance with the procedure established in Title II of the said Regulation.*

*As established by Article 34 of the Arbitration Regulation, after approval by the Board of Directors of the Board of Conciliation and Arbitration of the Chamber of Commerce and Production of Santo Domingo, the Parties may set the seat of the Arbitration Court at any other place, inside the country or abroad, in which case each party shall assume its expenses of transportation and lodging, and jointly, all of the expenses of the transfer of the Arbitration Court and the work of the Secretary of said court.  If one of the Parties opposes the transfer of the arbitration court, the expenses incurred for such effect shall be for the account of the requesting party.*

*The arbitration award pronounced to such effect shall be deemed the result of a proceeding initiated and held in Santo Domingo, Dominican Republic.*

*Any arbitration held pursuant to the above must be conducted in the Spanish language.*

*The shareholders, by acquiring such capacity, pursuant to the present by-laws, irrevocably waive their right to resort to ordinary or exceptional courts in order to request the opinion of the Court, insofar as the Law permits, in relation to any matter of law which may arise in the course of the arbitration or with regard to the decision taken by the arbitrators.  Likewise they irrevocably waive any right to object to or oppose or argue the validity or executory nature of both the arbitration proceedings and the arbitration awards pronounced in conformance with the provisions of the present article, including any objection based on incompetence or inappropriate jurisdiction.*

*For purposes of the present article, it is acknolwedged that the CDE or its creditors shall always be governed by the provisions of the Commercial Code of the Dominican Republic and Dominican Common Law, so that no immunity whatsoever shall be alleged concerning the arbitration proceeding referred to in the present article.*

*It is expressly  agreed that if in order, either of the parties in conflict may request the Arbitration Court to merge any arbitration proceeding which may arise or be related to the present by-laws if the main motive of the disputes comes from or is related to the by-laws.  Such merged arbitration must be*

5

*resolved by the arbitration court designated to hear the proceeding that first began. Excepting otherwise provided in the above paragraphs, the right of the parties to proceed to the resolution of the disputes by means of arbitration established in the present by-laws shall be independent of their right or the right of other entities to proceed with the resolution of their disputes in accordance with what is esablished in the agreements or contracts signed between them.*

*The shareholders and the company waive any right to resort to appeal any decision or arbitration award resulting from arbitration, so that such decision or arbitration award shall be deemed definitive/final and obligatory/binding for all, and must be obeyed without any delay whatever. Any arbitration award or decision may be executed by any competent court.*

*If the Dominican Republic should ratify the New York Convention on reocgnition and execution of foreign arbitration rulings adopted by the United Nations Conference on Internatioal Commercial Arbitration, dated June 10, 1958, and/or the Panama Convention on Commercial Arbitration, the parties accept to resolve their disputes by means of international arbitration, in conformance with the rules of the International Chamber of Commerce ( ICC Rules of Conciliation) dated August 1, 1988, and under the laws of New York. No arbitrator named according to the present article shall be a citizen of any of the jurisdictions of the Parties, nor may that arbitrator be an employee or agent/representative  or former employee or agent/representative of either of said persons.*

**B.  Contract for Exploitation of Electrical Works:**

*"ARTICLE 9.-  RESOLUTION OF DISPUTES*
*(a)  Any Dispute arising from or in relation to the present Contract and which is not resolved by mutual agreement between the parties in conflict must be resolved at the request of either of the parties, by means of arbitration held in conformance with the Arbitration Law and under the Rules of Arbitration. The parties waive from now and forever the submission of any litigation to any court of judicial or intenrational order, excepting as expressed below in letter h.*

*(b)  The arbitration shall take place in Santo Domingo, Dominican Republic, and, excepting if the Parties should decide otherwise, the number of arbitrators shall be three, named by means of agreement between the Parties, or in the event that they do not come to an agreement, the arbitrators shall be named in accordance with Title II of the Rules of Arbitration, or in case of substitute, the applicable title.*

*(c)  As established in Article 34 of the Rules of Arbitration, after approval by the Board of Directors, the Parties may set the seat of the arbitration court at*

*any place outside of Santo Domingo in the Dominican Republic or abroad, in which case each one of the Parties shall assume its expenses of transportation and lodging, and jointly all of the expense related to the transfer of the arbitration court and expenses of the secretary of the arbitration court. If one of the Parties opposes the transfer of the arbitration court, the requesting party shall pay the expenses incurred to such effect.*

*(d)   The arbitration award pronounced to that effect shall be deemed the result of a proceeidng initiated and held in Santo Domingo, Dominican Republic.*

*(e)   Any decision which may be rendered in this respect may not be appealed before any jurisdiction or court of the Dominican Republic or abroad, and shall be deemed final and binding for the parties immediately, and shall not be subject, for its executory nature, to the requirements of Articles 1020 and 1021 of the Civil Procedure Code, as established by the arbitration rule in effect of the Chamber of Commerce and Production of the National District, in its Article 52. Any monetary sanction shall include legal interest as of the date of any noncompliance or other violation of said contract until the date on which said sanction is paid, at a rate determined by the arbitrator(s).*

*(f)   Any arbitration held pursuant to the above must be conducted in the Spanish language.*

*(g)   By means of the present document the Parties irrevocably waive their right to resort to ordinary courts, or insofar as the Laws of the Dominican Republic permit, courts of exception in order to request the opinion of a court in relation to any matter of law which may arise in their course of arbitration or with regard to the decision taken by the arbitrators. They likewise irrevocably waive any right to object to or argue the validity or executory nature of both the arbitration proceedings and the arbitration awards pronounced in conformance with the provisions of the present Article, including any objection based on incompetence or inappropriate jurisdiction.*

*(h)   For purposes of the present Contract, it is acknowledged, and the CDE agrees, that the CDE or its creditors will always be governed by the provisions of the Commercial Code and the common law consecrated by the Laws of the Dominican Republic, and shall not allege any immunity whatsoever regarding the arbitration process referred to in the present Article.*

*(i)   It is expressly agreed that if appropriate, either of the parties in conflict may request the arbitration court to merge any arbitration proceeding which may arise from or be related to the present Contract with any arbitration which may rise or be related to the Company with one or more of the Basic*

7

*Contracts. Such consolidated arbitration must be resolved by the arbitration court designated to hear the arbitration process as was first initiated..*

*(j)    The parties irrevocably waive any right to appeal any decision or arbitration award resulting from the arbitration, so that the decision or arbitration award shall be deemed final and binding for all, and shall be obeyed without any delay whatsoever. Every arbitration award or arbitration decision may be executed by any competent court.*

*(k)    In the event that the Dominican Republic should ratify the New York Convention and/or the Panama Convention, the parties accept to resolve their disputes by means of international arbitration, in conformance with the rules of the International Chamber of Commerce (ICC Rules of Conciliation) of January 1, 1988, and under the laws of New York. No arbitrator named in accordance with the present article shall be a citizen of the jursidictions of any of the Parties, nor may such arbitrator be an employee or agent/representative nor former employee nor former agent/representative of any of said persons.*

## C. Administration Contract

*"ARTICLE 6.- RESOLUTION OF DISPUTES. Any Dispute, controversy or claim which may arise from the present Contract or the noncompliance, termination or validity of same, shall be resolved in accordance with the By-Laws."*

## D. Contract of Signing of Shares

*"12.3 Arbitration*
*(a)    Any Dispute which may arise from or with relation to the present Contract and which is not resolved by mutual agreement between the parties in conflict must be resolved at the request of either of the parties, by means of arbitration held in conformance with the Arbitration Law and under the Rules of Arbitration. The parties waive now and forever the submission of any litigation to any judicial or international court, excepting as expressed below in letter (k).*

*(b)    The arbitration shall take place in Santo Domingo, Dominican Republic, and excepting if the Parties should decide otherwise, the number of arbitrators shall be three, named by means of agreement between the Parties, or in the event that they do not come to an agreement, the arbitrators shall be designated in accordance with Title II of the Rules of Arbitration, or in case of substitution, the applicable title.*

*(c) As established by Article 34 of the Rules of Arbitration, after approval of the Board of Directors, the Parties may set the seat of the arbitration court in*

*any place outside of Santo Domingo, in the Dominican Republic, or abroad, in which case each one of the Parties shall assume its expenses of transportation and lodging, and jointly all of the expenses related to the transfer of the arbitration court and the expenses of the secretary of the arbitration court. If one of the Parties opposes the transfer of the arbitration court, the requesting party shall pay the expenses incurred to such effect.*

*(d)   The arbitration award pronounced to such effect shall be deemed the result of a proceeding initiated and held in Santo Domingo, Dominican Republic.*

*(e)   Any decision which may be rendered in this regard shall not be appealable before any jurisdiction  or court of the Dominican Republic or abroad, and shall be deemed final and binding for the parties immediately, and shall not be subject, for its executory nature, to the requirements of Articles 1020 and 1021 of the Civil Procedure Code, as established by the rule of arbitration in effect of the Chamber of Commerce and Production of the National District, in its Article 52.  Any economic sanction shall include legal interest as of the date of any noncompliance or other violation of that Contract until the date on which said sanction is paid, at a rate determined by the abitrator(s).*

*(f)   Any arbitration held pursuant to the above must be conducted in the Spanish language.*

*(g)   By means of the present document the Parties irrevocably waive their right to resort to ordinary courts, or, insofar as permitted by the Laws of the Dominican Republic, courts of exception, in order to request the opinion of a court in regard to any matter of law which may arise in their course of arbitration or with regard to the decision made by the arbitrators.  Likewise they irrevocably waive any right to object to or argue the validity or executory nature of both the arbitration proceedings and the arbitration awards pronounced in conformance with the provisions of the present Article, including any objection based on incompetence or inappropriate jurisdiction.*

*(h)  For purposes of the present Contract, it is acknowledged, and the CDE agrees, that the CDE or its creditors will always be governed by the provisions of the Commercial Code and the common law consecrated by the Laws of the Dominican Republic, and shall not allege any immunity whatsoever regarding the arbitration process referred to in the present Article.*

*(i)  It is expressly  agreed that if appropriate, either of the parties in conflict may request the arbitration court to merge any arbitration proceeding which may arise from or be related to the present Contract  with any arbitration which may rise or be related to the  Generator Company with one or more of*

*the Basic Contracts.  Such consolidated arbitration must be resolved by the arbitration court designatd to hear the arbitration process as was first initiated..*

*(j)    The parties irrevocably waive any right to appeal any decision or arbitration award resulting from the arbitration, so that the decision or arbitration award shall be deemed final and binding for all, and shall be obeyed without any delay whatsoever.   Any arbitration award or arbitration decision may be executed by any competent court.*

*(k)   In the event that the Dominican Republic should ratify the New York Convention and/or the Panama Convention, the parties accept to resolve their disputes by means of international arbitration, in conformance with the rules of the International Chamber of Commerce (ICC Rules of Conciliation) of January 1, 1988, and under the laws of New York.  No arbitrator named in accordance with the present article shall be a citizen of the jursidictions of any of the Parties, nor may such arbitrator be an employee or agent/representative nor former employee nor former agent/representative of any of said persons.*

**E.  Energy Sale Contract**

*"ARTICLE 9.3  ARBITRATION*
*Any Dispute originating in relation to the present Contract must be resolved by means of arbitartion held in conformance with the provisions of Law No. 50-87 dated June 4, 1987, of the Dominican Republic, and under the Arbitration Rules and Procedures established by the Regulation of the Arbitration Court of the Chamber of Commerce and Production of the National District, Inc., of November 1988 (the "Dominian Arbitration Rules").*

*The arbitration shall take place in Santo Domingo, Dominican Republic, and exepting if the Parties should decide otherwise, the number of arbitrators shall be three, named by means of agreement between the Parties, or, in the event that they not reach an agreement, the arbitrators shall be designated in accordance with Title II of the Arbitration Rules, or the applicable Title.*

*As established by Article 34 of the Dominican Arbitration Rules, after approval of the Board of Directors of the Board of Conciliation and Arbitration of the Chamber of Commerce and Production of Santo Domingo, the Parties may set the seat of the arbitration court at any place outside of Santo Domingo in the Dominican Republic, or abroad, in which case the Parties shall assume all expenses related to the transfer of the arbitration court.  If one of the Parties opposes the transfer of the arbitration court, the requesting party   shall pay the expenses incurred to such effect.*

*The arbitration award pronounced to that effect shall be deemed the result of a proceeding initiated and held in Santo Domingo, Dominican Republic.*

*Any decision which may be rendered in that regard shall not be appealable before any jurisdiction or court of the Dominican Republic or abroad, and shall be deemed final and binding for the parties immediately, and shall not be subject, for its executory nature, to the requirements of Articles 1020 and 102 of the Civil Procedure Code, as established by the arbitration rules in effect of the Chamber of Commerce and Production of the National District, in its Article 52. Any economic sanction shall include legal interest from the date of any noncompliance or default of the present Contract up to the date on which said sanction is paid, at a rate determined by the arbitrator(s).*

*Any arbitration held pursuant to the above must be conducted in the Spanish language.*

*By means of the present the Parties irrevocably waive their right to appeal to ordinary or exceptionoal courts insofar as the Law of the Domincan Republic permit, to request an opinion of any court in relation to any matter of law which may arise in the course of the arbitration or with regard to the decision made by the arbitrators. Likewise they irrevocably waive any right to object to or argue the validity or executory nature of both the arbitration proceedings and the arbitration awards pronounced in conformance with the provisions of the present Article, including any objection based on incompetence or inappropriate jurisdiction.*

*For purposes of the present Contract, it is acknowledged, and the CDE agrees, that the CDE or its creditors shall always be governed by the provisions of the Commercial Code and common law under the Laws of the Dominican Republic, so that it shall not enjoy any right as an agency of the Government of the Dominican Republic and shall not allege any immunity whatsoever regarding the arbitration process referred to in the present Article.*

*It is expressly agreed that if appropriate, either of the Parties may request tha the arbitration court merge any arbitration procedure arising from or related to the present Contract with any arbitration arising from or related to one or more of the Contrcts signed by both parties related to the process of capitalization of the Electrical Sector of the Dominican Republic, if the principal motive of the disputes comes from or is related to facts or essentially similar related transactions. Such consolidated arbitration must be resolved by the arbitration court designated to hear the arbitration proceeding which started first. Excepting as otherwise provided in the above paragraphs, the right of the parties to proceed with the resolution of the disputes by means of this section 9.3 shall be independent of their rights or the rights of other*

11

*entities to proceed with the resolution of their disputes in accordance with what is established in any other agreement or contract.*

*The parties irrevocably waive any right to recourse or appeal against any decision or arbitration award resulting from the arbitration, so that such decision or arbitration award shall be deemed final and binding for all, and must be obeyed without any delay whatsoever. Any arbitration award or arbitration decision may be executed by any competent court.*

*In the event that the Dominican Republic should ratify the New York Convention and/or the Panama Convention, the parties accept to resolve their disputes by means of international arbitration, in conformance with the rules of the International Chamber of Commerce (ICC Rules of Conciliation) dated August 1, 1988, and under the laws of New York. No arbitrator named according to the present article shall be a citizen of the jurisdictions of either of the Parties, nor may said arbitrator be an employee or agent or former employee or agent of either of said persons.*

**F.  Agreement for Transfer of the Energy Sale Contract**

*"7.1  Choice of Norms/Standards.*
*The parties agree that the conventions referring to liability and indemnity, force majeur, resolution of disputes, expenses, headings, commercial acts, choice of law, integrity of the Contract, participation of third parties, amendments, waiver of rights, relationship of the parties, survival, language, other guarantees, consent, severability, harm, confidentiality, successors and cessionaires and copies, are those agreed to by the CDE in articles VII, VIII, IX, and X of the Energy Sale Contract."*

15.  The By-Laws and other Basic Contracts signed between the parties, referring to the arbitration clauses, are the law between them.  This by virtue of the fact that they are obligations assumed pursuant to arts. 1134 of the Dominican Civil Code and article 631 of the Commercial Code, which provides the following:

Art. 1134 Civil Code:
"Agreements legally formed have the force of law for those who have made them.  They cannot be revoked, excepting by mutual consent, or due to the casuses which are authorized by law. *They must be carried out/executed in good faith."*

Art. 631 of the Commercial Code:

*"The commercial courts shall hear:     1ˢᵗ: All arguments related to commitments and transactions between businessmen, merchants, and bankers;*

*2nd: arguments between associates by reason of a commercial company; 3rd: arguments related to acts of trade between any persons.*

*Nevertheless, the parties may, at the moment when they contract them, agree to submit to arbitrators the disagreements indicated above, when same occur." (Highlighted accent is ours).*

16.   The stipulations to which the parties agree concerning the national arbitration jurisdiction of the "Chamber of Commerce and Production of the National District Inc.," now the "Chamber of Commerce and Production of Santo Domingo Inc.," provided for by Law No. 50-87 dated June 4, 1987, were supplanted by the obligatory holding of international arbitration before the International Chamber of Commerce (ICC), due to the fact that the Dominican Republic ratified the New York Convention by means of Resolution No. 178-01 of the National Congress, duly promulgated by the Executive Power on November 8, 2001.   The text of this resolution was composed of one single article which established the following:

*"TO APPROVE adherence to the Convention on Acknowledgement and Execution of Foreign Arbitration Rulings, signed by the Dominican Republic, in the city of New York, United States of America, on June 10, 1958.  In this convention **the arbitration ruling will not only comprise sentences pronounced by the arbitrators named for particular cases, but also the sentences pronounced by permanent arbitration entities to which the parties have submitted themselves.** Likewise, in said convention, **the Dominican State promises to acknowledge the authorities of arbitration rulings** and, at the same time, to grant their execution in conformance with the norms of procedure in effect in its territory." (Accent in highlight ours).*

17.   On the occasion of the signing of the By-Laws and other Basic Contracts of Capitalization, the CDE stipulated (which is applicable to any of its successors) that **it was acting as a business partnership, without any immunity or privilege of jurisdiction**, this latter being a basic condition in order to promote the interest of the foreign investors who participated in said process (in this regard one can see paragraph 7 of art. 58 of ITABO's Corporate By-Laws; art. 9, letter h) of the Contract for Exploitation of Electrical Works; and art. 12.3, letter h) of the Contract for Signing of Shares, the observation of whose principles is ordered by art. 6 of the Administration Contract; and other contracts).  Moreover, in conformance with the Basic Contracts, CDE expresly stipulated the waiver of the right of actions before the ordinary judicial courts of the Dominican Republic.

18.   The clauses of commitment to arbitration are valid and binding on the Dominican State as a shareholder of ITABO, on CDE, and on any successor with interest, because in conformance with our laws, the Dominican State, state-owned corporations, and municipal organizations can be subject to arbitration.   The arbitration commitment assumed by CDE, agreed to in the Basic Capitalization Contracts, had the approval of the CDE's Board of Administration, which in conformance with art. 9, letter k) of its Organic

Law 4115 dated April 21, of the year 1955, could: *"k)...commit in arbitrators or friendly conciliators"* the CDE´s participation.

19.  The Dominican State and the CDE lack immunity of sovereign jurisdiction, not only because of the clauses of commitment to arbitration contained in the By-Laws and other Basic Contracts in which the State and the CDE intervene in operations of commerce and as subjects of private law, but also because of the fact that Art. 15 of Law No. 50-87 dated June 4, 1987, on the Chamber of Commerce and Production, expressly modified and repealed part of Article 1004 of the Dominican Civil Procedure Code, by providing that: "... *among the disputes which said Board may hear are those arising between one or more members of the Chamber and  the State or any of its dependencies, whether they be city halls, townships, autonomous and decentralized  entities, enterprises and institutions of the State and entities of general public Administration, no matter what the nature of the disagreement..."* This sets the competency of a national or foreign arbitration jrusidiction as is the case of ITABO, to hear the controversies which may arise because of the capitalization.

20.  Lack of immunity of sovereign jurisdiction of the State in those cases in which the latter acts as a subject of private law make it perfectly subject to national or international arbitration, if the contract signed by it in said condition of subject of private law stipulates the supplementary arbitration clause.  This opinion has been repeatedly upheld by both our doctrinaries and by those of France, which is the country of origin of Dominican laws and the obligatory frame of refernce of our juridical-procedural system, which state that **"from the moment when the public entity is deliberately placed in the same plane as private parties, arbitration is open under the same conditions as to the former;** that is to say, that the commitment is possible for any public establishment that concludes a contract of private law, and that the binding clauses restricted to commercial matters can be adopted by public, industrial, and commercial serivces and by public establishments of that same nature" (Henry Motulsky, Ecrits, Etudes et Notes sur Lárbitrage.  Dalloz, París, 1974, Page 85).  This solution established by internal law for the State acting as a private person has likewise been applied by French jurisprudence, which has established that the general principles referring to the competent law to govern contracts "are applied to contracts concluded between a State and a foreign citizen when said contracts, **both because of their nature and because of the form in which they were performed fall in the category of conventions of private law assimilable/applicable to those performed between private parties** (Civ. 31 May 1932).

21.  The By-Laws and other Basic Capitalization Contracts contain in addition the choice of Applicable Law in case of dispute, in which the parties chose the application of the laws of the State of New York, United States of America, to govern everything relating to arbitration demands, or which in aid of such demands, the parties are interested in bringing.   Said legislation is unavoidably applicable to the CDE or to its legal continuations, because it is thus recorded in the By-Laws and other Basic Capitalization Contracts.

22.  Art. 2 of the New York Convention on Acknowledgement and Execution of Foreign Arbitration Rulings establishes the following:

> "Art. II
> 1.  Each one of the Contracting States shall acknowledge the written agreement in conformance to which the parties promise to submit to arbitration any differences or certain differences which may have arisen or could arise between them regarding a particular legal, contractual or· non-contractual relationship, concerning a matter which can be resolved by arbitration.
>
> 2....
> 3.    The court of one of the Contracting States to which litigation is submitted regarding which the prties have concluded an agreement in the sense of the present article, shall remit the parties to arbitration, at the petition of one of them, unless it should determine that said agreement is void, ineffective, or unapplicable."

23.    By virtue of said treaty and for the cse in question, one concludes that the Dominican Republic, in its capacity as signatory of same, is obligated to the following:

a)  to acknowledge the arbitration commitment clauses contained in the By-Laws and other Basic Contracts;

b)  the Dominican courts given the mere determination of the existence of the arbitration commitment clauses is obligated to decline to hear any particular contractual or non-contractual controversy of a legal relationship;

24.  The By-Laws and other Basic Contracts applicable to ITABO and to ITABO's shareholders define that the "dispute" between them is "any difference or disagreement of any kind whatsoever between the CDE or whoever substitutes it by virtue of the laws of the Dominican Republic, and the Empresa Generadora de Electricidad de (Haina Unit or ITABO Unit) in connection with or arising in relation to the present contract or concerning the Company and its operations" (Contract for Granting of Rights for the Exploitation of Electrical Works).

25. In addition to this, the Administration Contract defines dispute as: "any difference or disagreement of any type between the Generator Company and the Signing Partnership, or the Strategic Investor Shareholder, in connection with or arising in relation to the present contract or concerning the Generator Company, its by-laws and its operations." ITABO's "By-Laws" are an integral part of said contract (Art. 1 Administration Contract).

26.  Consequently, in conformance with ITABO's Corporate By-Laws and the rest of the stipulations of the Basic Contracts, the arbitration jursidiction of the International Arbitration Court of the International Chamber of Commerce is the one competent to hear any dispute arising: (i) between ITABO's shareholders themselves, or with ITABO's

administration; (ii) any claim, action, or dispute related to ITABO's operations, assumed by the Basic Capitalization Contracts, including any demand for rendering of accounts related to ITABO.

27.    A demand for Rendering of Accounts (Accountability) brought by a minority shareholder of ITABO (as would be the CDE and its successors, in our case), is an action originating in the disagreement of one or several shareholders of the company, and necessarily affects the interpretation and application of ITABO's By-Laws.    For these reasons, this type of action must be considered as a Dispute, and heard or resolved in the manner provided for by the By-Laws and other Basic Contracts.    In that regard, article 58 of the By-Laws in its first paragraph clearly establishes as obligatory the fact that the parties must resort to arbitration "so long as, whenever differences or disputes arise among the shareholders, or between one or more shareholders and the partnership, or within the Board of Administration, related to the interpretation and application of the present by-laws, it is impossible to resolve them by common agreement among them."

28.    ITABO's Corporate By-Laws specify the rights and duties of the shareholders, and are incorporated as an Attachment to the Contract for Signing of Shares.    **Art. 12 of said By-Laws expressly prohibits ITABO's shareholders from interfering in corporate businesses;** and art. 47 of said By-Laws provides the right of CDE or its creditors as "Class A" shareholders to name a Commissar of Accounts so that, in conformance with the provisions of the Dominican Commercial Code and arts. 49 and 50 of the Corporate By-Laws, they receive the accounts of ITABO's Board of Administration and issue a report on same to the Annual Ordinary General Assembly of shareholders.

29.    The By-Laws and other Basic Contracts permit the Commissars designated by each one of the types of shareholders (A and B) every three months  to inspect periodically whether the operations of the company are in order, and to produce a report to the Board of Administration in this respect, signed by them.    This report is different from the one presented to the Annual Ordinary General shareholders' Assembly.    These provisions therefore establish an entity by by-laws in order to verify and receive the accounts of ITABO's administration and any dispute because of disagreement must be submitted to arbitration.

30.    An action brought by CDE or its successors so that the accounts of ITABO's operations be rendered to it is directly linked to the Contract for Signing of Shares, because any right which is invoked by a shareholder in order to request a rendering of accounts to ITABO necessarily originates in the Corporate By-Laws, and these latter are an integral part of the Contract for the Signing of  Shares under Attachment A (Art. 1-Definitions Contract for Signing of Shares).    In addition, the Contract for Signing of Shares establishes that ITABO is the "Generator Company" that would be formed under shelter of the CDE, in conformance with the Law on Reform of State-Owned Enterprises No. 141-97, likewise covered by the Contract for Signing of Shares; and consequently the by-laws of the generator companies are necessarily the ones that should be invoked in order to determine the rights and questions relating to the rendering of accounts requested by the CDE and its successors.

31.  ITABO′s By-Laws are linked to all of the rest of the Basic Contracts, because they are concatenated and the rights of the "Class A" and "Class B" shareholders are born in the By-Laws.  The right of the foreign investor (Undersigning Partnership-Strategic Partner) admitted in the capitalization of the CDE, supposes the obligation of said invesetor to comply   with the terms of the Contract for Signing of Shares, the Administration Contract, the Contract Granting Rights for the Exploitation of Electrical Works, the Energy Sale Contrct, and the Agreement of Transfer of the Energy Sale Contract.   For that reason neither the By-Laws nor the rest of the Basic Contracts described above can be effective nor executed the one without the other, because the cause of the rights and obligations are co-related.  The regime instituted for the drafting, negotiation, and signing of the By-Laws and the rest of the Basic Contracts was established in the Law 141-97 itself, as in the terms of reference, the sample formulas, and the amendments made to said contracts.  By virtue of that fact, any dispute deriving from the compliance or noncompliance with a Basic Contract, especially if it is related to ITABO′s management-administration, falls under the provision of Paragraph I of art. 58 of the Corporate By-Laws.

32.  Based on the fact that the competence of the said International Arbitration Court and the Panel which it may create to such effect is regulated by an international convention, it is obvious that said jurisdiction acquires, when the parties have signed an arbitration commitment clause, substantive hierarchy   prevailing over the local ordinary laws of competence, by virtue of the fact that such jurisdiction and the decision-making procedures implemented form part of the block of constitutionality proclaimed by art. 3 of the Constitution of the Republic which is in effect.

> I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

> Executed on June _____, 2005.

> _____
> Dr. Wellington Ramos Messina

Grant Hanessian (GH-6582)
Susan R. Knox (SK-4110)
BAKER & McKENZIE LLP
805 Third Avenue
New York, New York 10022
Tel. (212) 751-5700
Fax (212) 759-9133

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

EMPRESA GENERADORA DE ELECTRICIDAD    :    05 Civ. 5004 (RMB)
ITABO, S.A. ("ITABO").

           :    ECF CASE

       Plaintiff,

           :        **DECLARATION OF**

       - against -           :      **DR. WELLINGTON RAMOS**
                                        **MESSINA**

CORPORACIÓN DOMINICANA DE EMPRESAS    :
ELÉCTRICAS ESTATALES ("CDEEE"),

           :

       Defendant.
------------------------------------------------------------- X

Dr. Wellington Ramos Messina declare as follows:

1.      Yo soy un abogado con el grado de Doctor en Derecho y Notario Público,

       autorizado para ejercer el derecho en los Tribunales de la República Dominicana

       desde 1950, soy miembro y socio fundador de la firma "Ramos Messina &

       Asociados", una Oficina de Abogados establecida en Santo Domingo, República

       Dominicana desde 1951, miembro del cuerpo de árbitros de la Cámara de Comercio

       y Producción de Santo Domingo, profesor titular de la Universidad Autónoma de

       Santo Domingo (1960-65) y la Universidad Nacional Pedro Henríquez Ureña

       (1966-) en las materias de derecho penal y criminología, miembro del consejo de

2

directores del Colegio de Abogados de la República Dominicana (1961-64), pasado presidente de la Fundación Institucionalidad y Justicia (FINJUS), autor del Tratado de Derecho Bancario de la República Dominicana. La firma de abogados Ramos & Messina es especializada en las áreas de derecho corporativo, comercial, bancario, empresarial, civil, internacional, contractual, concesiones, distribución y cualquier otra rama de práctica general.

2.    En fecha 20 de mayo de 1997 nuestra firma suscribió un contrato de asesoría legal para participar como consultores nacionales de la Comisión de Reforma de la Empresa Pública ("CREP"), creada por la Ley 141-97 de fecha 24 de junio del año 1997, en ocasión de la capitalización de la Corporación Dominicana de Electricidad ("CDE"). Le escribo a la Corte, para comunicarle mi opinión sobre las cláusulas de arbitraje contenidas en los Estatutos y los Contratos Suscritos entre CDE y la Empresa Generadora de Electricidad ITABO, S. A. ("ITABO"), los cuales fueron elaborados por esta oficina como parte de los servicios de asesoría legal que tuvimos a bien prestar en el marco del referido proceso de capitalización.

3.    El 24 de junio de 1997 el Poder Ejecutivo promulgó en República Dominicana la Ley General de Reforma de la Empresa Pública No. 141-97. Dicha ley (en lo sucesivo la Ley 141-97) estableció el marco legal para permitir la capitalización de CDE. CDE era inicialmente la empresa pública a través de la cual la República Dominicana mantenía su participación y contratos con el sector privado en el área de energía eléctrica.

4.    En los años 1998 y 1999, la República Dominicana llevó a cabo un programa de capitalización en relación con la industria eléctrica propiedad del estado

3

Dominicano o de las actividades que con monopolio de explotación ostentaba la CDE. Esa capitalización la llevó a efecto la CREP, que emitió con asesoría internacional los términos de referencia y los diversos instrumentos legales, entre ellos los contratos que serán descritos más adelante, los cuales fueron enmendados sucesivamente en la medida en que durante la fase de consultas participaron los distintos proponentes precalificados, hasta que quedó aprobada la versión final de dichos contratos.

5. Como resultado de dicho programa se crearon diversas empresas que, mediante la capitalización por parte de inversionistas privados, obtuvieron los recursos financieros y la asistencia técnica necesarios para mejorar y expandir la generación de energía eléctrica del país e invertir en el sector eléctrico.

6. De conformidad con la Ley 141-97 se crearon cinco empresas de comercio: dos de ellas, ITABO y Empresa Generadora de Electricidad Haina, S.A. estarían dedicadas a la **generación** de electricidad, mientras que las tres restantes, Empresa Distribuidora de Electricidad del Norte, S.A., Empresa Distribuidora de Electricidad del Sur, S.A. y Empresa Distribuidora de Electricidad del Este, S.A. tendrían por actividad principal la **distribución** de electricidad. Es decir que de las empresas comerciales generadoras de electricidad creadas mediante la Ley 141-97 ITABO fue una, para lo cual se suscribieron los correspondientes actos de constitución (Asambleas, Estatutos, Nóminas, Informes Comisariales de Aportes, y demás formalidades del Código de Comercio).

7. De acuerdo a los términos contenidos en la referida Ley 141-97, ITABO sería capitalizada mediante (i) el aporte que hiciera CDE a dichas empresas de ciertos

4

equipos e infraestructura para la generación de energía eléctrica, por cuya aportación CDE recibiría acciones comunes Serie A; y (ii) por el aporte en numerario por las empresas privadas que resultaren adjudicatarias en un procedimiento de licitación pública internacional a cargo de la CREP. Las empresas privadas que capitalizaran a las empresas generadoras de energía eléctrica recibirían por su aporte el equivalente al 50% de las acciones representativas del capital social de las empresas capitalizadas, bajo la forma de acciones Serie B.

8.   Como resultado del procedimiento de licitación pública internacional correspondiente, en el caso de ITABO se celebraron los siguientes contratos:

     i)     Estatutos Sociales de ITABO;
     ii)    Contrato de Suscripción de Acciones;
     iii)   Contrato de Administración;
     iv)   Contrato de Otorgamiento de Derechos para la Explotación de Obras Eléctricas relativas a la Generación de Electricidad;
     v)    Contrato de Venta de Energía;
     vi)   Acuerdo de Cesión del Contrato de Venta de Energía.

9.   A esos contratos se les ha denominado "Contratos Básicos" del Proceso de Capitalización. Esos contratos rigen las relaciones que se dan entre ITABO y los accionistas de ITABO, incluido el Fondo Patrimonial de las Empresas Reformadas (FONPER) creado por los arts. 20 de la Ley 141-97 y 2 y siguientes de la Ley 124-01 del 24 de julio del año 2001 y de cualesquiera otros intereses del Estado Dominicano en las empresas capitalizadas, en sucesión de los derechos de CDE. Tengo entendido que copia de esos contratos han sido depositados por ITABO ante ese honorable tribunal.

5

10.     Tanto los Estatutos como los demás Contratos Básicos establecen que los accionistas deberán intentar solucionar sus diferencias de manera amigable, pero que en caso de que dichos esfuerzos resultaren inútiles las disputas entre las partes deberán resolverse mediante arbitraje comercial internacional. En su parte relevante, los Estatutos y los demás Contratos Básicos disponen de la manera siguiente:

> *"Si la República Dominicana ratificase la Convención de Nueva York sobre el reconocimiento y ejecución de sentencias arbitrales extranjeras adoptada por las Conferencia de Naciones Unidas sobre Arbitraje Comercial Internacional, del 10 de junio de 1958, y/o la Convención de Panamá sobre Arbitraje Comercial, las partes aceptan dirimir sus disputas mediante un arbitraje internacional, de conformidad con las Reglas de Arbitraje de la Cámara de Comercio Internacional (ICC Rules of Conciliation) del 1 de enero de 1988, y bajo las leyes de Nueva York. Ningún árbitro designado según este artículo será ciudadano de ninguna de las jurisdicciones de las partes o de la jurisdicción de cualquiera de los accionistas iniciales, así como tampoco podrá ese árbitro ser empleado o agente ni antiguo empleado ni agente de cualesquiera de dichas personas."*

11.     La República Dominicana ratificó la Convención de Nueva York mediante resolución 178-01 del Congreso Nacional debidamente promulgada por el Poder Ejecutivo el día 8 de noviembre de 2001. República Dominicana se adhirió formalmente a la Convención de Nueva York en fecha 11 de abril del año 2002, entrando en vigor a partir del día 10 de julio del año 2002.

12.     Es menester informar a esta Honorable Corte, que la Convención de Nueva York, como se le conoce en el mundo internacional, se encuentra debidamente sustentada por la Constitución de la República Dominicana del 25 de julio de 2002, según artículos 3, 37 y 55 de la Carta Magna, al establecer dichos preceptos que la República Dominicana **"reconoce y aplica las normas del derecho internacional**

6

general y americano en la medida en que sus poderes públicos la hayan adoptado".

13.    Esta Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras, que se encuentra ya en vigor en la República Dominicana es un estatuto legal imponible a las partes intervinientes en el proceso de capitalización de la antigua CDE, o a cualquier sucesor con interés en dicho proceso, real continuador de los derechos de CDE.

14.    Los Estatutos Sociales de ITABO y los demás Contratos Básicos establecen que las partes deberán resolver sus diferencias por mutuo acuerdo pero que en caso de que dichos esfuerzos resultaran inútiles, los accionistas en conflicto deberán resolver sus disputas mediante arbitraje comercial internacional.    Este mecanismo de solución de disputas se encuentra previsto de manera expresa en los Estatutos Sociales y los demás Contratos Básicos, conteniendo cada uno de ellos dentro de su parte relevante una cláusula o estipulación en la cual se establece el carácter de obligatoriedad del arbitraje comercial internacional en caso de disputas no resueltas entre accionistas. En ese sentido, los Estatutos y los demás Contratos Básicos han estipulado separadamente de la manera siguiente:

A.    Estatutos Sociales de ITABO

*"ARBITRAJE*
*Art. 58. En caso de que en las deliberaciones de la Junta General Ordinaria o Extraordinaria se suscitare un empate que no pueda ser resuelto por mutuo acuerdo, los accionistas estarán obligados a recurrir al arbitraje realizado de conformidad con lo que posteriormente se dispone en este artículo. Será igualmente obligatorio recurrir al arbitraje siempre que, al surgir diferencias o disputas entre los accionistas o entre uno o más de éstos y la sociedad o dentro del Consejo de Administración relacionados con la interpretación y*

*aplicación de los presentes estatutos, sea imposible resolverlo de común acuerdo entre ellos.*

*Cualquier disputa, que según lo anteriormente establecido no sea resuelta por mutuo acuerdo entre las partes en conflicto, deberá ser resuelta mediante arbitraje celebrado de conformidad con las disposiciones de la Ley No. 50-87 del 4 de junio de 1987 de la República Dominicana y bajo las reglas y procedimientos de arbitraje establecidas por el Reglamento del Tribunal Arbitral de la Cámara de Comercio y Producción del Distrito Nacional, Inc. de noviembre de 1988 (los "Reglamentos de Arbitraje").*

*Dicho arbitraje tendrá lugar en Santo Domingo, República Dominicana, y, excepto si las Partes decidieran otra cosa, el número de árbitros será tres, designados mediante acuerdo entre las Partes y, en caso de no llegarse a un acuerdo, los árbitros serán designados conforme al procedimiento establecido en el Título II del mencionado Reglamento.*

*Tal como lo establece el Artículo 34 del Reglamento de Arbitraje, previa aprobación del Bufete Directivo del Consejo de Conciliación y Arbitraje de la Cámara de Comercio y Producción de Santo Domingo, las Partes podrán fijar la sede del Tribunal Arbitral en cualquier otro lugar, en el país o en el extranjero, en cuyo caso, cada parte asumirá sus gastos de transporte y estadía, y en conjunto, todos los gastos del traslado del Tribunal Arbitral y los trabajos de la Secretaría de dicho tribunal. Si una de las Partes se opusiera al traslado del tribunal arbitral, correrán bajo la cuenta del solicitante, los gastos en que se incurra para tal efecto.*

*El laudo que se dicte al efecto se considerará como resultado de un procedimiento iniciado y efectuado en Santo Domingo, República Dominicana.*

*Cualquier arbitraje celebrado en virtud de lo anterior deberá ser conducido en idioma español.*

*Los accionistas, al adquirir tal calidad, en virtud de los presente estatutos, irrevocablemente renuncian a su derecho de acudir a los tribunales ordinarios o de excepción para solicitar la opinión del Tribunal, en cuanto lo permita la Ley, en relación con cualquier asunto de derecho que surja en el curso del arbitraje o con respecto a la decisión tomada por los árbitros. Igualmente renuncian irrevocablemente a cualquier derecho a impugnar o discutir la validez o ejecutoriedad tanto de los procedimientos de arbitraje, como de los laudos dictados de conformidad con lo previsto en este artículo, incluyendo cualquier objeción basada en la incompetencia o jurisdicción inapropiada.*

8

*Para los fines de este artículo, se reconoce que la CDE o sus causahabientes estarán siempre regidos por las disposiciones del Código de Comercio de la República Dominicana y el Derecho Común dominicano, por lo que no se alegará inmunidad alguna en lo relativo al proceso arbitral al que se refiere el presente artículo.*

*Se acuerda expresamente que si fuere procedente, cualquiera de las partes en conflicto podrá solicitar al Tribunal Arbitral fusionar cualquier procedimiento de arbitraje que surja o se relacione con estos estatutos si el motivo principal de las disputas provienen de o se relacionan con los estatutos. Tal arbitraje fusionado deberá ser resuelto por el tribunal arbitral designado para conocer el procedimiento que hubiese iniciado primero. Excepto lo que en contrario se dispone en los párrafos anteriores, el derecho de las partes a proceder con la resolución de las disputas mediante el arbitraje establecido en estos estatutos será independiente de su derecho o del derecho de otras entidades a proceder con la resolución de sus disputas conforme a lo establecido en los acuerdos o contratos suscritos entre ellas.*

*Los accionistas y la compañía renuncian a cualquier derecho a recurrir o apelar cualquier decisión o laudo que resulte del arbitraje, por lo que tal decisión o laudo será considerada definitiva y obligatoria para todos y deberá ser acatada sin retardo alguno. Todo laudo o decisión arbitral podrá ser ejecutado por cualquier tribunal competente.*

*Si la República Dominicana ratificase la Convención de Nueva York sobre el reconocimiento y la ejecución de las sentencias arbitrales extranjeras adoptada por la Conferencia de las Naciones Unidas sobre Arbitraje Comercial Internacional, del 10 de junio de 1958 y/o la Convención de Panamá sobre Arbitraje Comercial, las partes aceptan dirimir sus disputas mediante un arbitraje internacional, de conformidad con las reglas de la Cámara Internacional de Comercio (ICC Rules of Conciliation) del 1 de agosto de 1988, y bajo las leyes de Nueva York. Ningún árbitro designado según este artículo será ciudadano de ninguna de las jurisdicciones de las Partes, así como tampoco podrá ese árbitro, ser empleado o agente ni antiguo empleado ni agente de cualesquiera de dichas personas."*

## B. Contrato de Explotación de Obras Eléctricas:

*"ARTICULO 9. – RESOLUCION DE DISPUTAS*
*(a)    Cualquier Disputa que surja o con relación a este Contrato y que no sea resuelta por mutuo acuerdo entre las partes en conflicto, deberá ser resuelta a solicitud de cualquiera de las partes, mediante arbitraje celebrado de conformidad con la Ley de Arbitraje y bajo los Reglamentos de Arbitraje. Las partes renuncian desde ahora y para siempre a someter cualquier litigio*

9

*a cualquier tribunal de orden judicial o internacional, salvo lo expresado más abajo en el literal h.*

*(b)    El arbitraje tendrá lugar en Santo Domingo, República Dominicana, y, excepto si las Partes decidieran otra cosa, el número de árbitros será tres, designados mediante acuerdo entre las Partes o, en caso de no llegarse a un acuerdo, lo árbitros serán designados de acuerdo con el Título II de los Reglamentos de Arbitraje, o, en caso de sustitución, el título aplicable.*

*(c)    Tal como lo establece el Artículo 34 de los Reglamentos de Arbitraje, previa aprobación del Bufete Directivo, las Partes podrán fijar la sede del tribunal arbitral en cualquier lugar fuera de Santo Domingo en la República Dominicana o en el extranjero, en cuyo caso, cada una de las Partes asumirá sus gastos de transporte y estadía, y en conjunto, todos los gastos relacionados al traslado del tribunal arbitral y los gastos de la secretaría del tribunal arbitral. Si una de las Partes se opone al traslado del tribunal arbitral, el solicitante pagará los gastos en que se incurran a tal efecto.*

*(d)    El laudo que se dicte al efecto se considerará como resultado de un procedimiento iniciado y efectuado en Santo Domingo, República Dominicana.*

*(e)    Cualquier decisión que pueda ser rendida al respecto, será inapelable ante cualquier jurisdicción o tribunal de la República Dominicana o del extranjero y será considerada definitiva y obligatoria para los partes de inmediato, y no estará sujeto, para su ejecutoriedad, a los requisitos de los Artículos 1020 y 1021 del Código de Procedimiento Civil, según lo establece el reglamento de arbitraje vigente de la Cámara de Comercio y Producción del Distrito Nacional, en su Artículo 52. Cualquier sanción monetaria incluirá los intereses legales desde la fecha de cualquier incumplimiento u otra violación de ese Contrato hasta la fecha en la cual se pague dicha sanción, a una tasa determinada por el (los) árbitro (s).*

*(f)    Cualquier arbitraje celebrado en virtud de lo anterior deberá ser conducido en idioma español.*

*(g)    Por este medio las Partes renuncian irrevocablemente a su derecho a acudir a los tribunales ordinarios o, en cuanto lo permitan las Leyes de la República Dominicana, de excepción para solicitar la opinión de algún tribunal en relación con cualquier asunto de derecho que surja en su curso del arbitraje o con respecto a la decisión tomada por los árbitros. Igualmente renuncian irrevocablemente a cualquier derecho de impugnar o discutir la validez o ejecutoriedad tanto de los procedimientos de arbitraje, como de los laudos dictados de conformidad con lo previsto en este Artículo, incluyendo cualquier objeción basada en la incompetencia o jurisdicción inapropiada.*



10

*(h)    Para los fines de este Contrato, se reconoce, y la CDE acuerda, que la
CDE o sus causahabientes estará siempre regidos por las disposiciones del
Código de Comercio y del derecho común consagradas por las Leyes de la
República Dominicana y no alegará inmunidad alguna en lo relativo al
proceso arbitral al que se refiere el presente Artículo.*

*(i)    Se acuerda expresamente que si fuere procedente, cualquiera de las
Partes en conflicto podrá solicitar al tribunal arbitral fusionar cualquier
procedimiento de arbitraje que surja de o se relacione con este Contrato con
cualquier arbitraje que surja de o tenga relación con La Compañía con uno
o más de los Contratos Básicos. Tal arbitraje consolidado deberá ser resuelto
por el tribunal arbitral designado para conocer el proceso arbitral que se
hubiese iniciado primero.*

*(j)    Las partes renuncian irrevocablemente a cualquier derecho a recurrir o
apelar cualquier decisión o laudo que resulte del arbitraje, por lo que tal
decisión o laudo será considerada definitiva y obligatoria para todos y será
acatada sin retardo alguno. Todo laudo o decisión arbitral podrá ser
ejecutado por cualquier tribunal competente.*

*(k)    En caso de que la República Dominicana ratificase la Convención de
Nueva York y/o la Convención de Panamá, las partes aceptan dirimir sus
disputas mediante un arbitraje internacional, de conformidad con las reglas
de la Cámara Internacional de Comercio (ICC Rules of Conciliation) del 1 de
enero de 1988, y bajo las leyes de Nueva York. Ningún árbitro designado
según este artículo será ciudadano de las jurisdicciones de cualquiera de las
Partes, así como tampoco podrá ese árbitro, ser empleado o agente ni
antiguo empleado ni agentes de cualesquiera de dichas personas.*

C.    Contrato de Administración

*"ARTÍCULO 6.- RESOLUCIÓN DE DISPUTAS. Cualquier Disputa,
controversia o reclamo que surja de este Contrato o del incumplimiento,
terminación o validez del mismo, será resuelta de acuerdo con los Estatutos".*

D.    Contrato de Suscripción de Acciones

*"12.3. Arbitraje*
*( a )    Cualquier Disputa que surja de o con relación a este Contrato y que
no sea resuelta por mutuo acuerdo entre las partes en conflicto, deberá ser
resuelta a solicitud de cualquiera de las partes, mediante arbitraje celebrado
de conformidad con la Ley de Arbitraje y bajo los Reglamentos de Arbitraje.
Las partes renuncian desde ahora y para siempre a someter cualquier litigio
a cualquier tribunal de orden judicial o internacional, salvo lo expresado más
abajo en el literal (k).*

11

(b)   El arbitraje tendrá lugar en Santo Domingo, República Dominicana, y, excepto si las Partes decidieran otra cosa, el número de árbitros será tres, designados mediante acuerdo entre las Partes o, en caso de no llegarse a un acuerdo, lo árbitros serán designados de acuerdo con el Título II de los Reglamentos de Arbitraje, o, en caso de sustitución, el título aplicable.

(c)   Tal como lo establece el Artículo 34 de los Reglamentos de Arbitraje, previa aprobación del Bufete Directivo, las Partes podrán fijar la sede del tribunal arbitral en cualquier lugar fuera de Santo Domingo, en la República Dominicana o en el extranjero, en cuyo caso, cada una de las Partes asumirá sus gastos de transporte y estadía, y en conjunto, todos los gastos relacionados al traslado del tribunal arbitral y los gastos de la secretaría del tribunal arbitral. Si una de las Partes se opone al traslado del tribunal arbitral, el solicitante pagará los gastos en que se incurran a tal efecto.

(d)   El laudo que se dicte al efecto se considerará como resultado de un procedimiento iniciado y efectuado en Santo Domingo, República Dominicana.

(e)   Cualquier decisión que pueda ser rendida al respecto, será inapelable ante cualquier jurisdicción o tribunal de la República Dominicana o del extranjero y será considerada definitiva y obligatoria para los partes de inmediato, y no estará sujeta, para su ejecutoriedad, a los requisitos de los Artículos 1020 y 1021 del Código de Procedimiento Civil, según lo establece el reglamento de arbitraje vigente de la Cámara de Comercio y Producción del Distrito Nacional, en su Artículo 52. Cualquier sanción monetaria incluirá los intereses legales desde la fecha de cualquier incumplimiento u otra violación de ese Contrato hasta la fecha en la cual se pague dicha sanción, a una tasa determinada por el (los) árbitro (s).

(f)   Cualquier arbitraje celebrado en virtud de lo anterior deberá ser conducido en idioma español.

(g)   Por este medio las Partes renuncian irrevocablemente a su derecho a acudir a los tribunales ordinarios o, en cuanto lo permitan las Leyes de la República Dominicana, de excepción para solicitar la opinión de algún tribunal en relación con cualquier asunto de derecho que surja en su curso del arbitraje o con respecto a la decisión tomada por los árbitros. Igualmente renuncian irrevocablemente a cualquier derecho de impugnar o discutir la validez o ejecutoriedad tanto de los procedimientos de arbitraje, como de los laudos dictados de conformidad con lo previsto en este Artículo, incluyendo cualquier objeción basada en la incompetencia o jurisdicción inapropiada.

(h)   Para los fines de este Contrato, se reconoce, y la CDE acuerda, que la CDE o sus causahabientes estará siempre regidos por las disposiciones del Código de Comercio y del derecho común consagradas por las Leyes de la

12

*República Dominicana por lo que no gozará de ningún derecho como entidad del Gobierno de la República Dominicana y no alegará inmunidad alguna en lo relativo al proceso arbitral al que se refiere el presente artículo.*

*(i)     Se acuerda expresamente que si fuere procedente, cualquiera de las Partes en conflicto podrá solicitar al tribunal arbitral fusionar cualquier procedimiento de arbitraje que surja o se relacione con este Contrato con cualquier arbitraje que surja de o tenga relación con la Generadora o con uno o más de los Contratos Básicos. Tal arbitraje consolidado deberá ser resuelto por el tribunal arbitral designado para conocer el proceso arbitral que se hubiese iniciado primero.*

*(j)     Las partes renuncian irrevocablemente a cualquier derecho a recurrir o apelar cualquier decisión o laudo que resulte del arbitraje, por lo que tal decisión o laudo será considerada definitiva y obligatoria para todos y será acatada sin retardo alguno. Todo laudo o decisión arbitral podrá ser ejecutado por cualquier tribunal competente.*

*(k)     En caso de que la República Dominicana ratificase la Convención de Nueva York y/o la Convención de Panamá, las partes aceptan dirimir sus disputas mediante un arbitraje internacional, de conformidad con las reglas de la Cámara Internacional de Comercio (ICC Rules of Conciliation) del 1ero. de enero de 1988, y bajo las leyes de Nueva York. Ningún árbitro designado según este artículo será ciudadano de las jurisdicciones de cualquiera de las Partes, así como tampoco podrá ese árbitro, ser empleado o agente ni antiguo empleado ni agente de cualesquiera de dichas personas.*

## E. Contrato de Venta de Energía

*"ARTICULO 9.3 ARBITRAJE*
*Cualquier Disputa originada por relacionada con este Contrato deberá ser resuelta mediante arbitraje celebrado de conformidad con las disposiciones de la Ley No. 50-87 del 4 de junio de 1987 de la República Dominicana, y bajo las Reglas y Procedimientos de Arbitraje establecidas por el Reglamento del Tribunal Arbitral de la Cámara de Comercio y Producción del Distrito Nacional, Inc. de noviembre de 1988 (las "Reglas Dominicanas de Arbitraje").*

*El arbitraje tendrá lugar en Santo Domingo, República Dominicana, y, excepto si las Partes decidieran otra cosa, el número de árbitros será tres, designados mediante acuerdo entre las Partes o, en caso de no llegarse a un acuerdo, los árbitros serán designados de acuerdo con el Título II de los Reglamentos de Arbitraje, o el título aplicable.*

*Tal como lo establece el Artículo 34 de las Reglas Dominicanas de Arbitraje, previa aprobación del Bufete Directivo del Consejo de Conciliación y*

13

*Arbitraje de la Cámara de Comercio y Producción de Santo Domingo, las Partes podrán fijar la sede del tribunal arbitral en cualquier lugar fuera de Santo Domingo en la República Dominicana o en el extranjero, en cuyo caso, las Partes asumirán todos los gastos relacionados al traslado del tribunal arbitral. Si una de las Partes se opone al traslado del tribunal arbitral, el solicitante pagará los gastos en que se incurra para tal efecto.*

*El laudo que se dicte al efecto se considerará como resultado de un procedimiento iniciado y efectuado en Santo Domingo, República Dominicana.*

*Cualquier decisión que pueda ser rendida al respecto, será inapelable ante cualquier jurisdicción o tribunal de la República Dominicana o del extranjero y será considerada definitiva y obligatoria para los partes de inmediato, y no estará sujeta, para su ejecutoriedad, a los requisitos de los Artículos 1020 y 1021 del Código de Procedimiento Civil, según lo establece el reglamento de arbitraje vigente de la Cámara de Comercio y Producción del Distrito Nacional, en su Artículo 52. Cualquier sanción monetaria incluirá los intereses legales desde la fecha de cualquier incumplimiento u otra violación de este Contrato hasta la fecha en la cual se pague dicha sanción, a una tasa determinada por el (los) árbitro (s).*

*Cualquier arbitraje celebrado en virtud de lo anterior deberá ser conducido en idioma español.*

*Por este medio las Partes renuncian irrevocablemente a su derecho a acudir a los tribunales ordinarios o de excepción en cuanto lo permitan las Leyes de la República Dominicana, para solicitar la opinión de algún tribunal en relación con cualquier asunto de derecho que surja en el curso del arbitraje o con respecto a la decisión tomada por los árbitros. Igualmente renuncian irrevocablemente a cualquier derecho de impugnar o discutir la validez o ejecutoriedad tanto de los procedimientos de arbitraje, como de los laudos dictados de conformidad con lo previsto en este Artículo, incluyendo cualquier objeción basada en la incompetencia o jurisdicción inapropiada.*

*Para los fines de este Contrato, se reconoce, y CDE acuerda, que la CDE o sus causahabientes estará siempre regidos por las disposiciones del Código de Comercio y del derecho común bajo las Leyes de la República Dominicana por lo que no gozará de ningún derecho como agencia del Gobierno de la República Dominicana y no alegará inmunidad alguna en lo relativo al proceso arbitral al que se refiere el presente Artículo.*

*Se acuerda expresamente que si fuere procedente, cualquiera de las Partes podrá solicitar al tribunal arbitral fusionar cualquier procedimiento de arbitraje que surja de o se relacione con este Contrato con cualquier arbitraje que surja de o tenga relación con uno o más de los Contratos*

14

*firmados por ambas partes relativos al proceso de capitalización del Sector Eléctrico de la República Dominicana, si el motivo principal de las disputas proviene de o se relaciona con hechos o transacciones relacionados esencialmente similares. Tal arbitraje consolidado deberá ser resuelto por el tribunal arbitral designado para conocer el proceso arbitral que se hubiese iniciado primero. Excepto lo que en contrario se dispone en los párrafos anteriores, el derecho de las partes a proceder con la resolución de las disputas mediante esta sección 9.3 será independiente de sus derechos o los derechos de otras entidades a proceder con la resolución de sus disputas conforme a lo establecido en cualquier otro acuerdo o contrato.*

*Las partes renuncian irrevocablemente a cualquier derecho a recurrir o apelar cualquier decisión o laudo que resulte del arbitraje, por lo que tal decisión o laudo será considerada definitiva y obligatoria para todos y deberá ser acatada sin retardo alguno. Todo laudo o decisión arbitral podrá ser ejecutado por cualquier tribunal competente.*

*En caso de que la República Dominicana ratificase la Convención de Nueva York v/o la Convención de Panamá, las partes aceptan dirimir sus disputas mediante un arbitraje internacional, de conformidad con las reglas de la Cámara Internacional de Comercio (ICC Rules of Conciliation) del 1 de agosto de 1988, y bajo las leyes de Nueva York. Ningún árbitro designado según este artículo será ciudadano de las jurisdicciones de cualquiera de las Partes, así como tampoco podrá ese árbitro, ser empleado o agente ni antiguo empleado ni agentes de cualesquiera de dichas personas.*

F. Acuerdo para la Cesión del Contrato de Venta de Energía

*"7.1 Elección de Normas.*
*Las partes acuerdan que los convenios que se refieren a responsabilidad e indemnización, fuerza mayor, resolución de disputas, gastos, encabezamiento, actos comerciales, selección de ley, integridad del Contrato, participación de terceras partes, enmiendas, renuncia de derechos, relación de las partes, supervivencia, idioma, otras garantías, consentimientos, divisibilidad, lesión, confidencialidad, sucesores y cesionarios y copias, son aquellos convenidos por la CDE en los artículos VII, VIII, IX y X del Contrato de Venta de Energía".*

15.    Los Estatutos y demás Contratos Básicos suscritos entre las partes, en lo referente a

las cláusulas de arbitraje, son la ley entre ellas. Ello en virtud de que son

obligaciones asumidas de conformidad con los arts. 1134 del Código Civil

Dominicano y el artículo 631 del Código de Comercio, que disponen lo siguiente:

15

Art. 1134 Código Civil:

"Las convenciones legalmente formadas tienen fuerza de ley para aquellos
que las han hecho. No pueden ser revocadas, sino por su mutuo
consentimiento, o por las causas que están autorizadas por la ley. *Deben
llevarse a ejecución de buena fe.*"

Art. 631 Código de Comercio:

*"Los tribunales de comercio conocerán: 1°. De todas las contestaciones
relativas a los compromisos y transacciones entre negociantes, comerciantes
y banqueros; 2°. De las contestaciones entre asociados por razón de una
compañía de comercio; 3°. De las contestaciones relativas a los actos de
comercio entre cualesquiera personas.*

*Sin embargo, las partes podrán, en el momento en que ellas contratan,
convenir en someter a árbitros las contestaciones arriba enumeradas,
cuando éstas se produzcan." (El acento en negritas es nuestro).*

16.   Las estipulaciones convenidas originalmente por las partes respecto a la jurisdicción
arbitral nacional de la "Cámara de Comercio y Producción del Distrito Nacional
Inc.", hoy "Cámara de Comercio y Producción de Santo Domingo Inc.", prevista
por la Ley No. 50-87 del 4 de junio de 1987, quedaron suplantadas por la
obligatoria celebración de un arbitraje internacional ante la Cámara de Comercio
Internacional (CCI), por efecto de haber ratificado la República Dominicana la
Convención de Nueva York mediante Resolución No. 178-01 del Congreso
Nacional debidamente promulgada por el Ejecutivo el día 8 de noviembre de 2001.
El texto de dicha resolución estaba compuesto por un artículo único en el cual se
establecía lo siguiente:

*"APROBAR la adhesión a la Convención sobre Reconocimiento y
Ejecución de las Sentencias Arbitrales Extranjeras, suscrita por la
República Dominicana, en la ciudad de New York, Estados Unidos
de América, el 10 de junio de 1958. En este convenio la sentencia
arbitral no sólo comprenderá las sentencias dictadas por los
árbitros nombrados para casos determinados, sino también las*

16

> *sentencias dictadas por los órganos arbitrales permanentes a las que las partes se hayan sometido. Asimismo, en dicho convenio, el Estado Dominicano se compromete a reconocer la autoridad de las sentencias de arbitraje y, al mismo tiempo, conceder su ejecución de conformidad con las normas de procedimiento vigentes en su territorio." (El acento en negritas es nuestro).*

17.  En ocasión de la suscripción de los Estatutos y demás Contratos Básicos de la Capitalización, CDE estipuló (lo que es aplicable a cualquier sucesora o continuadora jurídica de ella) que **actuaba como una sociedad de comercio, sin ninguna inmunidad ni privilegio de jurisdicción,** siendo ésta una condición básica para promover el interés de los inversionistas extranjeros que participaron en dicho proceso (en este sentido puede verse el párrafo 7 del art. 58 de los Estatutos Sociales de ITABO; art. 9, literal h) del Contrato de Explotación de Obras Eléctricas; y art. 12.3, literal h) del Contrato de Suscripción de Acciones, cuyos principios manda a observar el art. 6 del Contrato de Administración; y demás contratos). Más aún, de conformidad con los Contratos Básicos CDE estipuló expresamente la renuncia del ejercicio de acciones ante los tribunales judiciales ordinarios de la República Dominicana.

18.  Las cláusulas compromisorias de arbitraje son válidas y vinculantes al Estado Dominicano como accionista de ITABO, a CDE y cualquier sucesor con interés, porque de conformidad con nuestras leyes el Estado Dominicano, las corporaciones públicas y organizaciones municipales pueden ser sujeto de arbitraje. El compromiso de arbitraje asumido por CDE, pactado en los Estatutos y demás Contratos Básicos de la Capitalización contó con la aprobación del Consejo de Administración de CDE, el cual de conformidad con el art. 9, literal k) de su Ley

17

Orgánica 4115 del 21 de abril del año 1955, podía: *"k)...comprometer en árbitros o amigables componedores"*, la participación de CDE.

19.    El Estado Dominicano y la CDE carecen de inmunidad de jurisdicción soberana, no solo por las cláusulas compromisorias de arbitraje contenidas en los Estatutos y demás Contratos Básicos en los que el Estado y CDE intervienen en operaciones de comercio y como sujetos de derecho privado, sino además porque el Art. 15 de la Ley No. 50-87 del 4 de junio de 1987 sobre Cámaras de Comercio y Producción, de manera expresa modificó y derogó parte del Artículo 1004 del Código de Procedimiento Civil Dominicano, al disponer que *"entre los diferendos que podrá conocer dicho Consejo se encuentran aquellos que surjan entre uno o más miembros de la Cámara y el Estado o cualquiera de sus dependencias, sean estos ayuntamientos, municipios, organismos, empresas e instituciones autónomas y descentralizadas del Estado y órganos de la Administración pública en general, sin importar la naturaleza del diferendo..."* Esto fija la competencia de una jurisdicción arbitral nacional o extranjera como es el caso de ITABO, para dirimir las controversias que se susciten con motivo de la capitalización.

20.    La carencia de inmunidad de jurisdicción soberana del Estado en aquellos casos en que éste actúe como un sujeto de derecho privado le hacen perfectamente pasible de un arbitraje nacional o internacional, si el contrato suscrito por él en dicha condición de sujeto de derecho privado estipulara la cláusula arbitral supletoria. Este criterio ha sido sustentado repetidamente tanto por nuestros doctrinarios como por aquellos de Francia, país en que tuvieron origen las leyes dominicanas y marco de referencia obligatorio de nuestro sistema jurídico-procesal, los cuales afirman que *"desde el*

18

momento en que la colectividad pública se coloca deliberadamente en el mismo plano que los particulares, el arbitraje le está abierto en las mismas condiciones que a aquellos; es decir, que el compromiso es posible para cualquier establecimiento público que concluye un contrato de derecho privado, y que las cláusulas compromisorias restringidas a las materias comerciales pueden ser adoptadas por los servicios públicos, industriales y comerciales y por los establecimientos públicos de ese mismo carácter" (Henry Motulsky, Ecrits, Etudes et Notes sur L'arbitrage. Dalloz, París 1974, Página 85). Esta solución establecida por el derecho interno a propósito del Estado actuando como persona privada ha sido igualmente aplicada por la jurisprudencia francesa, la cual ha establecido que los principios generales referentes a la ley competente para regir los contratos "se aplican a los contratos concluidos entre un Estado y un ciudadano extranjero cuando esos contratos, tanto por su naturaleza como por la forma en que fueron realizados entran en la categoría de convenciones de derecho privado asimilables a aquellas realizadas entre particulares (Civ. 31 de mayo 1932).

21.   Los Estatutos y demás Contratos Básicos de la Capitalización contienen además elección de la Ley Aplicable en caso de disputa, para lo cual las partes eligieron la aplicación de las leyes del Estado de Nueva York, Estados Unidos de Norteamérica, para regir todo lo relativo a las demandas arbitrales, o que en ayuda de tales demandas las partes tengan interés de interponer. Esa legislación es de aplicación ineludible a CDE o a sus continuadores jurídicos, porque así consta en los Estatutos y demás Contratos Básicos de la Capitalización.

19

22.    El art. 2 de la Convención de Nueva York sobre el Reconocimiento y Ejecución de
las Sentencias Arbitrales Extranjeras establece lo siguiente:

"Art. II
1.  Cada uno de los Estados Contratantes reconocerá el acuerdo por escrito
    conforme al cual las partes se obliguen a someter a arbitraje todas las
    diferencias o ciertas diferencias que hayan surgido o puedan surgir entre
    ellas respecto a una determinada relación jurídica, contractual o no
    contractual, concerniente a un asunto que pueda ser resuelto por
    arbitraje.
2.  ...
3.  El tribunal de uno de los Estados Contratantes al que se someta un litigio
    respecto del cual las partes hayan concluido un acuerdo en el sentido del
    presente artículo, remitirá a las partes al arbitraje, a instancia de una de
    ellas, a menos que compruebe que dicho acuerdo es nulo, ineficaz o
    inaplicable".

23.    En virtud de dicho tratado y para el caso que nos ocupa se concluye que la
República Dominicana en su calidad de signataria del mismo está obligada a lo
siguiente:

a)   reconocer las cláusulas compromisorias de arbitraje contenidas en los
     Estatutos y demás Contratos Básicos;

b)   los tribunales dominicanos ante la simple comprobación de la existencia
     de las cláusulas compromisorias de arbitraje se encuentran en la
     obligación de declinar el conocimiento de cualquier controversia
     contractual o no contractual determinada de una relación jurídica;

24.    Los Estatutos y demás Contratos Básicos aplicables a ITABO y a los accionistas de
ITABO definen que la "disputa" entre ellos es "cualquier diferencia o desavenencia
de cualquier tipo en absoluto entre la CDE o quien la sustituya en virtud de las leyes
de la República Dominicana, y la Empresa Generadora de Electricidad [Unidad



20

Haina o Unidad iTABO] en conexión con o que surja en relación de este contrato o concerniente a la Compañía y sus operaciones" (Contrato de Otorgamiento de Derechos para la Explotación de Obras Eléctricas).

25. En adición a ello el Contrato de Administración define que disputa es: "cualquier diferencia o desavenencia de cualquier tipo entre la Generadora y la Sociedad Suscriptora, o el Accionista Inversionista Estratégico, en conexión con lo que surja en relación de este contrato o concerniente a la Generadora, sus estatutos y sus operaciones". Los "Estatutos" de ITABO son parte integrante de dicho contrato (Art. 1 Contrato de Administración).

26. En consecuencia, de conformidad con los Estatutos Sociales de ITABO y las demás estipulaciones de los Contratos Básicos, la jurisdicción arbitral de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, es la competente para dirimir toda disputa surgida ( i ) entre accionistas de ITABO entre sí, o con la administración de ITABO; ( ii ) toda reclamación, acción o disputa relacionada con las operaciones de ITABO, asumidas por los Estatutos y demás Contratos Básicos de la Capitalización, incluida cualquier demanda en rendición de cuentas relacionada con ITABO.

27. Una demanda en Rendición de Cuentas intentada por un accionista minoritario de ITABO (como vendrían a ser en nuestro caso CDE y sus sucesores) es una acción que tiene su origen en el desacuerdo de uno o varios accionistas de la compañía y afecta necesariamente la interpretación y aplicación de los Estatutos de ITABO. Por tales motivos, este tipo de acción deberá ser considerada como una Disputa, y ser dirimida o resuelta de la manera prevista por los Estatutos y demás Contratos

Básicos. En ese sentido, el artículo 58 de los Estatutos establece claramente en su primer párrafo, con carácter de obligatoriedad que las partes deberán recurrir al arbitraje "siempre que, al surgir diferencias o disputas entre los accionistas o entre uno o más de estos y la sociedad o dentro del Consejo de Administración relacionados la interpretación y aplicación de los presentes estatutos, sea imposible resolverlo de común acuerdo entre ellos."

28. Los Estatutos Sociales de ITABO especifican los derechos y deberes de los accionistas y son incorporados como Anexo al Contrato de Suscripción de Acciones. **El Art. 12 de dichos Estatutos prohíbe de manera expresa a los accionistas de ITABO su injerencia en los negocios sociales;** y el art. 47 de dichos Estatutos prevé el derecho de CDE o sus causahabientes como accionistas de la "Clase A" a designar un Comisario de Cuentas para que de conformidad con las disposiciones del Código de Comercio Dominicano y los arts. 49 y 50 de los Estatutos Sociales reciban las cuentas del Consejo de Administración de ITABO y emitan un informe sobre los mismos a la Asamblea General Ordinaria Anual de accionistas.

29. Los Estatutos y demás Contratos Básicos permiten a los Comisarios designados por cada uno de los tipos de accionistas (A y B) fiscalizar periódicamente, cada tres meses, la regularidad de las operaciones de la compañía y producir ante el Consejo de Administración un informe al respecto, firmado por ellos. Este es un informe distinto al presentado a la Asamblea General Ordinaria Anual de accionistas. Dichas disposiciones por tanto establecen un órgano estatutario para verificar y recibir las

22

cuentas de la administración de ITABO y cualquier disputa por desacuerdo deberá ser sometido a arbitraje.

30.  Una acción intentada por CDE o sus sucesores con el objeto de que le sean rendidas cuentas de las operaciones de ITABO está directamente vinculada al Contrato de Suscripción de Acciones, porque cualquier derecho que como accionista se invoque para pedir una rendición de cuentas a ITABO, se origina necesariamente en los Estatutos Sociales, y éstos son parte integrante del Contrato de Suscripción de Acciones bajo el Anexo A (Art. 1- Definiciones Contrato de Suscripción de Acciones). Además el Contrato de Suscripción de Acciones establece que ITABO es la "Empresa Generadora" que sería formada al amparo de CDE, de conformidad con la Ley de Reforma de la Empresa Pública No. 141-97, amparada igualmente por el Contrato de Suscripción de Acciones; y en consecuencia son los estatutos de las generadoras los que necesariamente deben ser invocados para determinar los derechos y las cuestiones relativas a la rendición de cuentas que pretendan la CDE y sus sucesores.

31.  Les Estatutos de ITABO están vinculados a todos los demás Contratos Básicos, porque son concatenados y los derechos de los accionistas de "Clase A" y de "Clase B" nacen en los Estatutos. El derecho del inversionista extranjero (Sociedad Suscriptora- Socio Estratégico) admitido en la capitalización de CDE, supone la obligación de dicho inversionista de cumplir con los términos del Contrato de Suscripción de Acciones, del Contrato de Administración, del Contrato de Otorgamiento de Derechos para la Explotación de Obras Eléctricas, del Contrato de Venta de Energía, y del Acuerdo de Cesión del Contrato de Venta de Energía. Por

23

ello ni los Estatutos ni los demás Contratos Básicos antes descritos pueden tener eficacia ni ser ejecutados los unos sin los otros, porque la causa de los derechos y de las obligaciones están correlacionados. El régimen instituido para la redacción, negociación y suscripción de los Estatutos y demás Contratos Básicos, estaba establecido en la propia Ley 141-97 como en los términos de referencia, las fórmulas tipo y las enmiendas efectuadas a dichos contratos. En esa virtud, toda disputa derivada del cumplimiento o no de un Contrato Básico, especialmente si está relacionada con la gestión-administración de ITABO, queda bajo la disposición del Párrafo I del art. 58 de los Estatutos Sociales.

32.     En razón de que la competencia de la señalada Corte Internacional de Arbitraje y del Panel que ella integre al efecto están reglamentados por una convención internacional, resulta obvio que cuando las partes han suscrito una cláusula compromisoria de arbitraje, esa jurisdicción adquiere jerarquía sustantiva que tiene primacía sobre las leyes locales ordinarias de competencia, en virtud de que tal jurisdicción y los procedimientos decisorios que se implementen forman parte del bloque de constitucionalidad que proclama el art. 3 de la Constitución de la República vigente.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on June 21, 2005.

_____
Dr. Wellington Ramos Messina