Grant Hanessian (GH-6582)
Susan R. Knox (SK-4110)
BAKER & McKENZIE LLP
805 Third Avenue
New York, New York 10022
Tel. (212) 751-5700
Fax (212) 759-9133

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

EMPRESA GENERADORA DE ELECTRICIDAD
ITABO, S.A. ("ITABO"),                          :

        Plaintiff,                              :

           - against -                          :

                                                 :

CORPORACIÓN DOMINICANA DE EMPRESAS        :
ELÉCTRICAS ESTATALES ("CDEEE"),

        Defendant.                             :

-------------------------------------------------------------- X

05 Civ. 5004 (RMB)

ECF CASE

**THIRD DECLARATION OF
GISELLE MARIE LEGER**

I, Giselle Marie Leger, declare as follows:

1.  I am an attorney licensed to practice before the courts of the Dominican Republic and
    General Counsel of ITABO.  I write to provide to the Court additional information
    regarding the investors and shareholders in ITABO, to describe the extent to which
    CDEEE's claims against ITABO in the Dominican Actions concern the Basic
    Agreements and ITABO's Bylaws, and are therefore subject to the arbitration provisions
    in those documents, and to describe the harm to ITABO and its foreign shareholders in
    the event that the Dominican Actions proceed to judgment.

## Structure of ITABO's Shareholdings and Administration

2. As I stated at Paragraph 7 of my Second Declaration dated June 1, 2005, the Government of the Dominican Republic holds a 49.97% interest in ITABO, former CDE employees hold 0.03%, and private foreign investors hold the remaining 50%. The foreign investors invested approximately $US178 million in ITABO in return for a 50% interest in ITABO and four of the five seats on ITABO's Board of Directors.

3. The original foreign investors in ITABO in 1999 were Gener, SA a Chilean company, and the Coastal Corporation, a U.S. company. In 2001, the AES Corporation, a publicly held company organized and existing under the laws of Delaware, acquired Gener and hence, Gener's stake in ITABO. AES holds this interest through AES Gener S.A., a publicly held company (*sociedad anónima abierta*) in Chile. Coastal's interest in ITABO, which was held by Coastal Itabo, Ltd., was acquired by El Paso Corporation, a company organized and existing under the laws of Delaware, when El Paso acquired Coastal in 2000. New Caribbean Investment, S.A., a Dominican *sociedad anónima* jointly owned by AES and El Paso, operates ITABO pursuant to an Administration Agreement, which is one of the Basic Contracts.

4. The shares held by CDEEE[1] and the ex-employees of CDEEE, which collectively account for 50% of the capitalization of ITABO, are denominated Class A shares. The shares held by the private foreign investors, AES and El Paso, which account for the other 50% of the capitalization of ITABO, are denominated Class B shares.

---

[1] Under Dominican law, FONPER, and not CDEEE, has the legal right to representation on ITABO's board of directors and to ownership of a 49.9% interest in ITABO, notwithstanding the fact that CDEEE has acted as the holder of those rights and interests. *See* Declaration of Javier L. Navarro-Velasco dated May 25, 2005, ¶ 6; ITABO Memorandum of Law dated May 25, 2005, p.13 n.1.

5. CDEEE has represented to this Court that it has sought an accounting in the Dominican actions, and that its alleged "right to an accounting derives from the Dominican Code of Civil Procedure and not . . . from ITABO's Bylaws or . . . the Basic Contracts." CDEEE Memorandum of Law at 11. In fact, as described below, CDEEE's claims in the Dominican Actions are based specifically on the following documents:

    a.    Stock Subscription Agreement (Contrato de Suscripción de Acciones) dated August 13, 1999, and annexed Bylaws (Estatutos Sociales) of ITABO dated August 17, 1999;[2]

    b.    Contract Granting Rights for the Exploitation of Electrical Works in Connection with the Service of Electrical Generation in the Dominican Republic (Contrato de Otorgamiento de Derechos para la Explotación de Obras Eléctricas Relativas al Servicio de Generación de Electricidad en la República Dominicana) dated September 8, 1999 ("Exploitation Contract");[3]

    c.    Administration Contract (Contrato de Administración) dated September 8, 1999.[4]

---

[2] These documents were provided to the Court as Exhibit 1A to the Navarro-Velasco Declaration dated May 25, 2005. Certified English translations of Articles 12.3 of the Stock Subscription Agreement and Article 58 of the Bylaws were provided to the Court on June 14, 2005 under cover of letter from Grant Hanessian, Exhs. 2A and 2B, respectively. ITABO will provide certified translations of Articles 6.2, 7.4 and 13.3 of the Stock Subscription Agreement, Article 58 of the Dominican Commercial Code and Articles 12, 37(b), 38, 39, 47, 48, and 49 of the Bylaws to the Court as soon as possible.

[3] Exhibit 1C to the Navarro-Velasco Declaration dated May 25, 2005.

[4] Exhibit 1B to the Navarro-Velasco Declaration dated May 25, 2005.

6. CDEEE and ITABO are Parties to the Stock Subscription Agreement, which specifically incorporates the Bylaws (see Articles 6.2 and 7.4 of the Stock Subscription Agreement), and to the Exploitation Contract. The parties to the Administration Contract are ITABO and New Caribbean Investment ("NCI"). NCI is a consortium, formed pursuant to the Administration Contract, by the two private foreign investors. Article 2 of the Administration Contract provides that NCI is to administer the business of ITABO in accordance with the ITABO Bylaws in exchange for a management fee of 2.75% of the net annual sales of ITABO. Under the direction of ITABO's Board of Directors, NCI runs the daily operations of ITABO, maintains the books and records of ITABO, pays the employees, and enters into contracts necessary to carry out the business purposes of ITABO. The ITABO Board of Directors elects an Administration General Director pursuant to Article 45 of the Bylaws and 3.3 of the Administration Agreement.

7. CDEEE agreed to waive sovereign immunity with respect to actions concerning the Basic Agreements. Article 13.3 of the Stock Subscription Agreement, titled "Commercial Acts; Immunity," provides as follows:

> CDE agrees that the signing, execution and completion by it of this contract constitutes a private and commercial act. Also, CDE agrees, unconditionally and irrevocably, that i) if an action (including an arbitral action) is initiated against it or its assets, in relation to this contract or any other transaction contemplated in this contract, CDE will not claim immunity from the actions, in whole or in part; ii) CDE renounces any right to immunity that it now possesses or may acquire in the future in any jurisdiction with respect to any of said actions; and iii) CDE agrees in general, to the execution of any judgment against it in any action (including any arbitral action) in any jurisdiction, the granting of any award or the issuance of any measure in connection with said claims.

**CDEEE's Claims in the Dominican Actions Concern
the Stock Subscription Agreement and the Bylaws**

8. CDEEE has brought claims against ITABO relating to the Stock Subscription Agreement and Bylaws in both the First Chamber Action and the Fifth Chamber Action.

9. CDEEE's initial request in the First Chamber Action, Bailiff's Act No. 1781/2004 dated July 16, 2004,[5] informed ITABO that failure to comply with CDEEE's demands "shall result in you being sued before the corresponding courts, so that the purposes *established in the Bylaws and laws regulating this matter* may be met (emphasis added)."

10. In its complaint in the First Chamber Action,[6] CDEEE asserts that its rights to an accounting arise out of its status as a shareholder of ITABO *"pursuant to . . . the Capitalization Contract* . . . whereby it has the right to know about all the acts and actions produced in same and to receive information in an amicable fashion . . ."  (emphasis added).  By "Capitalization Contract," CDEEE is referring to the Stock Subscription Agreement -- the full name of this agreement in the original Spanish is "Contrato de Suscripción de Accciones Con Relación a la Capitalización de Empresa Generadora de Electricidad de Itabo, S.A." (Stock Subscription Agreement Relating to the Capitalization of ITABO).

---

[5] A copy of Bailiff's Act No. 1781/2004, proceeded by a certified translation, is annexed hereto as Exhibit A.

[6] The complaint in the First Chamber Action is Bailiff's Act No. 1798/2004, filed on behalf of CDEEE in the First Chamber of the Civil and Commercial Court of First Instance for the National District on July 21, 2004.  A copy of Bailiff's Act No. 1798/2004 is annexed to the First Cornielle Declaration dated May 25, 2005 as Exhibit A.  A certified English translation of the complaint in the First Chamber Action was provided to the Court on June 14, 2005 under cover of letter from Grant Hanessian as Exhibit 3A.

11. CDEEE argues at length in its complaint in the Fifth Chamber Action[7] that ITABO
    violated the Bylaws.  CDEEE's complaint in the Fifth Chamber Action makes 14
    references to the Bylaws, particularly Articles 38 and 39.  In fact, pages 10-24 of the
    English translation of the complaint, which comprise almost half the length of the
    document, consist of allegations that ITABO is in breach of Article 38.

12. Article 38(a) of the Bylaws requires a unanimous vote of the Board of Directors in order
    for ITABO to enter into contracts that provide for payment obligations to companies
    affiliated with ITABO or its shareholders.  Specifically, CDEEE alleges in the Fifth
    Chamber Action that ITABO violated Article 38 of the Bylaw by;

    - acquiring assets from Coastal Technology Dominicana without the vote of the
      representatives of the Class A shareholders;

    - signing a contract with Servicios de Asistencia Tecnica for the services of
      consulting in engineering administration without unanimous approval by the
      Board; and

    - making payments to various affiliated companies in excess of the amount
      approved by the Board and entering into other contracts with affiliate companies
      that were not approved by unanimous vote of the Board.

Fifth Chamber Action complaint at pp. 12-25.

---

[7] The complaint in the Fifth Chamber Action is Bailiff's Act No. 422/2004, filed on behalf of
CDEEE by its attorney Dr. Carlos Manuel Padilla Cruz in the Fifth Chamber of the Civil and
Commercial Court of First Instance for the National District on July 21, 2004.  A copy of this
complaint is annexed to the First Cornielle Declaration dated May 25, 2005 as Exhibit B.  A
certified English translation of the complaint in the Fifth Chamber Action was provided to
the Court on June 14, 2005 under cover of letter from Grant Hanessian as Exhibit 4A.

**Relevant Arbitration Clauses of Stock Subscription Agreement and Bylaws**

13. The Stock Subscription Agreement, which incorporates the Bylaws by reference at

    Articles 6.2 and 7.4, contains the following arbitration provision in Section 12.3(a) and

    (k):

> Any dispute that arises under or in connection with this Agreement and
> cannot be resolved by mutual agreement among the parties to the dispute
> must be resolved, at the request of any of the Parties, by arbitration
> conducted in accordance with the Arbitration Act and the Rules of
> Arbitration.
>
> \* \* \*
>
> If the Dominican Republic ratifies the New York Convention and/or the
> Panama Convention, the parties hereby accept to settle their disputes
> through international arbitration, pursuant to the Rules of Arbitration of
> the International Chamber of Commerce (ICC Rules of Conciliation)
> dated January 1, 1988, and under the laws of New York. No such
> arbitrator appointed under this article shall be a citizen of any of the
> jurisdictions of the Parties, and no such arbitrator shall be an employee or
> agent, or former employee or agent, of any of the Parties.

14. Article 58 of the Bylaws provides that

> In the event that the deliberations of the Ordinary or Extraordinary
> Shareholder's Meeting result in a tie that cannot be resolved by mutual
> agreement, the shareholders must resort to arbitration as subsequently
> provided in this Article. They must also resort to arbitration if, in the
> event of a disagreement or dispute among the shareholders, or one or more
> of them and the Corporation, or within the Board concerning the
> interpretation and application of these Bylaws, it proves impossible to
> resolve the same by mutual agreement among them.
>
> \* \* \* \*
>
> If the Dominican Republic ratifies the New York Convention on the
> Recognition and Enforcement of Foreign Arbitral Awards adopted by the
> United Nations Conference on International Commercial Arbitration, on
> June 10, 1958, and/or the Panama Convention on Commercial Arbitration,
> the parties hereby accept to settle their disputes through international
> arbitration, pursuant to the Rules of Arbitration of the International

Chamber of Commerce (ICC Rules of Conciliation) dated January 1, 1988, and under the New York laws. No such arbitrator appointed under this article shall be a citizen of any of the jurisdictions of the parties or the jurisdiction of any of the initial shareholders, and no such arbitrator shall be an employee or agent, or former employee or agent, of any of said persons.

15. CDEEE's claims for an accounting, and the other relief sought, in the First and Fifth Chamber Actions, are within the arbitration clauses in the Stock Subscription Agreement and the incorporated Bylaws, for the following reasons:

    a. Since the Stock Subscription Agreement incorporates the Bylaws, any dispute "resulting from or in connection with" the Bylaws also "results from or is in connection with" the Stock Subscription Agreement.

    b. The Dominican Republic is a state party to the New York Convention, which triggers CDEEE's obligation in the last paragraph of Article 58 of the Bylaws to arbitrate all "disputes" with ITABO and its shareholders

    c. CDEEE's claims involve "differences or disputes between the shareholders, or one or more of them and [ITABO] . . . in connection with the interpretation and application of these by-laws" within the first paragraph of Article 58 of the Bylaws.

16. In addition to the express references to the Bylaws on the face of CDEEE's complaints in the Dominican actions, it is important that this Court appreciate that the CDEEE claims for an accounting directly arise out of, and require construction and application of, CDEEE's rights under the Bylaws.

17. Under Article 47 of the Bylaws, each class of ITABO shareholders has the right to appoint a Comisario de Cuentas (Internal Auditor). Article 47 provides as follows:

> In the First General Meeting of sharcholders and in the General Meetings
> that follow, there will be appointed at least one Comisario charged with
> presenting a report at the General Meeting of the following year, about the
> situation of the Company, the balance sheet and about the accounts
> presented by the Board of Directors. *Each class of shares will have, if it
> decides, the right to designate a Comisario de Cuentas.* The Comisario(s)
> must be certified public accountants of recognized professional ability and
> moral rectitude, proposed by the outside accounting firm to the Company
> or by another accounting firm, and can be reelected one or more times.
> (Emphasis added.)

18. Article 49 of the Bylaws defines the duties of the Comisario. Article 49 provides as

follows:

> In addition to the powers and obligations entrusted to it or them by the
> Commercial Code of the Dominican Republic, Accounts *Comisario(s)*
> shall periodically, and at least every three months, examine the regularity
> of the operations of the Company and present a signed report in this regard
> to the Board of Directors.

19. Finally, Article 12 of the Bylaws, titled "No interference in business matters,"

specifically restricts the rights of ITABO shareholders to participate in the business of the

company. Article 12 provides:

> Neither the shareholders nor their heirs, creditors or assignees may
> intervene in the business of the company; all of the foregoing is without
> prejudice to the right of the shareholders or their agents to take part in the
> deliberations of the General Meetings of Shareholders and to exercise the
> other rights accorded them by these Bylaws.

CDEEE has in fact appointed a Comisario to review the accounts of ITABO on behalf of

the Class A shareholders (CDEEE and the ex-employees of CDEEE).

20. The relief requested by CDEEE in the Dominican Actions concerns Articles 12, 47 and

49 of the Bylaws, since those articles state that it is CDEEE's elected Comisario will

have access to the Company's books, and not CDEEE itself, and that CDEEE shall not intervene in the business of the company.

21. Finally, to the extent that CDEEE argues that this dispute arises solely under Dominican law, the argument is undermined by Dominican law itself.   Article 58 of the Dominican Commercial Code states that "During the three months that precede the date set *by the Bylaws* for the General Meeting of Shareholders, the Comisarios will have the right, each time they decide it is important to the Company's interests, to see the Books and examine the operations of the Company." (Emphasis added.) *Thus, the very Dominican law that addresses the duties of the Comisarios specifically references the company's Bylaws.* Any request for an accounting beyond that to which the Comisarios are entitled would necessarily involve application of the Bylaws.

22. Because CDEEE's claims in the Dominican Actions specifically reference the Bylaws, and because these claims necessarily are "resulting from or [are] in connection" with the Bylaws or involve the "construction and application" of the Bylaws, the disputes between CDEEE and ITABO are arbitrable under the Stock Subscription Agreement and Bylaws.

## CDEEE's Claims in the Fifth Chamber Action are Within the Arbitration Clause of the Exploitation Contract

23. In the Fifth Chamber Action CDEEE specifically alleges violations by ITABO of the Exploitation Contract, pursuant to which CDEEE delegates to ITABO the right to construct, operate and exploit facilities for the generation of electricity.

24. CDEEE's complaint in the Fifth Chamber Action refers to the Exploitation Contract no fewer than eight times. CDEEE specifically alleges that ITABO has violated Article 5(a)

and (i). Fifth Chamber Action complaint at pp. 5-6. CDEEE alleges under Article 5(a) that ITABO did not "adhere to the norms handed down by the Superintendency of Electricity to decide the works that may be necessary for the service subject to [the Exploitation Contract]." Under Article 5(i), CDEEE alleges that ITABO did not "carry out the proofs of an increase of generation capacity in 100 mw." At the end of its complaint, CDEEE accuses ITABO generally of violating the legal obligations of the Exploitation Contract, without citing to specific provisions. Fifth Chamber Action complaint at p. 28.

25. The CDEEE complaint does not reference Article 9 of the Exploitation Agreement, titled "Resolution of Disputes," which provides, at 9(a) and (k):

> Any dispute that arises under or in connection with this Agreement and cannot be resolved by mutual agreement among the parties to the dispute must be resolved, at the request of any of the Parties, by arbitration conducted in accordance with the Arbitration Act and under the Rules of Arbitration . . .

* * * *

> If the Dominican Republic ratifies the New York Convention and/or the Panama Convention, the parties hereby accept to settle their disputes through international arbitration, pursuant to the Rules of Arbitration of the International Chamber of Commerce (ICC Rules of Conciliation) dated January 1, 1988, and under the laws of New York. No such arbitrator appointed under this article shall be a citizen of any of the jurisdictions of the Parties, and no such arbitrator shall be an employee or agent, or former employee or agent, of any of the Parties.[8]

26. CDEEE's disputes with ITABO concerning the Exploitation Agreement are within the arbitration clause in the Exploitation Agreement.

---

[8] ITABO will provide certified translations of Articles 5(a) and (i) and 9(a) and (k) of the Exploitation Contract to the Court as soon as possible.

### CDEEE's Claims in the Fifth Chamber Action are
### Within the Arbitration Clause in the Administration Contract

27. In its complaint in the Fifth Chamber Action CDEEE specifically alleges two violations of the Administration Contract, and refers to the Administration Contract eight times. Specifically, CDEEE alleges that ITABO violated Articles 3.6 and 3.7 of the Administration Contract.

28. In its complaint in the Fifth Chamber Action, CDEEE alleges that the Administration General Director made payments to companies related to ITABO without the unanimous consent of the Board of Directors. Fifth Chamber complaint at p. 9. On page 28 of the same action, CDEEE states that NCI violated the ITABO Bylaws by "taking acts of disposition of economic resources belonging to all the partners of ITABO without taking into account the requisites foreseen in the Corporate Bylaws . . . as if [it] were the sole [owner] of said company." Although CDEEE does not identify a specific provision of the Bylaws, presumably, this allegation refers to NCI's alleged violation of Article 38(a) of the Bylaws regarding payments to affiliated companies without the unanimous consent of the Board of Directors.

29. Under Article 3.6 of the Administration Contract, CDEEE alleges that ITABO's Administrator General Manager has "violated procedures . . . of payments to linked companies which did not have the unanimous approval of the board of Directors." Fifth Chamber Action complaint at page 9.

30. CDEEE accuses ITABO of violating article 3.7 of the Administration Contract by paying NCI a management fee "in foreign currency, without this having been foreseen in the administration contract, which generated economic losses for [ITABO]." Fifth Chamber

Action complaint at page 10. CDEEE also alleges that NCI has "not fulfilled its contractual and bylaws obligations [in] administering ITABO" and has taken "economic resources belonging to all the partners." Fifth Chamber Action complaint at page 28.

31. The CDEEE complaint does not reference the dispute resolution provisions of the Administration Contract. "Dispute" is defined in the Administration Agreement as "Any difference or disagreement of any type between [ITABO] and [NCI] or [AES Gener, the strategic investor of NCI, as between the two foreign shareholders] in connection with or that arises from this contract or concerning ITABO, its bylaws and its operations." Article 6 of the Administration Contract provides that "any Dispute, controversy or claim that arises from this contract or from the incompletion, termination or validity of the same, will be resolved according to the Bylaws." [9]

32. Since it relies on provisions of the Administration Contract in its claims against ITABO, CDEEE's disputes with ITABO concerning the Administration Contract are arbitrable.

* * * *

33. Thus, CDEEE has specifically argued in the Dominican Actions that its rights under the Bylaws, Exploitation Contract and Administration Contract have been violated. Since CDEEE is a party to the Share Subscription Agreement and corresponding Bylaws and the Exploitation Contract and is invoking rights under the Administration Contract, and all of the aforementioned disputes are within the arbitration clauses in those contracts,

---

[9] ITABO will provide certified translations of the definition provision for "Dispute" and Articles 3.6, 3.7, 6 in the Administration Contract to the Court as soon as possible.

these disputes must be resolved before the duly appointed ICC arbitrators and not a Dominican court.

**Irreparable Injury**

34. I have reviewed the declaration of CDEEE's General Counsel Henry M. Meran dated June 10, 2005. I believe that Mr. Meran misrepresents the Dominican Actions in the following ways.

    a. **The Dominican Actions are not actions for an accounting only**. Mr. Meran states at paragraph 22 that "the two actions in the Dominican Republic are actions for an accounting." Mr. Meran does not acknowledge or deny the statement in the Declaration of Carlos Radhamés Cornielle dated May 25, 2005 that in the First Chamber Action, in addition to seeking an order that ITABO provide an accounting, CDEEE has also demanded that ITABO's assets be seized if it failed to comply with such a court order, that the administrators of ITABO be held personally liable if the court order were not satisfied, and that the entire court order should be enforceable immediately and without bond, regardless of any right of ITABO to appeal. Nor does Mr. Meran acknowledge or deny Dr. Cornielle's statement that in the Fifth Chamber Action CDEEE seeks not only an accounting, but the imposition of sanctions on ITABO and certain officers of ITABO for noncompliance, the payment of money damages including punitive damages, and the payment of interest and attorneys' fees. Cornielle Declaration, ¶¶ 7, 13.

    b. **CDEEE Has Requested an Embargo (Seizure) of ITABO's Assets**. Mr. Meran does not acknowledge or deny the statement in Dr. Cornielle's Declarations that

14

in both the First Chamber Action and the Fifth Chamber Action CDEEE has

asked the Dominican courts to order an embargo (seizure) of ITABO's assets, that

this embargo might be ordered at any time, and that CDEEE may receive as little

as one day's notice before the embargo is ordered. Second Cornielle Declaration

dated June 2, 2005 provided to the Court by the letter from Grant Hanessian dated

June 3, 2005.

35. Finally, I wish to inform this Court of another case involving El Paso, one of the two

foreign shareholders in ITABO, which further demonstrates the failure of the courts in

the Dominican Republic to honor international arbitration contracts and the New York

Convention.

36. El Paso holds 48% of the shares of Compañía de Electricidad de Puerto Plata ("CEPP"),

another electricity generation company in the Dominican Republic El Paso acquired this

interest when it acquired Coastal Corporation in 2000.

37. A dispute arose between Coastal and Nicor Internacional Corporation ("Nicor") and a

Dominican firm, Consultores de la Cuenca del Caribe ("Carib Consult"), regarding

Coastal's acquisition of its interest in CEPP. Pursuant to an arbitration clause in the

relevant contract, an ICC arbitrator issued an award on August 13, 2001 ordering Nicor

and Carib Consult to pay Coastal about US$580,000 plus interest (the "Award").

Notwithstanding the Award, in September 2001 the Court of Appeal of the Civil and

Commercial Chamber in the Dominican Republic entered a judgment against Coastal

ordering Coastal to pay Carib Consult US$10,000,000. On October 21, 2003, Carib

Consult caused CEPP's funds in bank accounts and other receivables owed to it by its

creditors in the Dominican Republic to be frozen, making approximately US$5,250,000 in cash and over $35 million in receivables unavailable.

38. On November 24, 2003, the United States District Court for the Southern District of Florida granted summary judgment in favor of El Paso confirming the Award. *Nicor International Corp. v. El Paso Corp.*, 292 F.Supp.2d 1357 (S.D. Fla. 2004) and 318 F.Supp.2d 1160 (S.D. Fla. 2004). On December 14, 2004, the District Court issued a Final Judgment in which it dismissed Nicor's and Carib Consulting's claims on the merits, confirmed the Award, ordered Nicor and Carib to pay the damages provided for in the Award and issued a Permanent Injunction enjoining Nicor and Carib Consult from "continuing to prosecute or take any action with respect to the Dominican Republic litigation or any matter related thereto," and from "executing or attempting to execute on any of The Coastal Corporation's assets in satisfaction of the purported judgment entered in the Dominican Republic." A copy of the Permanent Injunction is annexed hereto as Exhibit B.

39. The United States and British Governments have formally and informally objected to the failure of the courts of the Dominican Republic to enforce the agreement to arbitrate and to enforce the Award.

40. Hans Hertell, the United States Ambassador to the Dominican Republic, was reported in the Dominican newspaper *Hoy* on June 17, 2005 to have called the treatment of CEPP an injustice and to have stated that the violation of the New York Convention in CEPP's case could affect foreign investment in the Dominican Republic. A copy of the article from *Hoy*, with a translation thereof, is annexed hereto as Exhibit C.

41. The Overseas Private Investment Corporation (OPIC) has likewise condemned the treatment of CEPP in the Dominican Republic. On March 11, 2002, Peter S. Watson, President and CEO of OPIC, sent a letter to the President of the Dominican Republic in which he expressed concern about the CEPP matter, and particularly "the failure of the judiciary of the Dominican Republic to honor or enforce arbitration provisions in contracts or to recognize fully litigated international arbitration awards." A copy of the March 11, 2002 letter is annexed hereto as Exhibit D.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on June 27, 2005.

Giselle Marie Leger



**MARK FREEHILL COMMUNICATION SERVICES**
US Certified Federal Court Interpreter No. 20293
Tel: 809-**623-1959** Fax: 809-**530-5571** Cel: 809-**440-1981** mark.freehill@codetel.net.do
Calle 5, No. 12 , Residencial Santo Domingo, Santo Domingo, DOMINICAN REPUBLIC
International Address: CE No. 277 / PO Box 149020 / Coral Gables, FL  33114-9020  USA

I, Mark Freehill, United States Federal Court Interpreter No. 20293, duly certified by the United States Government's Federal Court Interpreter Program, a United States citizen, of legal age, married, translator/interpreter by profession, bearer of Dominican Personal Identification Card (*Cédula*) No. 001-1488708-6, resident in Santo Domingo, Dominican Republic, domiciled at *Calle 5, No. 12, Residencial Santo Domingo*, in this city; HEREBY CERTIFY AND BEAR WITNESS that the following is a true and accurate version in the English language of a document presented to me in the Spanish language:

## ACT No. *1781/2004*

In the city of Santo Domingo, National District, Capital of the Dominican Republic, on the *sixteenth (16th )* day of the month of July of the year two thousand four (2004).

ACTING at the request of the *CORPORACION DOMINICANA DE EMPRESAS ELECTRICAS ESTATALES* (CDEEE), an autonomous public service enterprise, created by means of Law 125-01 dated 26 July 26 2001, with its domicile at *Av. Independencia Esq. Fray Cipriano de Utrera, Centro de los Héroes*, duly represented by its Executive Vice President, **ENGINEER CESAR SANCHEZ TORRES**, a Dominican citizen, of legal age, married, bearer of the Personal and Electoral Identification Card *(Cédula)* No. 001-0114321-2, of domicile and residence in this city, who has as incorporated and especially empowered Attorney of record **DR. ANGEL MONERO CORDERO**, a Dominican citizen, of legal age, married, bearer of the Personal and Electoral Identification Card *(Cédula* No. 012-0003924-4, Lawyer of the Courts of the Dominican Republic, with professional study open at Av. 27 de *Febrero No. 205, Edif. Bollero II*, Suite 205 in this city of Santo Domingo, in which place the party serving notice expressly and formally makes choice of domicile for all legal ends and consequences of the present act:

I,  _____*(illegible)*_____

_____
_____, duly named, licensed, and sworn in for the authorized exercise of all acts corresponding to my ministry.

EXPRESSLY, and pursuant to the above request, have presented myself in this same city to *Av. Rómulo Betancourt No. 1180, Sector La Julia*, in this city, which is the location of the main domicile of the *Empresa Generadora de Electricidad ITABO, S.A.* (EGEITABO), and once there, speaking personally with *Vicente Pimentel*, who informed me that he is an *employee* of my party served notice, a person with the capacity to receive documents of this nature, I have notified my party served notice, that my party serving notice, by means of the present document, makes formal and express DEMAND so that in a term of forty-eight (48) hours it deliver to my party serving notice through its incorporated and especially empowered lawyer the complete documentation of the bidding performed for the rehabilitation of the generation units 1 and 2, especially those



1

which support/serve as back-up for the changes performed in the different bids which resulted in a difference of US$15.7 million dollars, in addition to the resolution of the Shareholders Assembly which approved said changes. WARNING IT that if it does not obey this request, it will be sued before the corresponding courts, in order that it comply with what is established in the By-Laws and in the laws governing the subject.

### UNDER ALL RESERVATIONS OF RIGHTS AND ACTIONS

And so that my party served notice *Empresa Generadora de Electricidad ITABO* (EGEITABO) not attempt to allege ignorance of the present act, I have so notified and declared to it, leaving with it a copy faithful to the original of the present document with the person with whom I declare to have spoken in the place to which I have come, which consists of two (2) computer-written pages, on one side, all duly signed, stamped and initialed by me, the Bailiff who SO CERTIFIES AND GIVES FAITH.
COST RD*$1000*

### I SO SWEAR

### THE BAILIFF

[Signed and stamped]

[First page initialed and stamped]

MFCS / June.05 / ITABO.Acto No.21781-2004.English.cer

MADE AND SIGNED in Santo Domingo, Dominican Republic this
twenty-fourth (24th) day of the month of June of the year two thousand and five (2005).

Mark Freehill
U.S. Certified Federal Court Interpreter No. 20293

2

ACTO No. _____ / _____

En la ciudad de Santo Domingo, Distrito Nacional, Capital de la República Dominicana, a

los _____ ) días del mes de Julio del año dos mil cuatro (2004).

ACTUANDO a requerimiento de la **CORPORACION DOMINICANA DE EMPRESAS ELECTRICAS ESTATALES (CDEEE)**, empresa autónoma del servicio público, creada mediante la Ley 125-01 de fecha 26 de julio del año 2001, con su domicilio en la Av. Independencia Esq. Fray Cipriano de Utrera, Centro de los Héroes, debidamente representado por su Vicepresidente Ejecutivo **ING. CESAR SANCHEZ TORRES**, dominicano, mayor de edad, casado, provisto de la Cédula de Identidad y Electoral No.001-0114321-2, domiciliado y residente en esta ciudad, quien tiene como Abogado constituido y apoderado especial al **DR. ANGEL MONERO CORDERO**, dominicano, mayor de edad, casado, provisto de la Cédula de Identidad y Electoral No.012-0003924-4, Abogado de los Tribunales de la República Dominicana, con su estudio profesional abierto en la Av. 27 de Febrero No.205, Edif.. Bollero II, Suite 205 de esta ciudad de Santo Domingo, lugar donde mi requerente hace forma y expresa elección de domicilio para todos los fines y consecuencias legales del presente acto.

Yo, _____

_____

_____ debidamente nombrado, recibido y juramentado para el regular ejercicio de todos los actos de mi propio ministerio.

EXPRESAMENTE y en virtud del anterior requerimiento, me he trasladado dentro de esta misma ciudad a la Av. Rómulo Betancourt No.1180, sector La Julia de esta ciudad, que es donde tiene su domicilio principal la Empresa Generadora de Electricidad ITABO, S.A. (EGEITABO), y una vez allí hablando personalmente con _____ quien me dijo ser _____ de mi requerido, persona con calidad para recibir actos de esta naturaleza, le he notificado a mi requerido, que mi requerente, por medio del presente acto le hace formal y expresa INTIMACION para que en el plazo de cuarenta y ocho (48) horas entregue a mi requerente por intermedio de su abogado constituido y apoderado especial la documentación completa de licitación realizada para la

1

rehabilitación de las unidades de generación 1 y 2, de manera especial los que soportan los cambios que se realizaron en las distintas ofertas que dan como resultado una diferencia de US\$15.7 millones de dólares, además de la resolución de la Asamblea de Accionistas que aprobó dichos cambios. ADVIRTIENDOLE que de no obtemperar a dicho requerimiento será demandado por ante los tribunales correspondientes, a los fines de que cumpla con lo establecido en los Estatutos y en las leyes que rigen la materia.

### BAJO TODAS RESERVAS DE DERECHOS Y ACCIONES

Y para que mi requerida Empresa Generadora de Electricidad ITABO (EGEITABO) no pretenda alegar ignorancia o desconocimiento del presente acto, así se lo he notificado y declarado, dejándole copia fiel al original del presente acto con la persona con quien dije haber hablado en el lugar de mi traslado, el cual consta de dos (2) páginas escritas a computadora, en una sola de sus caras, todas debidamente firmadas, selladas y rubricadas por mí Alguacil que CERTIFICO Y DOY FE.

COSTO RD\$ 1000

DOY FE

EL ALGUACIL

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-21769-CIV-MARRA/SELTZER

NICOR INTERNATIONAL CORPORATION
and CONSULTORES DE LA CUENCA DEL
CARIBE a/k/a CARIB CONSULT

       Plaintiffs

vs.

EL PASO CORPORATION f/k/a OCEANO
CORPORATION or THE COASTAL
CORPORATION (later THE EL PASO
ENERGY CORPORATION)

       Defendants.

_____/

```
FILED by ___VZZ___ D.C.

DEC 1 4 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.
```

## **PERMANENT INJUNCTION**

This Cause is before the Court upon Defendant/Counter-Plaintiff's Emergency Motion in

Further Support of its Motion for Entry of Permanent Injunction (DE 105), filed December 2, 2004.

On December 8, 2004, Plaintiffs/Counter-Defendants filed an expedited response. The Court has

considered the motion and is otherwise advised in the premises.

## **I.**    **Background**

In an Order dated November 24, 2003, this Court granted summary judgment in favor of

Defendant/Counter-Plaintiff on its claim for confirmation of the Final Arbitration Award asserted in

Count I of its Counterclaim, as well as on Plaintiffs/Counter-Defendants' claims in the Second

Amended Complaint.[1] (DE 77.)   In the Order, the Court concluded that the proceedings in the

Dominican Republic were not entitled to recognition and that confirmation of the Final Arbitration

_____

[1] Defendant/Counter-Plaintiff voluntarily dismissed Counts II and III of the Counterclaim.

Award was warranted.    (Order at 25-26, 30-31.)    On May 25, 2004, the Court denied Plaintiffs/Counter-Defendants' motion for reconsideration of its ruling.  (DE 96.)  Thereafter, Defendant/Counter-Plaintiff sought the entry of a final judgment awarding damages consistent with the Final Arbitration Award, and the entry of a permanent injunction restraining Plaintiffs/Counter-Defendants from continuing with the Dominican Republic litigation. (DE 83, Motion at 3.) Because the issue of Defendant/Counter-Plaintiff's entitlement to injunctive relief had not been briefed by the parties, the Court declined to enter a final judgment at that time and ordered the parties to brief the issue.  (DE 97.)  Thereafter, the parties briefed the issue of whether an injunction restraining Plaintiffs/Counter-Defendants from continuing with the Dominican Republic litigation should issue. (DE 100, 101, 102, & 103.)  Neither party requested an evidentiary hearing on the matter, nor has either party asserted that an evidentiary hearing is necessary.

Thereafter, on September 29, 2004, Plaintiffs/Counter-Defendants obtained a judgment against Defendant/Counter-Plaintiff in the Dominican Republic.[2]    (Exhibit 3 to Motion.) Plaintiffs//Counter-Defendants are now attempting to execute on Defendant/Counter-Plaintiff's assets by freezing certain bank accounts. (Exhibits 4 & 5 to Motion.)  The Court now considers whether to issue an injunction to protect the integrity of its Final Judgment[3] affirming the Arbitration Award.

## II.    Discussion

---

[2]As discussed at length in this Court's Orders dated November 24, 2003 and May 25, 2004, such a judgment rendered by the court in the Dominican Republic is not entitled to recognition in this Court because the underlying proceeding was contrary to the parties' agreement to arbitrate and antithetical to the strong public policy favoring arbitration. (DE 77, 96.)

[3] The Court is simultaneously entering a Final Judgment confirming the Arbitration Award and dismissing the claims in the Second Amended Complaint by separate Order.

Ordinarily, parallel proceedings on the same claim may proceed in different foreign jurisdictions, at least until a judgment is rendered in one court which may be pled as *res judicata* in the other. Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926-28 (D.C. Cir. 1984). Once a judgment on the merits is rendered, "a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation." Mutual Service Ins. Co. v. Frit Industries, Inc., 358 F.3d 1312, 1324-25 (11th Cir. 2004) ("When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction.") (quoting Laker Airways, 731 F.2d at 928).

In this case, the Court has now entered a Final Judgment confirming the Arbitration Award and dismissing the claims in the Second Amended Complaint with prejudice. Based upon the pre-judgment actions of the Plaintiffs/Counter-Defendants, there is a legitimate concern that Plaintiffs/Counter-Defendants may engage in conduct which threatens the integrity of the Final Judgment. In order to protect the Final Judgment from such vexatious attack, the Court finds it necessary to enjoin Plaintiffs/Counter-Defendants from continuing with any action in the Dominican Republic litigation. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.  Defendant/Counter-Plaintiff's Emergency Motion in Further Support of its Motion for Entry of Permanent Injunction (DE 105), filed December 2, 2004, is **GRANTED**.

2.  Nicor International Corporation and Consultores De La Cuenca Del Caribe a/k/a Carib Consult are permanently restrained from continuing to prosecute or take any action with respect to the Dominican Republic litigation or any matter related thereto.

3.     Nicor International Corporation and Consultores De La Cuenca Del Caribe a/k/a Carib

Consult are permanently restrained from executing or attempting to execute on any of The

Coastal Corporation's assets in satisfaction of the purported judgment entered in the

Dominican Republic.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this

_14th_ day of December, 2004.

KENNETH A. MARRA
United States District Judge

Copies furnished to:

Alan T. Dimond, Esq.
Pedro Julio Martinez-Fraga, Esq.
Luis Miguel O'Naghten
David I. Katzman, Esq.
John McClune, Esq.
Richard Schaden, Esq.

*Hoy*-Dominican Republic
Friday, June 17, 2005
Afraid of harming the investment for not knowing the judgment

Hans Hertell



Ambassador Hans Hertell stated yesterday that failure to recognize the arbitral judgment that favored an American partner of the energy company known as *Compañía de Electricidad de Puerto Plata* (CEPP) in a legal dispute is "exasperating" the bilateral relation between the Dominican Republic and the United States, which may affect foreign investment in Dominican territory.
The diplomat referred to the case of the dispute against the CEPP and its partner, El Paso/Coastal Corporation, started by the Dominican firm *Consultores de la Cuenca del Caribe* (Carib Consult), who filed a complaint for damages.

The Commercial and Civil Chamber of the Court of Appeals in Santo Domingo passed judgment favoring Carib Consult, almost a month after an arbitration court of the International Chamber of Commerce, which was also handling the matter and had passed judgment in favor of the American company.
"The consequences of this will affect the foreign investment here, because the first thing these companies do is observe how the agreements and laws are complied with in the country", mentioned the Ambassador Hertell.
Furthermore, "if a clear violation like this one happens, they will think twice before choosing the Dominican Republic as a country to invest in," he added. "We promote what is known as the rule of law; and if the treaties and laws are not observed, then we are back to the jungle. For that reason, we have tried to encourage the compliance with the provisions of law, and in this case a treaty is very important for the Dominican Republic". Hertell explained that part of any ambassador's job is to encourage the compliance with justice in the country where he/she provides services. "You will never see an ambassador trying to encourage or promote the breach of laws or treaties", mentioned Hertell; "our job is to protect the interests of American legal entities as well, and a huge injustice has been committed with respect to this; we are trying to find a way to protect and encourage the rights of this company to be respected," he added.

Carib Consult, based on the determination of the Civil and Commercial Chamber of the Court of Appeals, had started a series of seizures of CEPP's accounts that are affecting its financial operation, according to the public declarations of the company.
Yesterday, Ambassador Hertell was interviewed during a visit to the facilities of the *Compañía de Electricidad de Puerto Plata*, where he was received by Marcos Cochón, manager of the company; Stephen de Monteverde, manager of the plant; and other executives. The diplomat was interested in the operations of the power plant, which supplies 69 megawatts to the interconnected electric system.

A slides presentation was carried out in one of the meeting rooms of the company, and he was given technical explanations during his visit around the plant. The Ambassador commented that, as far as he knows, "the case CEPP versus Carib Consult is still subject to the Courts, and we trust in the Dominican justice and expect the courts will solve this case in a fair manner".

He emphasized that the Dominican Republic, as a country that is receptive to international investments, executed a convention with the United Nations to solve commercial disputes through arbitration.

He indicated that the commercial dispute involving Carib Consult and the American company El Paso/Coastal Corporation, which has significant interests in CEPP, was submitted to arbitration and the arbitration judge, after analyzing the evidence, rendered judgment in favor of the American company.

Hertell mentioned that he considers the Dominican courts have no competence to hear this dispute.

The CEPP itself has publicly stated that it has never dealt with Carib Consult and that the dispute arises from an old professional service agreement that Coastal Corporation executed with the company Nicor International Corporation, which agreement included a clause specifying that every dispute resulting from it would be submitted to the Court of Arbitration of the International Chamber of Commerce, with headquarters in Paris, constituted by a sole judge and through the application of the laws of the State of Texas, United States of America.
The company Nicor assigned rights and obligations to Carib Consults after the expiry of its agreement with Coastal.

The North American diplomat added, "The international community is paying attention to how this case will be solved".

PERITO
TRADUCTOR
OFICIAL
del H. Tribunal
Superior de Justicia del
Estado de N.L. México, para
INGLES-ESPAÑOL,
ESPAÑOL-INGLES
Aut. 414/2005
Vigencia 31 ENERO 2006
Tel. 8134 9431
LIC. ISABEL CRISTINA MAYA VELAZQUEZ

Hoy- Dominican Republic
Viernes 17 de Junio, 2005
Teme daño a inversión al desconocer sentencia



Hans Hertell

El embajador Hans Hertell advirtió ayer que el desconocimiento de la sentencia arbitral que favoreció en un conflicto legal al socio norteamericano de la Compañía de Electricidad de Puerto Plata (CEPP), "es una irritante" en la relación bilateral entre la República Dominicana y Estados Unidos, que podría afectar la inversión extranjera en territorio dominicano.

El diplomático se refirió al caso del conflicto planteado contra la CEPP y su socio, El Paso/Coastal Corporation, por parte de la firma dominicana Consultores de la Cuenca del Caribe (Carib Consult), que le hizo una demanda alegando daños y perjuicios.

La Cámara Civil y Comercial de la Corte de Apelación de Santo Domingo falló en favor de Carib Consult, casi un mes después que un tribunal arbitral de la Cámara de Comercio Internacional, ante el cual se había llevado también el caso, había fallado en favor de la empresa norteamericana.

"Esto tiene unas consecuencias que van a afectar la inversión extranjera aquí, porque estas compañías lo primero que hacen es ver cómo se respetan los contratos y las leyes en el país", dijo el embajador Hertell.

Agregó que "si hay una violación tan clara como esta, pues van a pensarlo dos veces antes de escoger a la República Dominicana como un lugar para invertir".

Indicó que "nosotros promovemos lo que se conoce como la rule of law, el imperio del derecho, y si no se acatan los tratados y las leyes, pues entonces nos revertimos a la jungla. Por eso hemos tratado de promover que se cumpla con las disposiciones de las leyes, y en este caso, un tratado es muy importante para la República Dominicana".

Hertell explicó que parte del trabajo de cualquier embajador es promover que se cumpla la justicia en el país en el que presta sus servicios. "

Usted nunca va a ver a un embajador tratando de fomentar o promover la violación de las leyes y los tratados", sostuvo.

Añadió que "nuestro trabajo también es proteger los intereses de las entidades jurídicas estadounidenses, y en este caso se ha cometido una gran injusticia, y vamos a tratar de manera que podamos proteger y promover que se respeten los derechos de esta empresa".

Sobre la base del fallo de la Cámara Civil y Comercial de la Corte de Apelación, la Carib Consult ha iniciado una serie de embargos de las cuentas de la CEPP que están afectando su operabilidad financiera, según lo ha expresado públicamente la empresa.

El embajador Hertell fue entrevistado ayer durante una visita a las instalaciones de la Compañía de Electricidad de Puerto Plata, donde fue recibido por Marcos Cochón, gerente de la empresa; Stephen de Monteverde, gerente de la planta y otros ejecutivos.

El diplomático se interesó por las operaciones de la planta generadora, que aporta 69 megavatios al sistema eléctrico interconectado.

Se le hizo una exposición con diapositivas en uno de los salones de reuniones de la empresa y luego se le hicieron explicaciones técnicas durante un recorrido por la planta. Dijo que tiene entendido que el caso de la CEPP con Carib Consult "todavía está sometido a los tribunales, y nosotros confiamos en la justicia dominicana y esperamos que los tribunales resuelvan esto de una manera justa".

Hizo hincapié en el hecho de que la República Dominicana, como país que es receptivo a la inversión internacional, suscribió una convención con las Naciones Unidas para resolver las disputas comerciales a través de un mecanismo de arbitraje.

Indicó que la disputa comercial que envuelve a Carib Consult y a la empresa norteamericana El Paso/ Coastal Corporation, que tiene importantes intereses en la CEPP, fue llevada a un arbitraje y el árbitro actuante, ante quien ambas partes sometieron evidencias y pruebas, falló en favor de la compañía estadounidense.

Hertell manifestó que tiene la apreciación de que las cortes dominicanas no tienen jurisdicción para conocer de la disputa.

La propia CEPP ha expuesto ante la opinión pública que nunca ha tenido tratos con la Carib Consult y que la disputa nace de un viejo contrato de servicios profesionales que la Coastal Corporation firmó con la empresa Nicor International Corporation, en el que se incluía una cláusula que especificaba que los conflictos surgidos de él serían dirimidos en un Tribunal Arbitral de la Cámara de Comercio Internacional, con sede en París, constituido por un solo juez y aplicando las leyes del Estado de Texas, Estados Unidos.

La Nicor le hizo un traspaso de derechos y obligaciones a Carib Consult tiempo después de vencido su contrato con la Coastal.

El diplomático norteamericano expresó que "la comunidad internacional está pendiente de ver cómo se resuelve este asunto".



# OVERSEAS PRIVATE INVESTMENT CORPORATION
### WASHINGTON, D.C. 20527, USA

OFFICE OF THE
PRESIDENT

March 11, 2002

His Excellency Hipolito Mejia
President of the Dominican Republic
C/o Embassy of the Dominican Republic
1715  22nd Street, NW
Washington, D.C. 20008

Dear President Mejia:

I believe you are aware OPIC has significant support of U.S. Foreign direct investment into the Dominican Republic. In this context, OPIC has a policy of not supporting additional investments where there are disputes that significantly effect the overall foreign direct investment climate in host countries.

Of particular concern to us at this time is the failure of the judiciary of the Dominican Republic to honor or enforce arbitration provisions in contracts or to recognize fully litigated international arbitration awards. In particular, it has come to my attention that Coastal Power Company, a subsidiary of El Paso Corporation, is awaiting currently recognition of such an award while it continues to litigate the same issues before the Dominican Republic courts. As I am sure you know, El Paso has been a significant investor in your country and is therefore deserving of even handed treatment.

OPIC has significant financial support of El Paso-related investments, and is concerned generally about the type of situation that El Paso is currently experiencing in the Dominican Republic. Accordingly, it is crucial that the current situation with El Paso be resolved prior to OPIC, in substance, proceeding with further Dominican Republic supported investment. I thank you for your personal and urgent attention to this matter. Meanwhile, please advise me if you have any questions.

Very truly yours,

Peter S. Watson
President & CEO