**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
EMPRESA GENERADORA DE ELECTRICIDAD :
ITABO, S.A. ("ITABO"),                           :
                                                   :
                      Plaintiff,                    :             05 Civ. 5004 (RMB)
                                                     :
         -against-                       :
                                                     :            **DECISION AND ORDER**
CORPORACIÓN DOMINICANA DE EMPRESAS :
ELÉCTRICAS ESTATALES ("CDEEE")            :
                                                     :
                     Defendant.                  :
---------------------------------------------------------------X

**I.     Introduction**

On or about May 26, 2005, Empresa Generadora de Electricidad ITABO, S.A. ("Plaintiff" or "ITABO") filed a complaint ("Complaint" or "Compl."), an Order to Show Cause, and a Memorandum of Law in Support of its Motion for Interim Relief in Aid of Arbitration ("Plaintiff's Motion" or "Pl. Mot.") against Corporación Dominicana de Empresas Eléctricas Estatales ("Defendant" or "CDEEE"). In the Complaint, Plaintiff seeks (i) "an order enjoining CDEEE from continuing with or pursuing other litigation in Dominican courts against ITABO," (ii) "a judgment declaring that the arbitrability of the disputes between ITABO and CDEEE is to be determined by the arbitrators," and (iii) "an order compelling CDEEE to submit to [the arbitration] all of its disputes with ITABO" pursuant to 9 U.S.C. § 206.[1] (Compl. at ¶ 8.) On or about May 26, 2005, the Court denied without prejudice ITABO's application for interim relief. (See Order to Show Cause, memo endorsed on May 26, 2005) On June 14, 2005, Defendant opposed Plaintiff's Motion. (See Defendant's Memorandum of Law in Opposition, dated June

---

[1] ITABO's motion seeks to compel arbitration and to enjoin CDEEE from continuing with or pursuing other litigation in Dominican courts against ITABO (i.e., an anti-suit injunction). (See Pl. Mot. at 16; Letter from Hanessian to the Court dated June 3, 2005.)

14, 2005 ("Def. Opp.").)  Plaintiff filed a reply on June 27, 2005.  (See Plaintiff's Reply Memorandum of Law, dated June 27, 2005 ("Pl. Rep.").  The Court heard oral argument on July 18, 2005.

**For the reasons set forth below, the Court denies ITABO's motion to compel arbitration and for an anti-suit injunction.**

**II.    Background**

The parties do not dispute the basic facts of this case.  CDEEE is a Dominican Republic company whose purpose is to "coordinate the electrical companies that remained public property after Corporación Dominicana de Electricidad ("CDE") [the former Dominican state electricity company] was privatized." (Declaration of Giselle Marie Leger, dated May 25, 2005 ("Leger Decl.") ¶ 2.)  CDEEE does not "own, lease or possess any real property or other assets in the United States," "maintain any bank or financial institution accounts in the United States," or "maintain or have any office for the conduct of business in the United States." (Supplemental Declaration of Henry Meran, dated June 13, 2005 ("Supp. Meran Decl.") ¶¶ 5-7.)  ITABO is a private company incorporated in the Dominican Republic in 1999 "to take on certain activities that had formerly been performed by CDE." (Leger Decl. ¶ 3.)  The Dominican Government "holds a 49.97% interest in ITABO, former CDE employees hold 0.03%, and foreign private investors hold the remaining 50%."[2] (Second Declaration of Giselle Marie Leger, dated June 1,

---

[2] The original foreign private investors in ITABO in 1999 were "Gener, SA ["Gener"] a Chilean company, and the Coastal Corporation ["Coastal"], a U.S. company." (Third Declaration of Giselle Marie Leger, dated June 27, 2005 ("3d Leger Decl.") ¶ 3.)  In 2001, the AES Corporation ("AES"), a publicly held company organized under Delaware law, purchased Gener's stake in ITABO.  (Id.)  AES "holds this interest through AES Gener S.A., a publicly held company (*sociedad anónima abierta*) in Chile."  (Id.)  In 2000, the El Paso Corporation ("El Paso"), a company organized under Delaware law, acquired Coastal's interest in ITABO.  (Id.)  New Caribbean Investment, S.A., a "Dominican *sociedad anónima* jointly owned by AES and El Paso", "operates ITABO pursuant to an Administration Agreement" executed in 1999. (Id.)

2005 ("2d Leger Decl.") ¶ 7.) ITABO's bylaws provide that "ITABO's board of directors consists of four representatives of the private shareholders and one representative of the Dominican state." (Leger Decl. ¶ 4.) Pursuant to several contracts (the "Basic Contracts") executed in 1999, "ITABO was to generate and supply electrical power to CDE and other electrical distribution companies that were created at the same time and by the same process as ITABO." (Id. ¶ 5.) In 2003, differences between CDEEE and ITABO arose, stemming from a rehabilitation project ("Rehabilitation Project") ITABO had undertaken at its main power plant located in the Dominican Republic. (Declaration of Javier Navarro-Velasco, dated May 25, 2005 ("Navarro-Velasco Decl.") ¶ 12.) CDEEE claims that ITABO "spent approximately $15.7 million more than necessary on the [Rehabilitation Project], and that these funds had been paid to affiliates and subsidiaries of ITABO's foreign shareholders." (Id.)

A.   **The Dominican Lawsuits**

On July 21, 2004, CDEEE brought two actions in the Dominican Republic against ITABO: (1) "an action for an accounting of the expenses ITABO incurred in connection with the Rehabilitation Project, in the First Chamber of the Civil and Commercial Court of First Instance for the National District" ("First Chamber Action"), (Declaration of Carlos Radhamés Cornielle, dated May 25, 2005 ("Cornielle Decl.") ¶ 4), seeking that (a) "ITABO's assets be seized if it failed to comply [with any order for an accounting]," (b) "the administrators of ITABO be held personally liable" if such order were not satisfied, (c) "the entire court order be enforceable immediately, regardless of any right of ITABO to appeal," and (d) attorneys' fees (id. ¶ 7); and (2) "an action for an accounting of the expenses incurred in connection with various matters concerning operations and administration of ITABO" before the Fifth Chamber of the Civil and Commercial Chamber of the Court of First Instance of the National District ("Fifth Chamber

3

Action"), (id. ¶ 4), seeking (a) "the imposition of sanctions on ITABO and certain officers of ITABO for noncompliance," (b) "the payment of money damages including punitive damages," and (c) payment of interest and attorneys' fees. (Id. ¶ 13.)

ITABO "refused to participate" on the merits in the First Chamber Action, "maintaining that the dispute between the parties should be arbitrated," pursuant to arbitration clauses in the Basic Contracts and ITABO's bylaws (collectively, "Arbitration Clauses"). (Id. ¶ 8.) The Dominican Court dismissed CDEEE's case on November 29, 2004 because, inter alia, "CDEEE had not submitted to the court the proofs necessary to substantiate its allegations." (Id.) CDEEE appealed the dismissal to the Civil and Commercial Chamber of the Court of Appeal of Santo Domingo ("Court of Appeal"), and ITABO appeared at oral argument on May 12, 2005 to argue that the Court of Appeal did not have jurisdiction because the dispute between the parties had to be arbitrated. (Id. ¶ 9.) The Court of Appeal "reserved judgment on ITABO's argument that the matter should be resolved in arbitration, and ordered that the parties be heard on the merits" on May 27, 2005. (Id.) On May 27, 2005, the Court of Appeal denied ITABO's request for a stay of "proceedings concerning the merits" before the First Chamber Action pending a determination of ITABO's jurisdictional objection, and ordered ITABO to "make a presentation on the merits." (Second Declaration of Carlos Radhamés Cornielle, dated June 2, 2005 ("2nd Cornielle Decl.") ¶ 6.) When ITABO submitted no evidence, "the Court of Appeal entered an order finding ITABO in default on the merits" and ordered the parties to brief the merits and the jurisdictional issue by July 18, 2005. (Id. ¶ 7.) ITABO's submission "is limited to the issue of whether the court may hear the matter; CDEEE may submit papers regarding the merits of the dispute as well as the arbitrability question." (Letter from Hanessian to this Court dated June 3, 2005; 2d Cornielle Decl. ¶ 7.)

4

ITABO also "refused to participate" on the merits in the Fifth Chamber Action, asserting the same jurisdictional objection at a hearing on May 30, 2005. (Cornielle Decl. ¶¶ 14-15.) The Fifth Chamber allowed the parties to brief the jurisdictional issue, and memoranda of law were submitted on April 14, 2005. The matter is pending before the Fifth Chamber. (2d Cornielle Decl. ¶ 10.)

**B.     The New York Arbitration**

ITABO contends that the Arbitration Clauses "call[] for arbitration of all disputes between the parties under New York law under the Rules of the International Chamber of Commerce ("ICC")." (Leger Decl. ¶ 6.) CDEEE responds that "not all disputes between ITABO shareholders are subject to arbitration." (Def. Opp. at 6.)

Article 58 of ITABO's bylaws provides that the parties "must resort to arbitration" where (a) "deliberations of [shareholders' meetings] result in a tie that cannot be resolved by mutual agreement," or (b) there is "a dispute among shareholders or between one or more of them and the Corporation or within the Board of Directors concerning the interpretation and application of these Bylaws." (Declaration of Lee Penya, dated June 10, 2005 ("Penya Decl.") at 2.)[3] Article 58 also provides that "[i]n the event that the Dominican Republic should ratify the New York Convention [on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention")]. . . the parties accept to settle their disputes via international arbitration" and pursuant to ICC rules. (See Ex. 2B to letter from Hanessian to this Court dated June 14, 2005.) The Dominican Republic ratified the New York Convention on November 8, 2001. (Navarro-Velasco Decl. ¶ 11.)

---

[3] Under Article 58, the shareholders "irrevocably waive their right to recur to the ordinary courts or those of exception to request the opinion of the Court . . . with respect to any matter of law that may arise in the course of the arbitration or with respect to the decision taken by the arbiters." (See Ex. 2B to letter from Hanessian to this Court dated June 14, 2005.)

One of the Basic Contracts, i.e., the Stock Subscription Agreement, provides that "[a]ny dispute that may arise from or be related to this Contract and that is not resolved by mutual agreement of the parties in conflict, must be resolved ay the request of any of the parties, via arbitration." (See Ex. A to letter from Hanessian to the Court dated July 1, 2005, at Art. 12.3(a).) Article 12.3 also provides that "[i]n the event that the Dominican Republic should ratify the New York Convention . . . the parties accept to settle their disputes via international arbitration" pursuant to ICC rules. (Id. at Art. 12.3(k).)[4]

On February 8, 2005, ITABO commenced an ICC arbitration against CDEEE and Fondo Patrimonial de las Empresas Reformadas / Fondo Patrimonial para el Desarollo ("FONPER") in New York before the ICC Secretariat.[5] (Navarro-Velasco Decl. ¶ 15) In the arbitration, ITABO seeks:

> (1) a declaration that (a) the Basic Contracts are valid and effective and (b) CDEEE violated the Basic Contracts by initiating and proceeding with judicial and extrajudicial proceedings before the courts of the Dominican Republic; (2) an order enjoining CDEEE and FONPER from initiating or proceeding with any judicial or extrajudicial action in the Dominican Republic against ITABO inconsistent with the Basic Contracts; (3) a declaration that all ITABO shareholders must comply with the bylaws of ITABO and with the Basic Contracts in raising any questions concerning the management or administration of ITABO; [and damages, costs, and attorneys' fees.]

---

[4] CDEEE argues that "only two of [the Basic Contracts] have any application to CDEEE – the Stock Subscription and the Agreement on the Assignment of Generation Rights (Contract Granting Rights for the Exploitation of Electrical Works) ["Assignment of Generation Rights"]." (Def. Opp. at 7.) ITABO appears primarily to rely upon the arbitration clause in the Stock Subscription Agreement. (See Navarro-Velasco Decl. ¶ 7. The Assignment of Generation Rights provides that "[a]ny dispute that may arise from or with respect to this Contract . . . must be resolved at the request of any of the Parties, via arbitration . . . . The parties waive from now and forever the submission of any litigation to any court of the judicial or international order. . ." (See Ex. D to letter from Hanessian to this Court dated July 1, 2005 at Art. 9.)

[5] FONPER is a state-owned entity "created to hold, manage and maintain the Dominican Government's interest in new private entities such as ITABO." (Navarro-Velasco Decl. ¶ 6.)

6

(Id. ¶ 23.)  CDEEE answered ITABO's demand for arbitration on April 23, 2005, and objected to the arbitration on the grounds that "it has a right to an accounting, . . . which right does not fall within the arbitration clause[s]" found in the Basic Contracts or in ITABO's bylaws.  (Id. ¶ 26.)

On June 10, 2005, the ICC confirmed the appointment of two co-arbitrators and "invite[d] the co-arbitrators to jointly select the Chairman of the Tribunal." (Second Declaration of Javier Navarro-Velasco, dated June 27, 2005 ("2d Navarro-Velasco Decl.") ¶ 4.)  On June 13, 2005, the co-arbitrators sent a letter to the ICC "declin[ing] the invitation of the parties and the ICC to nominate the Chairman of the tribunal and … defer[ring] such appointment to the ICC." (Id. ¶ 5.)  On June 15, 2005, ITABO filed a motion with the ICC requesting, among other things, (i) "[t]hat CDEEE be directed to suspend and discontinue judicial proceedings initiated before the Courts of Dominican Republic," and (ii) "[a]n order preventing CDEEE from claiming any monetary remedy or attachment or repossession of assets under ITABO's control and enforcing any judgment whether definitive or interlocutory obtain [sic] from the Courts of Dominican Republic in regard to the above matters." (Id. ¶ 6.)  On June 17, 2005, ITABO sent a letter to the ICC "requesting [the ICC] to expedite the appointment of the Chairman of the Tribunal."  (Id. ¶ 8.)  As of this date, the ICC Secretariat awaits the nomination of the Chairman of the arbitral tribunal by the ICC Court of Arbitration.

**III.    Legal Standard(s)**

**A.    Subject Matter Jurisdiction**

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et. seq., a "'foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' unless one of several statutorily defined exceptions applies."  Republic of Arg. v.

Weltover, 504 U.S. 607, 611 (1992) (citing 28 U.S.C. § 1604).[6] One such exception relates to the enforcement of:

> an agreement made by a foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States . . . if (A) the arbitration takes place or is intended to take place in the United States, [or] (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards. . .

28 U.S.C. § 1605(a)(6); see Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1017 (2d Cir. 1993). A federal court may also exercise subject matter jurisdiction where "the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1); see Robinson v. Gov't of Malay, 269 F.3d 133, 148 (2d Cir. 2001).

**B.      Personal Jurisdiction**

Generally, "subject matter jurisdiction plus service of process equals personal jurisdiction" under the FSIA. Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981). "The exercise of personal jurisdiction under the FSIA must also comport with the Due Process Clause . . . which permits a forum to exercise personal jurisdiction over a non-resident defendant who has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." U.S. Titan, 241 F.3d at 152 (internal citations omitted); Calder v. Jones, 465 U.S. 783, 788 (1984); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

---

[6] A "foreign state" "'includes . . . an agency or instrumentality of a foreign state,' which, in turn, is defined to include 'any entity . . . which is a separate legal person, corporate or otherwise, and . . . a majority of whose shares or other ownership interest is owned by a foreign state.'" U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 150 n.10 (2d Cir. 2001) (citing 28 U.S.C. § 1603(a), (b)).

**C.    Motion to Compel Arbitration**

"The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ["FAA"], establishes a liberal policy in favor of arbitration . . . ." Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 665 (2d Cir. 1997). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "Under the FAA, the role of the courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate." Jacobs v. USA Track & Field, 374 F.3d 85, 88 (2d Cir. 2004) (internal quotation marks omitted). Parties to an arbitration agreement "may provide that the arbitrator, not the court, shall determine whether an issue is arbitrable," Painewebber, Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996), but only if "there is 'clear and unmistakable' evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." Id. at 1198-99 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

A party refuses to arbitrate if it "commences litigation or is ordered to arbitrate the dispute and fails to do so." Id. at 89 (quoting Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 725 F.2d 192, 195 (2d Cir. 1984)).

**D.    Anti-Suit Injunction**

Injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." Med. Soc'y of the State of N.Y. v. Toia, 560 F.2d 535, 538 (2d Cir. 1977). Where necessary to prevent irreparable harm, "a federal court may enjoin a party before it from pursuing litigation in a foreign foum." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004).

9

Irreparable harm is injury that "is likely and imminent, not remote or speculative, and . . . is not capable of being fully remedied by money damages." NAACP, Inc. v. Town of E. Haven, 70 F.3d 219, 224 (2d Cir. 1995). The movant is required to establish not a mere possibility of irreparable harm, but that it is "likely to suffer irreparable harm if equitable relief is denied." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).

An anti-suit injunction "may be imposed only if: (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987). When these threshold requirements are met, courts consider five suggested factors in determining whether the foregoing action should be enjoined:

> (1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment.

Am. Home Assurance Corp. v. Ins. Corp. of Ireland, Ltd., 603 F. Supp. 636, 643 (S.D.N.Y. 1984). "[P]rinciples of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'" Paramedics Electromedicina, 369 F.3d at 652 (citing China Trade, 837 F. 2d at 35)).

**IV.     Analysis**

**A.     Subject Matter Jurisdiction**

CDEEE argues that this Court does not have subject matter jurisdiction over the instant case because FSIA § 1605(a)(6) does not apply to the underlying dispute between CDEEE and ITABO. CDEEE contends that "a complete and careful reading of the applicable provisions of the ITABO Bylaws and [the Basic Contracts] … makes clear that (1) not all disputes between

10

ITABO shareholders are subject to arbitration, and (2) none of the documents … establish an agreement by CDEEE to proceed by arbitration in its request for an accounting." (Def. Opp. at 6.) ITABO argues that the § 1605(a)(6) exception to sovereign immunity applies because "the parties' disputes are within the arbitration clauses of the Basic Contracts and the Bylaws." (Pl. Rep. at 5, 10)  ITABO also argues that CDEEE has contractually agreed in the Basic Contracts:

> unconditionally and irrevocably, that . . . if an action (including an arbitral action) is initiated against it or its assets, in relation to this contract [the Stock Subscription Agreement] or any other transaction contemplated in [the Stock Subscription Agreement], [CDEEE] will not claim immunity from the actions, in whole or in part.

(See Ex. A to letter from Hanessian to the Court, dated July 1, 2005, at Art. 13.3; 3d Leger Decl. ¶ 7.)

As a preliminary matter, "[i]t is doubtful that a petition to compel filed before the 'adverse' party has refused arbitration would present an Article III court with a justiciable case or controversy in the first instance." Phoenix Aktiengesellschaft v. Ecoplas, Inc., 391 F.3d 433, 437 (2d Cir. 2004) (citing Painewebber Inc. v. Faragalli, 61 F.3d 1063, 1067 (3d Cir. 1995)); see also Hartford Accident & Indem. Co. v. Equitas Reins, Ltd., 200 F. Supp. 2d 102, 208 (D. Conn. 2002) ("If the adverse party has not refused to arbitrate . . . there is no reason for court involvement in the first place.").

Next, the issue of whether CDEEE's accounting claim(s) is arbitrable should, in the Court's view, be decided by the arbitrators.  That is, questions regarding the "existence, validity or scope of the arbitration agreement . . . shall be taken by the Arbitral Tribunal itself." (ICC Rules of Arbitration dated Jan. 1, 1998 ("ICC Rules"), at Art. 6(2); Pl. Mot. at 12); see also (ICC Rules at Art. 6(2)); Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 118 (2d Cir. 2003) ("[B]ecause the rules of [the ICC] expressly provide for the International Court of Arbitration

("ICA") to resolve in the first instance any disputes about its own jurisdiction, we conclude that the arbitrability of [plaintiff's] claim . . . was a question for the arbitrator rather than the court."); Fraternity Fund, Ltd. v. Beacon Hill Asset Mgmt., L.L.C., No. 03 Civ. 2387, 2005 U.S. Dist. LEXIS 10834, at *8 (S.D.N.Y. June 7, 2005) (questions of arbitrability reserved to the arbitrators where the parties "incorporated the rules of the International Chamber of Commerce, which empower the arbitrator to decide questions of arbitrability"); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp., 88 F.3d 129, 135 (2d Cir. 1996) (citing First Options, 514 U.S. at 945).

And, the Court need not decide whether the § 1605(a)(6) exception applies here, because subject matter jurisdiction would exist under § 1605(a)(1). That is, CDEEE appears to have waived immunity for actions "initiated . . . in relation to" the Basic Contracts. (See Complaint at ¶¶ 15, 32); Wasserstein Perella Emerging Mkts. Fin. L.P. v. Province of Formosa, No. 97 Civ. 793, 2000 U.S. Dist. LEXIS 6416, at *13 (S.D.N.Y. May 11, 2000) ("Explicit waiver [of immunity] is generally found when the contract language itself clearly and unambiguously states that the parties intended waiver").

**B.**     **Personal Jurisdiction**

CDEEE argues that "the requisite minimum contacts are lacking and any exercise of personal jurisdiction would be in violation of the Due Process Clause." (Def. Opp. at 13.) ITABO responds that "an agreement to arbitrate in a particular forum constitutes consent to personal jurisdiction in the courts of that forum." (Pl. Rep. at 11.)

There is no (serious) dispute that service of process has been effected and, as noted, "subject matter jurisdiction plus service of process equals personal jurisdiction" under the FSIA. Texas Trading, 647 F.2d at 308. The FSIA also provides that "[p]ersonal jurisdiction over a

foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); see also U.S. Titan, 241 F.3d at 151-52; Bowers v. Transportes Navieros Ecuadorianos, 719 F. Supp. 166, 169 (S.D.N.Y. 1989).[7]

**C.     Motion to Compel Arbitration**

ITABO argues that CDEEE should be compelled to arbitrate its claims because "CDEEE has failed to assert in the New York Arbitration the claims it asserts in the two Dominican actions." (Letter from Hanessian to the Court, dated June 3, 2005.)  CDEEE argues that it "has not refused to arbitrate" because it "filed an answer [with the arbitral tribunal]… in which it objects to the arbitration."  (Def. Opp. at 16.)  CDEEE contends that this "challenge to the arbitration is not a refusal to arbitrate and an order to compel CDEEE to submit to arbitration will not change CDEEE's course of conduct."  (Id. at 16.)

A party may seek to compel arbitration "only when the respondent unequivocally refuses to arbitrate, either by failing to comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to arbitrate the subject matter of the dispute." Faragalli, 61 F.3d at 1066.  A challenge to arbitrability "does not constitute a 'refusal to arbitrate' on the part of respondents." Jacobs, 374 F.3d at 89.  In Laif X Sprl v. Axtel, S.A. de C.V., 390 F.3d 194 (2d Cir 2004), plaintiff sought to compel defendant to arbitrate claims raising issues over which defendant had already filed suit in Mexico. Id. at 198.  Defendant answered plaintiff's demand for arbitration and "requested that [the arbitral tribunal] dismiss the arbitration for lack of an arbitrable dispute."  Id.  Plaintiff complained that the Mexican court might

---

[7] And, "agreements to arbitrate in a particular forum have been held to constitute consent to personal jurisdiction in the courts of that forum." Merrill Lynch v. Shaddock, 822 F. Supp. 125, 128 (S.D.N.Y. 1993); Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd., 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988).

determine the scope of arbitrability "before the [arbitral tribunal] has an opportunity to rule on the issue." Id. at 199. The Court found that defendant's Mexican lawsuit did not constitute a refusal to arbitrate because the defendant had actively participated in the arbitration and, "without an attendant refusal to arbitrate," defendant's preference "not to arbitrate [the issues also before the Mexican court] . . . does not matter." Id.

Similarly, CDEEE has not refused to arbitrate. It has participated in the arbitration while, at the same time, challenging the scope of arbitrability in its answer to the ICC.[8] (See Navarro-Velasco Decl. ¶¶ 19, 24-26); see also Laif X, 390 F.3d at 198-99; Jacobs, 374 F.3d at 89. **ITABO's recourse is to pursue vigorously its claims in the arbitral tribunal.**

**D.     Anti-Suit Injunction**

ITABO argues that it is likely to suffer irreparable harm in the absence of an anti-suit injunction if the Dominican court orders an accounting. (Pl. Rep. at 5.) ITABO contends that if it does not comply with such order, "one of the primary remedies that CDEEE seeks in the First Chamber Action and Fifth Chamber Action is an order authorizing CDEEE to seize ITABO's assets," (Pl. Mot. at 10), but that if it does comply with such an order, ITABO faces the "loss of its arbitration." (Pl. Rep. at 5.) CDEEE responds that "if an order is entered requiring ITABO to provide an accounting and ITABO complies with the court order, ITABO will not be deprived of its assets and no irreparable harm will result." (Def. Opp. at 14.)

ITABO has not met its "heavy burden" of establishing irreparable harm. Subaru Distribs. Corp. v. Subaru of Am., Inc., 47 F. Supp. 2d 451, 460 (S.D.N.Y. 1999). First, ITABO waited nearly ten months after CDEEE initiated the Dominican lawsuits, and over three months after making its own demand for arbitration before the ICC, before seeking relief in this Court. See

---

[8] ITABO has participated in the Dominican lawsuits by challenging the jurisdiction of the Dominican courts. (See Cornielle Decl. ¶¶ 8, 14; 2d Cornielle Decl. ¶¶ 3, 5, 7, 10.)

Tough Traveler v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) ("any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."); Plessey Co. PLC v. Gen. Elec. Co. PLC, 628 F. Supp. 477, 500 (D. Del. 1986) ("The element of urgency becomes questionable when such a delay exists.").

Second, any harm to ITABO is speculative at this point. Neither Dominican court has awarded the relief sought by CDEEE or directed the outcome(s) of which ITABO complains. See New Line Int'l Releasing, Inc. v. Ivex Films, S.A., 140 B.R. 342, at *12 (S.D.N.Y. 1992) (argument that a foreign court "may " refuse to exercise jurisdiction "is merely conjectural. As yet there is no indication that the [foreign court] will take this action."); Garpeg, Ltd. v. Chase Manhattan Bank, N.A., 583 F. Supp. 789, 797 (S.D.N.Y. 1984) ("claims of irreparable harm are somewhat speculative" where the foreign court "has not yet finally adjudicated" all of the relevant claims.).

Nor has ITABO established that it will lose its arbitration rights even if it were to comply with some (future) Dominican court order. (See Ex. A to letter from Hanessian to the Court dated July 1, 2005, at Arts. 12.3 & 58.) Indeed, waiver of arbitration right is itself generally "a matter to be decided by the arbitrator." Bell v. Cendant Corp., 293 F.3d 563, 569 (2d Cir. 2002). It is far from clear – perhaps even unlikely – that the arbitrators, applying New York law, would find that ITABO had waived its right to arbitrate by complying with a Dominican court order. See Cotton v. Slone, 4 F.3d 176, 179 (2d Cir. 1993) ("there is a strong presumption in favor of arbitration and that waiver of the right to arbitration is not to be lightly inferred."); Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812, Int'l Brotherhood of Teamsters, 242 F.3d 52, 58 (2d Cir. 2001) ("those cases in which we have found a waiver have

involved substantially more protracted involvement in litigation . . . often with the party charged with waiver delaying until the very last opportunity or even until it has lost on the merits.").

Because Plaintiff has "failed to establish that [it] would suffer irreparable harm in the absence of an injunction, there is no need to reach the second portion [whether ITABO is likely to succeed on the merits or there are serious questions going to the merits of the case and the balance of hardship tips in ITABO's favor] of the preliminary injunction analysis." Jayaraj v. Scappini, 66 F.3d 36, 38-39 (2d Cir. 1995); see Green Party v. N.Y. State Bd. of Elecs., 389 F.3d 411, 424 (2d Cir. 2004).

Even assuming arguendo that Plaintiff showed irreparable harm, an anti-suit injunction might be inappropriate because "[p]rinciples of comity weigh heavily in the decision to impose a foreign anti-suit injunction." Paramedics Electromedicina, 369 F.3d at 654-55; see also Laker Airways Ltd. v. Sabena, 731 F.2d 909, 928 n.53 (D.C. Cir. 1984)). CDEEE's suits in the Dominican Republic do not appear "materially [to be] delaying, or even directly interfering with, the ongoing arbitration, for both are proceeding simultaneously." Id. "Parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other," Laker Airways, 731 F.2d at 926-27 (citing Colorado River Water Conservation District v. United States, 424 U.S. 800, 817 (1976)); MasterCard Int'l, Inc. v. Argencard Sociedad Anonima, No. 01 Civ. 3027, 2002 U.S. Dist. LEXIS 4625, at *30 (S.D.N.Y. Mar. 20, 2002); see also Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 537 (1883). "The possibility of an 'embarrassing race to judgment' or potentially inconsistent adjudications does not outweigh the respect and deference owed to independent foreign proceedings." Laker Airways, 731 F.2d at 928-29.

V.  **Conclusion and Order**

For the reasons stated above, Plaintiff's motion to compel arbitration and to enjoin Defendant from pursuing litigation against ITABO in the Dominican courts is denied.

Dated: New York, New York
       July 18, 2005

*RMB*

_____
Richard M. Berman, U.S.D.J.